Jeffrey F. Keller, Esq. (Bar No. 148005)
    jfkeller@kellergrover.com
Kathleen R. Scanlan, Esq. (Bar No. 197529)
    kscanlan@kellergrover.com
**KELLER GROVER LLP**
1965 Market Street
San Francisco, CA 94103
Telephone: (415) 543-1305
Facsimile: (415) 543-7861

Attorneys for Relator
JULIE A. MACIAS

FILED
CLERK, U.S. DISTRICT COURT

FEB - 3 201

ORIGINAL

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

CASE NO. ___ CV12-00960 RSWL (SHx)

UNITED STATES OF AMERICA,
*ex rel.* JULIE A. MACIAS

      Plaintiff,

      v.

PACIFIC HEALTH CORPORATION, a Georgia corporation; and LOS ANGELES DOCTORS HOSPITAL CORPORATION, a California corporation and SGG, INC., a California corporation

      Defendants.

**FILED *IN CAMERA* AND UNDER SEAL**

**COMPLAINT**

**JURY TRIAL DEMANDED**

PAID
FFB - 3 2012
Clerk, US District Court
COURT 4612

DOCKETED ON CM
FEB - 3 2012
BY _____ 200

Jeffrey F. Keller, Esq. (Bar No. 148005)
  jfkeller@kellergrover.com
Kathleen R. Scanlan, Esq. (Bar No. 197529)
  kscanlan@kellergrover.com
**KELLER GROVER LLP**
1965 Market Street
San Francisco, CA  94103
Telephone:  (415) 543-1305
Facsimile:  (415) 543-7861

Attorneys for Relator
JULIE A. MACIAS

FILED
CLERK U.S. DISTRICT COURT

FEB - 3 2012

CENTRAL DISTRICT OF CALIFORNIA
BY            DEPUTY

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,
*ex rel.* JULIE A. MACIAS

       Plaintiff,

   v.

PACIFIC HEALTH CORPORATION, a
Georgia corporation; and LOS
ANGELES DOCTORS HOSPITAL
CORPORATION, a California
corporation and SGG, INC., a California
corporation

      Defendants.

CASE NO: CV12- 00960 RSWL (SHx)

**FILED *IN CAMERA* AND UNDER SEAL**

**COMPLAINT**

JURY TRIAL DEMANDED

DOCKETED ON CM

FEB - 3 2012

BY            200

1       Plaintiff/Relator Julie A. Macias ("Macias") brings this *qui tam* action as
2 Relator on behalf of the United States against Defendants under the False Claims
3 Act, 31 U.S.C. §§ 3729-3733, and in her own name to obtain the relief needed to
4 make her whole from the damages she suffered from violations of 31 U.S.C.
5 §3130(h). She is an "original source" of the information on which the allegations
6 contained herein are based as that term is defined in 31 U.S.C. §3730(e)(4). She
7 alleges – upon knowledge with respect to her own acts and those she personally
8 witnessed, and upon information and belief with respect to all other matters as
9 follows:

10    **INTRODUCTION**

11     1.    This is an action to recover damages and civil penalties on behalf of
12 the United State of America arising from false statements and claims made or
13 caused to be made by the Defendants to the United States and its agents in violation
14 of the False Claims Act, 31 U.S.C. § 3729 et seq. (the "Act").

15     2.    The false claims and statements at issue were made or caused to be
16 made by the Defendants in connection with kickbacks and claims for payments
17 made for psychiatric services in Los Angeles County beginning not later than 2004,
18 and continuing through the date of the filing of this complaint.

19    **JURISDICTION AND VENUE**

20     3.    The Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331
21 and 31 U.S.C. §3732.

22     4.    The Court has personal jurisdiction over the Defendants pursuant to 31
23 U.S.C. §3732(a) because Defendants can be found in and transact the business that
24 is the subject matter of this lawsuit in the Central District of California.

25     5.    Venue is proper in this district pursuant to 31 U.S.C. §3732(a) because
26 the acts complained of herein occurred in Los Angeles County, within the Central
27 District of California, and Defendants transact the business that is the subject matter
28 of this lawsuit in this district.

## THE PARTIES

6.     Relator Julie A. Macias is a citizen of the United States and a resident of California.  She is employed at Los Angeles Metropolitan Medical Center as a Registered Nurse ("RN") on the Psychiatric Emergency Team ("PET").

7.     Defendant PACIFIC HEALTH CORPORATION ("PHC") is, and at all times relevant was, a corporation organized and existing under the laws of the State of Georgia with its principal place of business in Tustin, California.  PHC owns and operates, directly and indirectly, numerous hospitals in Los Angeles and Orange Counties.

8.     Defendant LOS ANGELES DOCTORS HOSPITAL CORPORATION ("DOCTORS HOSPITAL") is, and, at all relevant times, was, a corporation organized and existing under the laws of the State of California with its principal place of business in Los Angeles, California.  It is a subsidiary of PHC and owns and operates Los Angeles Metropolitan Medical Center ("LAMMC") at 2231 Western Avenue, in Los Angeles County, also commonly known as "LA Metro" or "Western Campus" as well as a campus in Hawthorne, California commonly known as the "Hawthorne Campus."

9.     PACIFIC   HEALTH   CORPORATION   and   LOS   ANGELES DOCTORS HOSPITAL CORPORATION are herein collectively referred to as the "Hospital" or "Hospitals."

10.     Defendant SGG, INC. ("SGG") is a corporation organized and existing under the laws of the State of California with its principal place of business in San Marino, California.  SGG is corporation engaged in the health services industry, including in hospital marketing.

11.     At all times relevant hereto, each Defendant was acting as an agent, representative, partner, joint venture, co-schemer, or co-conspirator of the other Defendant, and in committing wrongful acts and omissions alleged herein, was

1  acting within the scope of that agency, representation, partnership, joint venture,
2  scheme or conspiracy.

3  ## THE MEDICARE AND MEDI-CAL PROGRAMS

4  ### The Medicare Program

5  12. Medicare is a health care benefit program funded by the federal
6  government. The Medicare program compensates participating doctors, hospitals
7  and other health care providers who furnish health care services to citizens of the
8  United States (and certain other legal residents) who have reached the age of 65 or
9  who suffer from certain qualifying disabilities. The Medicare program was
10 established by Title XVIII of the Social Security Act of 1965 (codified as amended
11 at 42 U.S.C. §1395 *et. seq.*).

12 13. The agency of the United States responsible for the Medicare program
13 is the United States Department of Health and Human Services ("HHS"). *See e.g.*
14 42 U.S.C. §§1395b-1, 1395b-2, 1395b-3, 1395b-4, 1395b-7, 1395r and 1395u. The
15 agency within HHS administering the program is the Centers for Medicare and
16 Medicaid Services which prior to July 1, 2001, was known as the Health Care
17 Financing Administration. Notice, 66 Fed. Reg. 35437 (2001).

18 14. Physicians, hospitals and ambulance companies (and certain other
19 health care providers) who meet the requirements for participation in the Medicare
20 program may receive compensation for health care services furnished to patients
21 eligible for benefits that are reasonable and necessary for the treatment of the
22 patient. In particular, the law provides in relevant part that:

23  Notwithstanding any other provision of this title, no payment may be
24  made under [Medicare] part A or part B for any expenses incurred for
     items or services … [¶] which … are not reasonable and necessary for
25  the diagnosis or treatment of illness or injury…

26 42 U.S.C. §1395Y(a)(1)(A).

27 15. When electing to participate in the Medicare program, the provider
28 enters into a contract with HHS-CMS in which the provider agrees to conform to all

applicable statutory and regulatory provisions relating to Medicare reimbursement, including the provisions of Section 1866 of the Social Security Act and Title 42 of the Code of Federal Regulations.

16.    The United States administers the hospital insurance benefits program for the aged and disabled, commonly referred to as "Medicare Part A." 42 U.S.C. §§1395c – 1395i-5. Medicare Part A "provides basic protection against the costs of hospital, related post-hospital, home health services, and hospice care." 42 U.S.C. §1395c. Benefits include services provided by psychiatric hospitals. 42 U.S.C. §1395d(c).

17.    Acute care hospital inpatient stays are paid under Medicare Part A (Hospital Insurance) based on a payment system under which each case is categorized into a diagnosis-related group ("DRG").

18.    Participating hospitals also receive a portion of their Part A reimbursement through a second mechanism called a cost report, which is submitted annually by the hospital and used to calculate and reimburse the facility's costs associated with services to Medicare patients. Hospitals are required to submit to the Medicare contractor annual cost reports detailing the costs the hospital claims it incurred in providing services and supplies to Medicare beneficiaries. Hospitals are required by Medicare to sign the cost report under penalty of perjury and to maintain all documentation supporting the costs set forth on each annual report for three years after the report is reviewed by the Medicare contractor.

19.    Medicare Part B (Medical Insurance) provides reimbursement for physician services, outpatient care and certain other medical services that Medicare Part A does not cover.

20.    Medicare provides reimbursement for physician services based on a fee schedule. Medicare reimburses 80% of the "allowed amount" on covered claims. The remaining 20%, the co-payment, may be covered by a patient's secondary insurance plan, by Medi-Cal, or by the patient themselves.

21.    Federal regulations require hospitals to maintain medical records that are accurately written, promptly completed, properly filed and retained, and accessible. Hospitals must use a system of author identification and record maintenance that ensures the integrity of the authentication and protects the security of all record entries. Hospitals must retain their medical records in their original or legally reproduced form for at least five years for each inpatient.

### The Medi-Cal Program

22.    Medicaid is a health care benefit program funded jointly by the federal government and by the states. Medi-Cal is the name used by the Medicaid program operating in the State of California. The Medi-Cal program compensates participating doctors, hospitals and other health care providers who furnish health care services to legal residents of California who meet certain poverty and other eligibility criteria. Medi-Cal operates under the supervision of the California Department of Health Care Services.

23.    The Medi-Cal program only provides compensation for those health care services "which are reasonable and necessary to protect life, to prevent significant illness or significant disability, or to alleviate severe pain through the diagnosis or treatment of disease, illness or injury…." 22 CCR §51303(a).

24.    Under the Medi-Cal program, "[i]npatient services in hospitals are covered only when provided on the signed order of the physician … responsible for the care of the patient." 22 CCR §51303(d).

25.    Ambulance services are only covered under the Medi-Cal program "when the beneficiary's medical and physical condition is such that transport by ordinary means of public or private conveyance is medically contraindicated, and transportation is required for the purpose of obtaining needed medical care." 22 CCR §51323(a).

26.    The Medi-Cal program requires that "[e]ach provider shall keep, maintain, and have readily retrievable such records as are necessary to fully disclose

the type and extent of services provided to a Medi-Cal beneficiary," and that "[s]uch records shall include, but not be limited to… (2) Treatment authorization requests (3) All medical records, service reports, and orders prescribing treatment plans … (7) identification of the person rendering services." 22 CCR §51476(a).

27.    Medicare and Medi-Cal both provide for reimbursement of costs and services associated with psychiatric holds, including those being used by the Defendants as part of the unlawful Psych Hold scheme described below.

## THE APPLICABLE LAWS

### The False Claims Act

28.    The federal False Claims Act (the "FCA") was originally enacted during the Civil War, and was substantially amended in 1986 and again in 2009. Both series of amendments were enacted by Congress in order to enhance the Government's ability to recover losses sustained as a result of fraud against the United States, after finding that fraud in federal programs was pervasive and that the FCA was in need of modernization in order to more effectively combat such fraud. Congress has characterized the FCA as the primary tool for combating fraud against the Government.

29.    The liability provisions of the FCA provide that any person who knowingly submits, or causes the submission of, a false or fraudulent claim for United States funds for payment or approval, or who makes or causes to be made false records and statements in support of such claims, is liable for a civil penalty of up to $11,000 for each such claim, plus three times the amount of damages sustained by the Government.

30.    The "qui tam" provisions of the FCA allow any person having information about violations of the liability provisions of the Act to bring an action for herself and the Government, and to share in any recovery.

31.    Under 31 U.S.C. §3730, a *qui tam* complaint is to be filed *in camera* and remains under seal for a period of at least sixty (60) days after the United States

1  receives both the complaint and the material evidence and information (without
2  service on the defendant during that time) to allow the Government time to conduct
3  its own investigation and to determine whether to join the suit. That time may be
4  extended by order of the Court.

5      32.    The statute of limitations for violations under the federal FCA is at
6  least six years from the date of the violation and as long as ten years after such
7  violation, provided that, for claims over six years old, United States government
8  officials charged with responsibility to act under the circumstances were not on
9  actual or constructive notice of such older violations sued upon for more than three
10 years before the claims were brought regarding these older violations. Separate
11 limitations periods run with respect to each distinct false claim made (or other
12 substantive False Claims Act violation).

13     33.    To Relator's knowledge, no federal government official of any kind
14 was on actual or constructive notice of any of the misconduct currently alleged in
15 this Complaint before Relator brought these matters to their attention. The period
16 of time alleged to be relevant to the claims raised in this Complaint is thus at least
17 the six-year period, and presumptively the 10 year period immediately prior to the
18 filing of Relator's original complaint in this action.

19                    **Anti-Kickback Statute**

20     34.    At its core, the Anti-Kickback Statute prohibits pay-for-patient referral
21 schemes. However, the statute is much broader, reaching schemes where only "one
22 purpose of the payment was to induce further referrals, even if the payments were
23 also intended to compensate for professional services." *United States v. Kats*, 871
24 F.2d 105, 108 (9th Cir. 1989). As long as one of the purposes of the offer or
25 payment is to induce Medicare or Medicaid patient referrals, it violates the Anti-
26 Kickback Statute.

27     35.    "The anti-kickback statute was originally enacted in 1972 to reduce
28 unnecessary governmental health care expenditures and control inappropriate

1  utilization. The original statute made it a misdemeanor for anyone to solicit,
2  receive, offer, or pay a kickback, bribe, or rebate in connection with the provision
3  of items or services for which payment may be made under Medicare or Medicaid."
4  *See*, Aspinwall, Timothy J., *The Anti-Kickback Statute Standards of Intent: The*
5  *Case for a Rule of Reason Analysis* (2000) 9 <u>Annals of Health Law</u> 155, 160-161.

6       36.   "Congress, concerned with escalating fraud and abuse in the Medicare-
7  Medicaid system amended the misdemeanor anti-kickback statute in 1977 to
8  strengthen the government's ability to prosecute and punish fraud in the system.
9  Language was added prohibiting (1) the solicitation or receipt of 'any remuneration
10 (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly,
11 in cash or in kind,' in return for referrals, and (2) the offer or payment of such
12 remuneration to 'induce' referrals. [Citation.] Congress also upgraded the violation
13 to a felony." *The Hanlester Network v. Shalala*, 51 F.3d 1390, 1396 (9th Cir. 1995).
14 *See*, 42 U.S.C. §1320a-7b(b)(1) and (2). Hospitals certify compliance with the
15 Anti-Kickback statute in seeking payment from the Medicare program. *See* Form
16 CMS-855A.

17      37.   "Congress introduced the broad term 'remuneration' in the 1977
18 amendment of the statute to clarify the types of financial arrangements and conduct
19 to be classified as illegal under Medicare and Medicaid. [Citation.] The phrase 'any
20 remuneration' was intended to broaden the reach of the law which previously
21 referred only to kickbacks, bribes, and rebates." *Hanlester*, *supra*, 51 F.3d at 1398.
22 Thus, remuneration includes the transfer of anything of value, in cash or in-kind,
23 directly or indirectly, covertly or overtly.

24      38.   The Anti-Kickback Statute prohibits the solicitation or receipt of
25 kickbacks, bribes, or other remuneration, stating:

26
27       Whoever knowingly and willfully solicits or receives any
         remuneration (including any kickback, bribe or rebate) directly or
28       indirectly, overtly or covertly, in cash or in kind -

> (A)   in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
>
> (B)   in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony...

42 U.S.C. §1320a-7b(b)(1).

39.   The Anti-Kickback Statute also prohibits the offer or payment of such consideration:

> Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly, in cash or in kind to any person to induce such person –
>
> (A)   to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
>
> (B)   to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in party under a Federal health care program, shall be guilty of a felony....

42 U.S.C. §1320a-7b(b)(2).

40.   For purpose of the Anti-Kickback Statute, "Federal health care program" includes both the Medicare and Medi-Cal programs.  42 U.S.C. §1320a-7b(f)(1) and (2).

41.   "The term 'refer' as used in the Anti-Kickback Statute, is not limited to the physician who formally authorizes a particular service," it "may apply to physicians or others who refer, recommend, turn over, select or give business to a particular recipient." *See, United States v. Rogan*, 459 F. Supp.2d 692, 714-715 (N.D. Il. 2006).  Thus, the Anti-Kickback Statute reaches even minor actors in a kickback scheme.

42.   The Anti-Kickback statute contains statutory exceptions that exempt certain transactions from its prohibitions.   Each exception requires that strict

1    standards are met.  For example, all arrangements must be in writing.  There are

2    regulatory safe harbors for space rental, equipment rental, personal services and

3    management contracts.

4        43.    The personal services or management contracts safe harbor applies to

5    payments to an agent if there is a written agreement, and the agreement is "intended

6    to provide the services of the agent on a periodic, sporadic or part-time basis" with

7    schedules, interval, and costs expressly stated in the contract, and the compensation

8    is "consistent with the fair market value in arms-length transactions and is not

9    determined in a manner that takes into account the volume or value of any referrals

10   or business otherwise generated between the parties..."  42 C.F.R. §1001.952(d).

11   Thus, where no written agreement exists and/or compensation purportedly is paid

12   for personal services or management that are not provided and are made with the

13   intent to reward referrals, the Anti-Kickback Statute has been violated.

14                    **California's Anti-Kickback Statute**

15       44.    The California counterpart to the federal Anti-Kickback Statute is

16   Welfare and Institutions Code section 14107.2.  It prohibits any person from:

17       solicit[ing] or receiv[ing] any remuneration, including, but not limited
18       to any kickback, bribe, or rebate, directly or indirectly, overtly or
         covertly, in cash or in valuable consideration of any kind, either:

19       (1) In return for the referral or promised referral, of any individual to a
20       person for the furnishing or arranging for the furnishing of any service
         or merchandise for which payment may be made, in whole or in part,
21       under [the Medi-Cal program]; or

22       (2) In return for the purchasing, leasing, ordering or arranging for or
         recommending the purchase, leasing, or ordering of any goods,
23       facility, service or merchandise for which payment may be made, in
         whole or in part, under the [Medi-Cal program]...

24

25   Cal. Wel. & Inst. Code § 14107.2(a).

26       45.    The statute also prohibits "offer[ing] or pay[ing] any remuneration,

27   including, but not limited to, any kickback, bribe or rebate, directly or indirectly,

28   overtly or covertly, in cash or in valuable consideration," in return for referring

COMPLAINT                        10                    Case No.

1  patients for medical services or purchasing or ordering goods or services, payment
2  for which may be made by the Medi-Cal program. Cal. Wel. & Inst. Code
3  §14107.2(b).

4  46. The statute specifically defines the term "kickback" as meaning "a
5  rebate or anything of value or advantage, present or prospective, or any promise or
6  undertaking to give any such rebate or thing of value or advantage, with a corrupt
7  intent to unlawfully influence the person to whom it is given in actions undertaken
8  by that person in his or her public, professional or official capacity." Cal. Wel. &
9  Inst. Code §14107.2(d).

10  47. Unlike the federal Anti-Kickback statute, the California Anti-Kickback
11  statute has no express "knowing and willful" requirement which has been
12  interpreted to mean that a showing of a specific intent to violate the law is not
13  necessary.

## California's Involuntary Hold Law – Lanterman Petris Short Act

15  48. Under California law, "[w]hen any person, as a result of mental
16  disorder, is a danger to others, or to himself or herself, or gravely disabled, a peace
17  officer, member of the attending staff … of an evaluation facility designated by the
18  county, designated members of a mobile crisis team …, or other professional person
19  designated by the county may, upon probable cause, take, or cause to be taken, the
20  person into custody and place him or her in a facility designated by the county and
21  approved by the State Department of Mental Health as a facility for 72-hour
22  treatment and evaluation." Cal. Wel. & Inst. Code §5150. The Act containing
23  section 5150 is also commonly known as the Lanterman Petris Short ("LPS") Act.

24  49. A "5150 Hold" is the term commonly used to refer to a person taken
25  into custody pursuant to the legal criteria set forth in California Wel. & Inst. Code §
26  5150.

27  50. The rights of a patient subject to a 5150 Hold and the responsibilities
28  of any peace officer, member of the attending staff of an evaluation facility

1    designated by the county, designated members of a mobile crisis team, or other

2    professional person designated by the county committing a patient to a 5150 hold

3    are also set forth in the Welfare and Institutions Code.  *See*, Cal. Wel. & Instit.

4    Code §§5150.05-5157.

5          **DEFENDANTS' ILLEGAL SCHEME**

6          51.   From at least 2004 to the present, Defendants have engaged in a

7    scheme to defraud the Government out of millions of dollars by causing the

8    unnecessary hospitalization of patients pursuant to unlawful psychiatric holds which

9    Defendants bill to Medicare and/or Medi-Cal. (the "Psych Hold Scheme").

10         52.   Defendants own and operate hospitals in Los Angeles County.

11   Defendant Los Angeles Doctors Hospital operates two hospitals with psychiatric

12   units that provide patients with psychiatric services.   Defendants bill the

13   Government for the care and services, including psychiatric services, provided to

14   patients treated at Defendants' hospitals.

15         53.   As Medicare providers Defendants know that Medicare will only pay

16   for care and services that are both reasonable and medically necessary.  *See* 42

17   U.S.C. § 1395Y(a)(1)(A).  Defendants also know that the Government relies on

18   Defendants to issue non-fraudulent bills and to bill the Government only for

19   reasonable and medically necessary costs and services.

20         54.   Notwithstanding   these   well-known   prerequisites   for   Medicare

21   reimbursement, Defendants have billed and likely continue to bill the Government

22   for psychiatric stays that were not and are not reasonable or medically necessary.

23         55.   The Psych Hold Scheme has been carried out through the willful and

24   knowing conduct of the Defendants and their agents, including but not limited to

25   LAMMC's executives, administrators, doctors, nurses, marketers and other

26   employees who order the holds, falsify patient records and otherwise facilitate the

27   Defendants' ability to perpetrate the scheme.

28

56.     Defendants have perpetrated this scheme, in part, through kickback arrangements with other Los Angeles area hospitals, skilled nursing facilities ("SNF") and board and care facilities ("B&C") which supply the patients Defendants have held in the psych units at LAMMC and subsequently billed to the Government.  Defendants have also perpetrated this scheme with the assistance of transport companies, including ambulance services, which transport targeted individuals from other hospitals, SNFs and B&Cs to LAMMC without legal status for a psych hold so that those individuals can be admitted to LAMMC's psych units and their stays billed to the Government.

57.     Defendants paid illegal kickbacks to other Los Angeles area facilities, including their owners and/or operators, ambulance companies as well as employees and marketers at LAMMC.  These kickbacks included but were not limited to cash payments, payments of rent, gift certificates and other non-cash benefits.

58.     Beginning in at least 2004, Defendants began using 5150 holds as a means of securing the admission of patients to the Defendants' psych units for which Government health care programs would be billed.  Defendants and their agents and employees initiated these 5150 holds even though the individuals subjected to them did not meet the legal criteria to be involuntarily held.  They initiated these unlawful 5150 holds by improper methods, including pressuring or ordering the 5150 evaluators, like Relator, to 'find' the legal criteria when they did not exist, or by falsifying information in the targeted individual's medical records to influence the outcome of a 5150 evaluation and assure that the legal criteria would be found.

59.     If the LAMMC doctor, staff and/or marketer could not secure a 5150 hold for a targeted individual, they would arrange for the targeted individual to be admitted by other, equally improper, means.  In the absence of a 5150 hold, LAMMC doctors, marketers and administrators arranged for a targeted individual to

1  be transported to LAMMC by ambulance, which was billed to the Government, and
2  admitted to the psych units by routinely and knowingly falsifying the person's
3  medical records to reflect that the person was coming in voluntarily.   These
4  "voluntary" admissions were regularly initiated by LAMMC doctors and staff for
5  patients who lacked the mental capacity to make the informed decision to commit
6  themselves for psychiatric evaluation.   Sometimes these voluntary admissions took
7  place over the protest of the purportedly voluntary patient.

8  60.   From at least 2006 forward, Defendants' unlawful scheme expanded.
9  Using the same false and fraudulent techniques of initiating improper 5150 holds
10 and/or falsifying 'voluntary' admissions, Defendants transferred LAMMC patients
11 between the medical and surgical ("med/surg") floors and the psych units for
12 unlawful psych holds when the stay in the psych unit was not reasonable or
13 medically necessary.

14 61.   Even though Defendants knew the hospital stays that resulted from the
15 Psych Hold Scheme were not reasonable or medically necessary, they submitted
16 bills for costs and services associated with these hospital stays to the Government as
17 such, and received reimbursement for them.

18 62.   Knowing that the Government relies on Defendants to deal honestly in
19 their contracts with the Government for these costs and services, Defendants
20 concealed their fraudulent scheme.   Defendants concealed, disguised and covered
21 up the Psych Hold Scheme and/or the nature and extent of their own involvement in
22 it by, among other things, falsifying patient records and other paperwork related to
23 the care and service of these patients, retaliating against employees who tried to
24 expose the scheme, modifying how they secured the unlawful psych holds and lying
25 and concealing the unlawful scheme from regulators and law enforcement.   This
26 concealment has prevented the Government from discovering Defendants'
27 systematic and ongoing fraud.

28

63.  Defendants' violations of the False Claims Act listed herein and their concealment thereof, stem from at least 2004 and are ongoing.

### Harm to the Government

64.  As a result of Defendants' unlawful Psych Hold Scheme, Defendants have billed and caused the Government to pay for psychiatric holds that were not lawfully initiated and were not reasonable or medically necessary.  The harm to the Government includes but is not limited to:

65.  The submission of false and fraudulent claims to the Medicare and Medi-Cal programs seeking payments for services provided to patients admitted as a part of the Defendants' unlawful Psych Hold scheme which the Government paid.

66.  The submission of false and fraudulent annual cost reports to the federal government which the Government paid.

67.  The preparation of false and fraudulent reports which conceal that the marketers and transport companies are being paid to illegally recruit, refer and transport patients.

### Defendants' Retaliation Against Relator

68.  Before filing this *qui tam* action, Relator experienced extreme harassment, threats and retaliation at her job and/or with the knowledge and consent of her employer for her efforts to expose and stop the 5150 Scheme.  Some instances of the retaliation include, but are not limited to, the following:

69.  On August 8, 2008, Relator prepared to bring a letter to her employer's Human Resources department reporting what she then suspected was illegal activity arising out of the way LAMMC's intake staff were admitting patients who did not meet the legal criteria for 5150 Holds.  She showed the letter to LAMMC's Director of Intake, Mark Aiken ("Aiken").  Aiken verbally threatened Relator that if she continued to complain about the alleged unlawful 5150 holds she witnessed he would make sure Relator's calls to other facilities would be significantly reduced thereby negatively impacting her pay. Aiken also verbally warned Relator that if

1  she went to the Hospital's administration they would ignore her complaints because
2  it was the hospital's administration's orders that he and others were following.

3      70.    Notwithstanding Aiken's threat, in August 2008 Relator took her
4  report to the hospital CEO, John Fenton, and described the illegal activity. Fenton
5  said he would talk to the staff in Intake and get back to her.

6      71.    On November, 11 2008, when she had not heard anything back from
7  Fenton, Relator contacted the Corporate Compliance hotline for Defendant, PHC.
8  On November 20, 2008, when Aiken learned that Relator had contacted the
9  Corporate Compliance hotline he confronted her and demanded to know "What are
10  you trying to do by this whistleblowing crap? Get us all FIRED?" On November
11  22, 2008, Tom Miller, Vice President of Corporate Compliance and HR called
12  Relator. He indicated a lawyer would call her back.

13      72.    On December 15, 2008, when a month had passed and she had not
14  heard from anyone, Relator left a follow up message with Miller. The next day he
15  left her a voicemail message telling her he did not have time for her "silly
16  complaints."

17      73.    On February 22, 2009, Relator contacted the Corporate Compliance
18  hotline again.

19      74.    On March 2, 2009, Miller left Relator another voicemail message
20  informing her that she was not allowed to bring these issues up again. Miller
21  indicated that it was the last he would hear about it.

22      75.    On August 17, 2009, Relator filed an EEOC claim for gender and age
23  discrimination and retaliation for reporting the unlawful activity to the Corporate
24  Compliance hotline and the CEO.

25      76.    Thereafter, Relator was repeatedly threatened that she needed to stop
26  any discussion of the unlawful activity which LAMMC's administrators
27  characterized as "gossip." If Relator continued, she would be fired.

28

77.    In approximately October, 2009, LAMMC's administrators began subjecting Relator to a pattern of increased scrutiny and monitoring, tracking everything she did.  Other employees were not subjected to the same scrutiny.  This escalating pattern of harassment continued throughout 2010.

78.    In January 2011, Relator sent another letter to LAMMC administrators protesting ongoing harassment and retaliation, showing a copy to the state Labor Board.  Immediately thereafter, Relator was formally written up for violations based on false information provided by Aiken.

79.    As a result of the severe stress from the threats and harassment, in March 2011, Relator's doctor placed her on temporary disability.

80.    On April 21, 2011, Relator filed a Labor Board Claim for retaliation.

81.    After 10 weeks on disability, Relator came back to work at LAMMC. It took over a month for LAMMC's administrators to put Relator back in the schedule, fabricating reasons why they could not proceed.  Relator was not paid while she was not able to get on the schedule.

82.    On June 24, 2011, Relator finally successfully got herself back in the schedule.  While she is 'on call,' she is rarely sent out on evaluations, as described above.  The 5150 evaluation calls have been turned over to "new" employees willing to participate in the Psych Hold scheme.  Because Relator is 'on call' but does not do evaluations, Relator's pay has been reduced to approximately one quarter of what she had previously earned.  And once she returned to work, the practices of scrutiny and monitoring started again.  She was again written up for violations based on trumped up information.

83.    In December, 2011 in response to her Labor Board Claim, a Labor Board Commissioner informed Relator that she should file a claim as soon as possible as she had presented evidence of wage violations.

84.   Relator continues to work for LAMMC now, though her pay continues to be less than it was before she reported the unlawful activity, and she continues to be subjected to the ongoing pattern of harassment and retaliation.

## COUNT I

### 31 U.S.C. § 3729(a)(1)

85.   The Relator re-alleges the allegations made in the paragraphs above.

86.   This is a claim for treble damages and forfeitures under the False Claims Act, 31 U.S.C. §§ 3729-32, as amended.

87.   Through the acts described above, the Defendants and their agents and employees knowingly presented and caused to be presented to the Government fraudulent claims, records, and statements to obtain reimbursement for psychiatric services provided under the Medicare and Medi-Cal programs.

88.   The Government, unaware of the falsity of the claims made by the Defendants, approved, paid and participated in payments made by the Government for claims that otherwise would not have been allowed.

89.   To the extent that the facts alleged in this Complaint have been previously disclosed to the public or the government in any fashion, Relator is the "original source" of the information as defined in 31 U.S.C. § 3730(e)(4).

90.   By reason of these payments and approvals, the Government has been damaged and possibly continues to be damaged, in an amount yet to be determined.

## COUNT II

### 31 U.S.C. § 3729(a)(2)

91.   The Relator re-alleges the allegations made in the paragraphs above.

92.   This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729 *et seq.*

93.   Through the acts described above, Defendants knowingly made, used and caused to be used false records and statements to get false or fraudulent claims paid or approved by the Government.

94.   The Government was unaware of the falsity of the records, statements, and claims submitted by Defendants and their agents, principals, employees and contractors for claims that would not have been paid had the truth been known.

95.   To the extent that the facts alleged in this Complaint have been previously disclosed to the public or the government in any fashion, Relator is the "original source" of the information as defined in 31 U.S.C. § 3730(e)(4).

96.   By reason of the Defendants' false records, statements, and claims, the Government has been damaged.

## COUNT III

### 31 U.S.C. § 3730(h) - Retaliation

97.   The Relator re-alleges the allegations made in the paragraphs above.

98.   Relator was discriminated against, harassed by and marginalized in her employment by her employers, Defendant LOS ANGELES DOCTORS HOSPITAL CORPORATION and, by and through its officers, agents and employees because of lawful acts taken by her in furtherance of an action and/or possible action under the False Claims Act and/or investigation of False Claims Act violations that could serve as a basis of an action under the False Claims Act.

99.   The actions of the Defendants set forth above violated 31 U.S.C. § 3730(h) and damaged Relator.

100.  As alleged above, each of Defendants' officers, agents and employees harassed Relator in violation of 31 U.S.C. § 3730(h) and/or assisted and/or conspired with the other Defendant to harass Relator in violation of 31 U.S.C. § 3730(h) making each subject to liability.

101.  Relator is, therefore, entitled to the relief provided by 31 U.S.C. § 3730(h), including damages in an amount to be determined at trial.

### RELIEF REQUESTED

WHEREFORE, the Relator requests that judgment be entered against Defendants, ordering that:

a. Defendants cease and desist from violating the False Claims Act, 31 U.S.C. § 3729 *et. seq.;*

b. Defendants pay an amount equal to three times the amount of damages the Government has sustained because of Defendants' actions, plus a civil penalty against Defendants of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

c. Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

d. Relator be awarded all costs of this action, including attorneys' fees, expenses, and costs pursuant to 31 U.S.C. §§3730(d) and (h);

e. The Government and the Relator be granted all such other relief as the Court deems just and proper; and

f. With regard to Count III, that Relator be awarded all the relief to which she is entitled pursuant to 31 U.S.C. § 3730(h), including personal injury damages for emotional and mental distress, two times her back pay, interest on her back pay, reinstatement of her prior hours and pay, attorneys' fees and litigation costs, and such other relief as the Court deems appropriate.

## **DEMAND FOR JURY**

Pursuant to Fed. R. Civ. P. 38, the Relator hereby demands a trial by jury.

Respectfully Submitted,

DATED: February 2, 2012       **KELLER GROVER LLP**

By: _____
          JEFFREY F. KELLER
Attorneys for Relator