

1    JEFFREY F. KELLER (SBN 148005)
     jfkeller@kellergrover.com
2    KATHLEEN R. SCANLAN (SBN 197529)
     kscanlan@kellergrover.com
3
4    **KELLER GROVER, LLP**
     1965 Market Street
5    San Francisco, California 94103
     Telephone:   (415) 543-1305
6    Facsimile:   (415) 543-7861
7
8    Attorneys for Relator
9
10
11              **IN THE UNITED STATES DISTRICT COURT**
12          **FOR THE CENTRAL DISTRICT OF CALIFORNIA**
13                    **(WESTERN DIVISION)**
14
15   UNITED STATES OF AMERICA, *ex*        Case No.: CV-12-00960 RSWL (SHx)
     *rel.,* [UNDER SEAL],
16                                         **AMENDED COMPLAINT**
                   Plaintiff[s],
17
         v.
18
19   [UNDER SEAL],                         **[FILED *IN-CAMERA* AND UNDER**
20                 Defendant[s].           **SEAL]**
21
22
23
24
25
26
27
28



FILED
CLERK, U.S. DISTRICT COURT
AUG 20 2009
CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

DOCKETED ON CM
AUG 20 2013
BY _____ 167

RECEIVED BUT NOT FILED
CLERK, U.S. DISTRICT COURT
AUG 19 2013
CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

31

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

AMENDED COMPLAINT              CASE NO:  CV-12-00960 RSWL (SHX)

1 JEFFREY F. KELLER (SBN 148005)
2 jfkeller@kellergrover.com
  KATHLEEN R. SCANLAN (SBN 197529)
3 kscanlan@kellergrover.com
  **KELLER GROVER, LLP**
4 1965 Market Street
5 San Francisco, California 94103
  Telephone: (415) 543-1305
6 Facsimile: (415) 543-7861
7
8 Attorneys for Relator
  *JULIE A. MACIAS*
9



FILED
CLERK, U.S. DISTRICT COURT

AUG 20 2009

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

RECEIVED BUT NOT FILED
CLERK, U.S. DISTRICT COURT
AUG 19 2013
CENTRAL DISTRICT OF CALIFORNIA

FAXED

10 **IN THE UNITED STATES DISTRICT COURT**

11 **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

12 **(WESTERN DIVISION)**

13 UNITED STATES OF AMERICA and | Case No.: CV-12-00960 RSWL (SHx)
   THE STATE OF CALIFORNIA, *ex*
14 *rel.,* JULIE A. MACIAS,

15          Plaintiffs, | **AMENDED COMPLAINT**

16     v.

17 PACIFIC HEALTH CORPORATION,
   a Georgia corporation; LOS ANGELES
18 DOCTORS HOSPITAL
   CORPORATION, a California
19 corporation; SGG, INC., a California
   corporation; PROCARE MOBILE
20 RESPONSE LLC, a California Limited
21 Liability Company, KAREN
   TRIGGIANI, an individual, ROBERT
22 BARRETT, an individual, KEIVAN
23 GOLCHINI, M.D., an individual,
   FARHAD, KHOSSOUSSI, M.D., an
24 individual; ALAN MARKIE, M.D., an
25 individual; and LITOS O. MALLARE,
   M.D., an individual,

26

27          Defendants. | **[FILED *IN-CAMERA* AND UNDER SEAL]**

28

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305; Fax. 415.543.7861

AMENDED COMPLAINT | CASE NO: CV-12-00960 RSWL (SHX)

**TABLE OF CONTENTS**

Page

I.   INTRODUCTION ...................................................................................1

II.   JURISDICTION AND VENUE .........................................................2

III.  THE PARTIES ....................................................................................2

    A.   The Plaintiffs ..............................................................................2

    B.   The Defendants ...........................................................................3

        1.   The Hospital Defendant ...................................................3

        2.   The Marketer Defendants ................................................4

        3.   The Doctor Defendants ....................................................5

        4.   The Ambulance Defendant ...............................................6

IV.  THE PSYCH HOLD SCHEME .........................................................6

V.   THE MEDICARE AND MEDI-CAL PROGRAMS .......................12

    A.   The Medicare Program..............................................................12

        1.   Conditions for Medicare Providers................................12

            (A)  MEDICARE'S PROVIDER AGREEMENT.................12

            (B)  ADDITIONAL MEDICARE CONDITIONS FOR PROVIDERS .................................................................14

        2.   Medicare Part A – Inpatient Psychiatric Care .........................15

            (C)  LIMITED MENTAL HEALTH BENEFITS.................15

            (D)  MEDICAL NECESSITY FOR INPATIENT PSYCHIATRIC SERVICES .........................................16

            (E)  MEDICARE REIMBURSEMENT FOR MENTAL HEALTH CARE.............................................................17

        3.   Yearly Cost Reporting Requirements.......................................17

        4.   Medicare Part B ......................................................................19

            (F)   ALL PART B PROVIDERS' OBLIGATIONS TO MEDICARE................................................................20

            (G)  PHYSICIAN SERVICES ..............................................20

            (H)  AMBULANCE SERVICES ...........................................21

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

AMENDED COMPLAINT      i      CASE NO:  CV-12-00960 RSWL (SHX)

**TABLE OF CONTENTS**

**(continued)**

Page

B.   THE MEDI-CAL PROGRAM................................................22

   1.   Controlling Law...............................................22

   2.   Medi-Cal Funding Sources .................................24

VI.   APPLICABLE LAWS.............................................................24

A.   FALSE CLAIMS ACTS .............................................24

   1.   The Federal False Claims Act.............................24

     (A)   LIABILITY PROVISIONS .........................24

     (B)   THE QUI TAM PROVISIONS .....................26

     (C)   THE STATUTE OF LIMITATIONS .............26

   2.   California's False Claims Act .............................27

B.   THE ANTI-KICKBACK LAWS ...................................27

   1.   Federal Anti-Kickback Laws ..............................27

     (A)   THE ANTI-KICKBACK STATUTE .............28

       (1)   WHAT THE AKS PROHIBITS.........28

       (2)   RECENT AMENDMENTS TO THE AKS .........29

     (B)   THE STARK STATUTE................................30

       (1)   STARK ENFORCEMENT .................31

       (2)   STARK VIOLATORS SUBJECT TO EXCLUSION.........................................33

   2.   California's Anti-Kickback Laws.........................33

     (A)   WELFARE AND INSTITUTIONS CODE SECTION 14107.2.........................................33

     (B)   CALIFORNIA HEALTH AND SAFETY CODE § 445..................................................34

     (C)   BUSINESS AND PROFESSIONS CODE § 650............34

     (D)   CALIFORNIA'S BUSINESS & PROFESSIONS CODE § 2273(A) .........................................36

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

AMENDED COMPLAINT          ii          CASE NO:  CV-12-00960 RSWL (SHX)

**TABLE OF CONTENTS**

**(continued)**

Page

C.   THE EXCLUSION LAWS ............................................................36

D.   STATE LAW GOVERNING MEDICAL CARE ............................37

   1.   California's Medical Practice Act ..............................37

   2.   California's Lanterman Petris Short Act ....................38

       (A)  LEGAL CRITERIA TO BE INVOLUNTARILY COMMITTED ..........................................................39

       (B)  PATIENT'S RIGHT TO VOLUNTARILY COMMIT FOR TREATMENT ........................................41

VII. FACTUAL BACKGROUND ...........................................................42

A.   LAMMC – Filling Its Beds by Defrauding the Government.............42

   1.   The Skid-Row Scheme ............................................42

   2.   The Psych Hold Scheme ..........................................43

       (A)  THE PSYCH HOLD SCHEME BEGINS .....................44

       (B)  THE PSYCH HOLD SCHEME ESCALATES..............54

       (C)  WHAT PROCARE MEDICS WERE AUTHORIZED TO DO UNDER THE LAW..........................................56

       (D)  WHAT PROCARE MEDICS ACTUALLY DID AS PART OF THE PSYCH HOLD SCHEME...................57

       (E)  THE ILLEGAL KICKBACKS FOR PATIENTS REFERRALS ..................................................................59

       (F)  TRIGGIANI'S AGREEMENT WITH LAMMC ...........60

       (G)  TRIGGIANI'S AGREEMENTS WITH REFERRAL SOURCES...................................................................60

       (H)  THE SGG-LAMMC WRITTEN CONTRACT .............62

       (I)  THE SGG CONTRACT IS A SHAM CONTRACT ......63

       (J)  LAMMC OPENLY DISCUSSED ITS ONGOING NEEDS TO FILL PSYCHIATRIC BEDS AFTER TRIGGIANI'S EXCLUSION .........................................67

       (K)  TRIGGIANI KEPT THEIR BEDS FULL.....................70

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

**TABLE OF CONTENTS**

**(continued)**

Page

(L)   DEFENDANTS ATTEMPT TO CONCEAL TRIGGIANI'S ROLE ...................................................71

(M)   REFERRAL SOURCES OPENLY USE TRIGGIANI...72

(N)   TRIGGIANI'S ONGOING INVOLVEMENT IN 2009...........................................................................73

(O)   LAMMC, INCLUDING ITS CEO FENTON, ADMITTED TRIGGIANI STILL INVOLVED IN CARE OF LAMMC PATIENTS IN 2009 ...................76

(P)   TRIGGIANI'S ONGOING INVOLVEMENT IN 2010...........................................................................77

(Q)   UNLAWFUL SGG REFERRALS CONTINUE IN 2011...........................................................................91

B.   INVOLUNTARY COMMITMENT AND MEDICALLY UNNECESSARY CARE .................................................92

1.   Unlawful Custody of Elderly and Dependent Adults.............92

(A)   DEFECTIVE 5150 HOLDS ...........................................93

(B)   FAKE VOLUNTARIES...............................................94

2.   Lack of Medical Necessity.................................................98

(A)   "GOOD CANDIDATE FOR PSYCH"..........................98

(B)   DEVELOPMENTALLY DISABLED PATIENTS ......101

(C)   PATIENTS IN GENUINE PSYCHIATRIC CRISIS....103

C.   RETALIATION AGAINST RELATOR ..........................................107

1.   Retaliation in 2008.................................................................107

2.   Retaliation in 2009.................................................................108

3.   Retaliation in 2010.................................................................109

4.   Retaliation in 2011.................................................................109

5.   Retaliation in 2012.................................................................111

6.   LAMMC Fires Relator............................................................114

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

AMENDED COMPLAINT          iv          CASE NO:  CV-12-00960 RSWL (SHX)

## **TABLE OF CONTENTS**

### (continued)

|  | | Page |
|---|---|---|
| D. | HARM TO THE GOVERNMENT | 115 |
| RELIEF REQUESTED | | 136 |
| DEMAND FOR JURY | | 138 |

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

1     Plaintiff/Relator JULIE A. MACIAS ("Macias") brings this *qui tam* action as
2  Relator on behalf of the United States and the State of California against Defendants
3  under the False Claims Act, 31 U.S.C. §§ 3729-3733, and the California False
4  Claims Act, Cal. Gov't Code § 12650 *et. seq.*, and in her own name to obtain the
5  relief needed to make her whole from the damages she suffered from violations of
6  31 U.S.C. §3730(h) and state laws prohibiting retaliation.  She is an "original
7  source" of the information on which the allegations contained herein are based as
8  that term is defined in 31 U.S.C. §3730(e)(4) and Cal Gov't Code § 12652(d)(3).
9  She alleges – upon knowledge with respect to her own acts and those she personally
10  witnessed and upon information and belief with respect to all other matters as
11  follows:

## I.  **INTRODUCTION**

13     1.     The Director of Business Development for Defendant Los Angeles
14  Doctors Hospital Corporation's Los Angeles Metropolitan Medical Center summed
15  this case up best when he told Relator in 2012 that he did not care about her "damn
16  laws.  We have a business to run."  This is an action to recover damages and civil
17  penalties on behalf of the United State of America and the State of California for
18  violations of those laws, including false statements and claims made or caused to be
19  made by the Defendants to the United States and the State and their respective
20  agents in violation of the False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA") and
21  the California False Claims Act, Cal. Gov't Code § 12650 *et. seq.* ("CFCA").

22     2.     The false claims and statements at issue were made or caused to be made
23  by the Defendants in connection with kickbacks and services provided by a provider
24  who had been excluded from Medicare and Medi-Cal for her prior acts.  The
25  institutions that worked with her, thus, not only benefited from kickbacks she paid to
26  referral sources, but they themselves provided services which lacked medical
27  necessity.  This conduct involved inpatient acute care, inpatient psychiatric care,
28  / / /

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

---

AMENDED COMPLAINT            1            CASE NO:  CV-12-00960 RSWL (SHX)

1 professional and transportation services (hereinafter "Health Care Services") in Los

2 Angeles County beginning not later than 2004.

3 **II.   JURISDICTION AND VENUE**

4     3.    The Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331

5 and 31 U.S.C. §3732.

6     4.    The Court has personal jurisdiction over the Defendants pursuant to 31

7 U.S.C. §3732(a) because Defendants can be found in and transact the business that is

8 the subject matter of this lawsuit in the Central District of California.

9     5.    Venue is proper in this district pursuant to 31 U.S.C. §3732(a) because

10 the acts complained of herein occurred in Los Angeles County, within the Central

11 District of California, and Defendants transact the business that is the subject matter

12 of this lawsuit in this district.

13 **III.   THE PARTIES**

14     **A.    The Plaintiffs**

15     6.    Relator Julie A. Macias is a citizen of the United States and a resident of

16 California.  She was employed at Los Angeles Metropolitan Medical Center as a

17 Registered Nurse ("RN") on the Psychiatric Evaluation Team ("PET").

18     7.    The UNITED STATES OF AMERICA has created, and provides

19 continuing funding for a variety of health care payment programs, including but not

20 limited to the Medicare and Medicaid Programs ("Programs").  A principal purpose

21 of the Programs is to provide for the delivery of medically necessary health care

22 services and for the payment of reasonable fees and costs associated with the

23 delivery of the medically necessary care by participating providers to persons who

24 qualify for benefits under the Programs, including but not limited to persons who are

25 aged, infirm and/or impoverished.  Health care services covered under the Programs

26 include inpatient mental health services.

27     8.    The STATE of CALIFORNIA, in conjunction with the federal

28 government, has created, and provides continued funding for the Medi-Cal program.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

1  Medi-Cal is the State of California's Medicaid program.  It is jointly administered by
2  the California State Department of Health Services and the Centers for Medicare and
3  Medicaid Services ("CMS").  The purpose of the Medi-Cal program is to provide
4  access for the delivery of medically necessary health care services and for the
5  payment of reasonable costs associated with the delivery of the medically necessary
6  care by participating providers to persons who qualify for benefits under Medi-Cal,
7  including but not limited to persons who are aged, infirm and/or impoverished.
8  Health care services covered under Medi-Cal include mental health services.

9     **B.**    <u>**The Defendants**</u>

10          **1.**    **The Hospital Defendant**

11       9.    Defendant PACIFIC HEALTH CORPORATION ("PHC") is, and at all
12  times relevant was, a corporation organized and existing under the laws of the State
13  of Georgia with its principal place of business in Tustin, California.  PHC owns and
14  has operated, directly and indirectly, numerous hospitals in Los Angeles and Orange
15  Counties.  In March, 2013, PHC closed Anaheim General Hospital.  On or about
16  April 2, 2013, PHC announced the immediate closure of its remaining three area
17  hospitals, including Los Angeles Metropolitan Medical Center.

18       10.    Defendant LOS ANGELES DOCTORS HOSPITAL CORPORATION
19  ("DOCTORS HOSPITAL") is, and, at all relevant times, was, a corporation
20  organized and existing under the laws of the State of California with its principal
21  place of business in Los Angeles, California.  It is a subsidiary of PHC and owns and
22  has operated Los Angeles Metropolitan Medical Center ("LAMMC") at 2231
23  Western Avenue, in Los Angeles County, also commonly known as "LA Metro" or
24  "Western Campus" as well as a campus at 13300 S. Hawthorne Blvd. in Hawthorne,
25  California commonly known as the "Hawthorne Campus."  The Western and the
26  Hawthorne Campus are not currently operating. LAMMC is listed in the National
27  Plan & Provider Enumeration System ("NPPES") and its National Provider
28  Information ("NPI") number is 1639195175.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

AMENDED COMPLAINT     3     CASE NO:  CV-12-00960 RSWL (SHX)

1    11.    PACIFIC HEALTH CORPORATION and LOS ANGELES DOCTORS

2  HOSPITAL CORPORATION are herein collectively referred to as the "Hospital

3  Defendant" or "LAMMC."

4          **2.    The Marketer Defendants**

5    12.    Defendant SGG, INC. ("SGG") was a corporation organized under the

6  laws of the State of California with its principal place of business in San Marino,

7  California.  SGG was a corporation engaged in the health services industry,

8  including in hospital marketing. SGG was founded in 1997 by Karen Triggiani (aka

9  Karen Barrett) ("TRIGGIANI").  SGG was incorporated on March 20, 1998.

10  TRIGGIANI was the sole shareholder from March 20, 1998 until August 15, 2007,

11  when the shares were transferred to Alex Berezovsky.  On December 27, 2007,

12  Robert Barrett ("BARRETT"), TRIGGIANI'S husband, became the owner of one

13  hundred percent of the shares.  On August 1, 2009, Dr. Keivan Golchini

14  ("GOLCHINI") purchased 100 percent of the shares from BARRETT.  On

15  December 26, 2012, SGG was dissolved.

16    13.    Defendant KAREN TRIGGIANI, aka Karen Barrett, is an individual

17  who resides in Pasadena, California.  TRIGGIANI was excluded from Medicare on

18  June 19, 2008 after she was convicted for conspiracy to commit Medicare fraud.

19  TRIGGIANI founded KST & Associates at or about the time that she was excluded

20  from Medicare and Medi-Cal in 2008.

21    14.    Defendant ROBERT BARRETT is an individual who resides in

22  Pasadena, California.

23    15.    Defendants SGG and TRIGGIANI are herein collectively referred to as

24  the "Marketer Defendants."  For all allegations relating to events on or after

25  December 27, 2007 until August 1, 2009, when BARRETT was sole shareholder of

26  SGG, the term Marketer Defendants also includes BARRETT.  For all allegations

27  relating to events on or after August 1, 2009, when GOLCHINI became sole

28  shareholder of SGG, the term Marketer Defendants also includes GOLCHINI.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

### 3.   The Doctor Defendants

16.   Defendant KEIVAN GOLCHINI, M.D. is a medical doctor who specializes in internal medicine.  He is not a psychiatrist.  GOLCHINI's principal place of business is located in Beverly Hills, California.  GOLCHINI is listed in the NPPES and his NPI number is 1528074812.  GOLCHINI was disciplined by the California State Medical Board in 2006 which accused him of multiple instances of extreme departures from the standard of care, failure to formulate timely and accurate medical records, and a demonstrated lack of knowledge or ability.  He agreed to three years' probation.  During his probation which ran from November 2006 to November 2009, GOLCHINI agreed to "obey all federal state and local laws, all rules governing the practice of Medicine in California and remain in full compliance with any court order, ordered criminal probation, payments and other orders."

17.   Defendant FARHAD KHOSSOUSSI, M.D. ("KHOSSOUSSI") is a medical doctor who specializes in psychiatry.  KHOSSOUSSI resides in Beverly Hills, California.  KHOSSOUSSI is listed in the NPPES and his NPI number is 1114093143.

18.   Defendant ALAN MARKIE, M.D. ("MARKIE") is a medical doctor who specializes in psychiatry.  MARKIE's principal place of business is located in La Canada, California.  MARKIE is listed in the NPPES and his NPI number is 1861475337.

19.   Defendant LITOS O. MALLARE, M.D. ("MALLARE") is a medical doctor who specializes in psychiatry.  MALLARE resides in Malibu, California.  MALLARE is listed in the NPPES and his NPI number is 1457351421.

20.   Defendants GOLCHINI, KHOSSOUSSI, MARKIE and MALLARE are herein collectively referred to as the "Doctor Defendants."

///

///

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

AMENDED COMPLAINT          5          CASE NO:  CV-12-00960 RSWL (SHX)

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

### 4. The Ambulance Defendant

21. Defendant Procare Mobile Response, LLC ("PROCARE") is a California Limited Liability Company which filed its Articles of Organization on August 13, 2001. PROCARE's principal place of business is in Los Angeles, California. As of September 10, 2006, PROCARE was owned by Tricia Pedroza, TRIGGIANI's sister, Brett Drake, Zinovy Ganopolsky, and John Shidlovitsky. In November, 2011, John Shidlovitsky pleaded guilty in Los Angeles County Superior Court to grand theft. Thereafter, on July 9, 2012, John Shidlovitsky transferred his shares to Laura Shidlovitsky. John Shidlovitsky continues to work for PROCARE in its business development department and is active in PROCARE's day to day operations despite his conviction. PROCARE is listed in NPPES and its NPI number is 1467497172.

22. At all times relevant hereto, each Defendant was acting as an agent, representative, partner, joint venture, co-schemer, or co-conspirator of the other Defendant, and in committing wrongful acts and omissions alleged herein, was acting within the scope of that agency, representation, partnership, joint venture, scheme or conspiracy.

## IV. THE PSYCH HOLD SCHEME

23. This case is about Defendants' exploitation for profit of Los Angeles' most vulnerable of citizens— including the sick, elderly and/or mentally ill. As a driver for PROCARE aptly described the scheme: "We are no longer EMT's just two people in a van kidnapping old people."

24. In 2004, Defendants began using involuntary psychiatric holds to bring patients in to LAMMC's locked psychiatric units so that Defendants could bill Medicare and Medi-Cal. At the heart of this case, LAMMC paid SGG and TRIGGIANI, for referrals of patients that could be admitted to LAMMC's locked inpatient psychiatric units. This unlawful kickback arrangement continued even after TRIGGIANI was excluded from Medicare and Medi-Cal because of her

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

1   conviction for a different Medicare fraud.  By her exclusion, TRIGGIANI was

2   prohibited from participating in any way in the care and services provided to patients

3   whose bills were paid for by Medicare and/or Medi-Cal.  Drs. KHOSSOUSSI,

4   GOLCHINI, MARKIE and MALLARIE worked with SGG and TRIGGIANI to

5   ensure that the patients were admitted to LAMMC and placed in the locked

6   psychiatric units.  LAMMC and the marketers also paid PROCARE ambulance to

7   ensure that the patients were transported without question to and from LAMMC.  In

8   the end, Los Angeles County's old, sick, and mentally ill were removed from

9   numerous board & care and skilled nursing facilities, strapped to gurneys (often

10  times in restraints), transported to LAMMC, and locked into a psychiatric unit for

11  supposed evaluation and treatment at the government's expense (the "Psych Hold

12  Scheme").  These elderly, sick and/or mentally ill patients were nothing more than

13  tickets to bill the government – even as it drained the patients' limited Medicare

14  mental health benefits.

15          25.     Psychiatric holds are governed in California by the Lanterman Petris

16  Short Act ("LPS") Act.  The LPS Act provides that:

17          when a person, as a result of mental disorder, is a danger to others, or to
18          himself or herself, or gravely disabled, a ... person designated by the county may,
        upon probably cause, take or cause to be taken, the person into custody and place
19          him or her in a facility designated by the county and approved by the State
        Department of Mental Health as a facility for 72-hour treatment and evaluation.
20          (emphasis added).

21

22          26.     Consistent with the LPS law's goal of curtailing involuntary

23  commitment, a person must be offered the least restrictive alternative for mental

24  health treatment, including being allowed to come in voluntarily for evaluation and

25  treatment.  The Los Angeles County Department of Mental Health, which oversees

26  implementation of the LPS law in Los Angeles County where the Psych Hold

27  Scheme took place, emphasizes the seriousness of the involuntary commitment

28  process, saying:

AMENDED COMPLAINT          7          CASE NO:  CV-12-00960 RSWL (SHX)

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

1   The ability to place a person on an involuntary hold in the community is the
2   only situation outside of law enforcement where an individual may take away
3   another individual's civil right to freedom and detain him or her against his or her
    will. This is a serious responsibility and the decision should never be made lightly.

4

5      27.   The Psych Hold Scheme started at about the time Drs. MARKIE and
6   MALLARE arrived at LAMMC as a "package deal" with their own county-certified
7   evaluator.  Their hand-picked evaluator was supposed to handle psychiatric
8   evaluations pursuant to the LPS law for their patients, notwithstanding LAMMC's
9   written policy that evaluation calls were to be rotated among LAMMC's county-
10  certified evaluators, Psychiatric Evaluation Team clinicians ("PET clinicians"),
11  including Relator.

12     28.   When Relator did get a MARKIE or MALLARE call, Relator quickly
13  learned that finding "no criteria" for an involuntary hold for MARKIE and
14  MALLARE patients was not an option.  She and other PET clinicians were expected
15  to bring all patients in on 5150 holds for MARKIE and MALLARE who had not
16  themselves evaluated the patients' conditions.  When Relator refused to go along, the
17  number of evaluation calls allocated to her dropped and PET clinicians willing to
18  write the involuntary holds got the calls instead.

19     29.   Relator complained about the unlawful scheme to the head of LAMMC's
20  Psychiatric Department, KHOSSOUSSI, but it was clear he already knew about it.
21  Rather than put an end to the unlawful scheme, KHOSSOUSSI offered to make her
22  his hand-picked evaluator instead.  He guaranteed her that she would make more
23  money.  KHOSSOUSSI's only condition was that Relator had to promise to admit all
24  the patients on 5150 holds.  KHOSSOUSSI did not want to hear there were "no
25  criteria."  When she refused he told her to think about it because the offer "still
26  stands."  The Psych Hold Scheme only escalated from there.

27     30.   By 2005, the Psych Hold Scheme included LAMMC and the Doctor
28  Defendants taking patients from outside referral sources, and PET clinicians

AMENDED COMPLAINT          8          CASE NO:  CV-12-00960 RSWL (SHX)

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

1   initiating psychiatric holds even when patients did not meet legal criteria.  The Psych

2   Hold Scheme also included marketers like TRIGGIANI who got paid to "keep the

3   beds full."  TRIGGIANI, in turn, gave kickbacks to the "outside facilities," as they

4   were known at LAMMC, to make sure they would call TRIGGIANI or LAMMC

5   when they needed a patient out of their facility (either because of a genuine

6   psychiatric issue, or just because they were a nuisance).  The Psych Hold Scheme

7   also included PROCARE whose medics were willing to look the other way when

8   transferring the patients between the outside facilities and LAMMC without a lawful

9   5150 hold in place, or when the patient resisted coming in all together.  Not

10  coincidentally, PROCARE is owned, in part, by TRIGGIANI's sister, Trish Pedroza.

11       31.    Even when events arose that should have deterred the Psych Hold

12  Scheme– like TRIGGIANI's indictment on an unrelated Medicare fraud charge in

13  2006, the Defendants still forged ahead, and continued their own fraud on the

14  government health care programs.  They just adapted their methods.  With

15  TRIGGIANI's unrelated conviction pending, Defendants began taking steps to

16  conceal TRIGGIANI's ongoing role in the Psych Hold Scheme.

17       32.    By the time TRIGGIANI ultimately stood convicted and was excluded

18  from Medicare and Medi-Cal, Defendants were so confident in their ability to

19  perpetrate the Psych Hold Scheme, including TRIGGIANI who was now an

20  excluded provider, that they even continued the scheme after the FBI began

21  investigating LAMMC and TRIGGIANI in August 2008 as part of yet another

22  Medicare fraud, the Skid Row scheme.  They even continued as they negotiated

23  resolution of their liability for their role in the Skid Row scheme.  They simply

24  shifted their focus to filling the psychiatric beds instead of the acute care beds that

25  were the subject of the Skid Row investigation.

26       33.    Admittedly, the Psych Hold Scheme looked somewhat different after the

27  summer of 2008.  Defendants developed symbols, like a circled "T" on patient

28  records and intake forms to denote a TRIGGIANI referral.  They also increasingly

AMENDED COMPLAINT          9          CASE NO:  CV-12-00960 RSWL (SHX)

1  used just her first name "Karen" rather than TRIGGIANI. All the while, however,

2  the phone numbers used to arrange the patient transfers remained the same, as did

3  the person behind the transfers – TRIGGIANI.

4      34.    They also hid TRIGGIANI through SGG. TRIGGIANI transferred her

5  sole ownership of SGG through a pass-through to her husband BARRETT and

6  ultimately to GOLCHINI to conceal her connection to the unlawful referral

7  arrangement without ever ceasing that involvement. GOLCHINI assumed 100%

8  ownership in SGG even as he was serving three years' probation with the State

9  Medical Board during which time he agreed to abide by all state, federal and local

10  laws.

11      35.    LAMMC was also a full participant in this concealment. Its CEO in

12  2009, John Fenton, knew that "TRIGGIANI and her group of doctors" were the ones

13  bringing patients in to his hospital. Indeed, he signed the written SGG contract with

14  TRIGGIANI and then with BARRETT that was the pretext for the referral

15  arrangement. His successors knew about the Psych Hold Scheme too. Relator told

16  them. But LAMMC's Director of Business Development, Dan Rolwing, summed it

17  up best when he told Relator in 2012 that he did not care about her "damn laws. We

18  have a business to run."

19      36.    As described below, the Psych Hold Scheme continued without regard to

20  state or federal law, adapting in order to work around obstacles including Relator's

21  refusal to participate, until LAMMC abruptly closed its doors in April, 2013.

22  Significantly, PHC's press release explaining the sudden closure said, "Pacific

23  Health Corp. has taken the difficult decision to suspend services at all three of its

24  remaining hospitals as we work to resolve the legacy issues facing our company …

25  includ[ing] … legal matters from our past, which have made it impossible for us to

26  continue operating …"

27      37.    The United States and the State of California are victims of the Psych

28  Hold Scheme because they paid hundreds of millions of dollars purportedly for

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

AMENDED COMPLAINT    10    CASE NO: CV-12-00960 RSWL (SHX)

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

1  Health Care Services related to the thousands of patients cycled through LAMMC

2  between 2004 and 2013 as part of the Psych Hold Scheme.  And since LAMMC

3  ranked fifth in the entire country for hospitals whose patients cost Medicare the most

4  in 2012 – both during their stays and for all services in the months afterward, the

5  extent of the unlawful diversion of government health care funds is not insignificant.

6  In fact, the Psych Hold Scheme is exactly what Congress hoped to curb when it

7  passed the Anti-Kickback laws - payoffs to those who can influence healthcare

8  decisions which would corrupt decision-making.

9         38.     In addition to the public fisc, the real victims of the Psych Hold Scheme

10  are the elderly, sick and/or mentally ill who became unwitting chattel in the

11  Defendants' scheme to move them between LAMMC and skilled nursing facilities

12  and board & cares to maximize billing to government health care programs.

13         39.     These patients included people who were mentally ill and needed – and

14  deserved - psychiatric care.  But even more troubling, these patients included those

15  who were not mentally ill and not in need of psychiatric care.  They were just "good

16  candidates for transfer to psych" because they had Medicare and/or Medi-Cal

17  benefits, they were unable to advocate for themselves and they had no friends or

18  family to protect them from those who, literally and figuratively, would "chase them

19  down, tackle them and strap them in restraints."

20         40.     When California passed the LPS laws in 1967 as one of the most

21  humane pieces of legislation of its kind, the law's supporters – and those who would

22  implement it over the next forty years – had no way to predict that the law designed

23  to end involuntary commitments would be so flagrantly abused just to bilk

24  government health care programs for personal gain.  Yet, by the Psych Hold

25  Scheme, that is exactly what the Defendants here did.

26  / / /

27  / / /

28  / / /

## V.     THE MEDICARE AND MEDI-CAL PROGRAMS

### A.     The Medicare Program

41.     Medicare is a health care benefit program funded by the federal government.  The Medicare program compensates participating doctors, hospitals and other health care providers who furnish health care services to citizens of the United States (and certain other legal residents) who have reached the age of 65 or who suffer from certain qualifying disabilities.  Medicare was established by Title XVIII of the Social Security Act of 1965 (codified as amended at 42 U.S.C. §1395 *et. seq.*).

42.     The agency of the United States responsible for the Medicare program is the Department of Health and Human Services ("HHS").  *See e.g.* 42 U.S.C. §§1395b-1, 1395b-2, 1395b-3, 1395b-4, 1395b-7, 1395r and 1395u.  The agency within HHS administering the program is CMS.

43.     Physicians, hospitals and ambulance companies (and certain other health care providers) who meet the requirements for participation in the Medicare program may receive compensation for health care services furnished to patients eligible for benefits that are reasonable and necessary for the treatment of the patient.  The law provides in relevant part:

> Notwithstanding any other provision of this subchapter, no payment may be made under [Medicare] part A or part B for this subchapter for any expenses incurred for items or services ... [¶] which ... are not reasonable and necessary for the diagnosis or treatment of illness or injury...

42 U.S.C. §1395Y(a)(1)(A).

#### 1.     Conditions for Medicare Providers

##### (a)     Medicare's Provider Agreement

44.     When electing to participate in the Medicare program, the provider enters into a "provider agreement" with Medicare and must submit certain information on applicable enrollment applications.  42 CFR § 424.510.  Among

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

other things, the provider agrees to comply with all statutory and regulatory provisions relating to Medicare reimbursement, including the provisions of Section 1866 of the Social Security Act and Title 42 of the Code of Federal Regulations.

45.     The application to become a Medicare Provider is Form CMS 855A. Every healthcare provider must execute the Enrollment Application before they may participate in Medicare or bill Medicare for services or goods.  As part of completing the CMS-855A, a certification must be executed which includes the following attestation:

> I agree to abide by the Medicare laws, regulations, and program instructions that apply to this provider... I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including but not limited to, the Federal anti-kickback Statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

46.     By executing the application, therefore, a provider certifies to abide by all applicable laws, regulations and instructions.  Furthermore, the provider certifies his/her understanding that payment of claims by Medicare is conditioned upon compliance with "all applicable conditions of participation in Medicare."

47.     The Medicare regulations in Title 42 of the Code of Federal Regulation, Part 424, Conditions for Medicare Payment, plainly require ongoing certifications by all Medicare providers for maintaining active enrollment status in the Medicare Program.  42 CFR § 424.516.  This regulation provides that "CMS enrolls and maintains an active enrollment status for a provider ... when that provider ... certifies that it meets, and continues to meet ... all of the following requirements:

> (1)     Compliance with title XVIII of the [Social Security] Act and applicable Medicare regulations.

> (2)     Compliance with Federal and State licensure, certification and regulatory requirements, as required, based on the type of services or supplies the provider or supplier will furnish and bill Medicare.

(3)   Not employing or contracting with individuals or entities that meet … the following conditions:

i.   Excluded from participation in any Federal health care programs, for the provision of items and services covered under the programs, in violation of section 1128A(a)(6) of the Act.

42 CFR § 424.516.

48.   At all times relevant to this complaint, the Hospital Defendant, PROCARE, GOLCHINI, KHOSSOUSSI, MARKIE and MALLARE were approved Medicare providers.  These Defendants are herein collectively referred to as the "Provider Defendants."

49.   Like other Medicare providers, the Provider Defendants agreed in their Enrollment Applications to abide by all federal and state laws and regulations governing Medicare providers.  Each of them further agreed in their Enrollment Applications not to engage in or commit fraud and abuse, including intentional deception or misrepresentation to obtain an unauthorized benefit.

**(b)   Additional Medicare Conditions for Providers**

50.   Hospital Providers such as LAMMC must also agree to certain "Conditions of Participation," including but not limited to:

a.   42 CFR § 482.11 – Compliance with Federal, State and local laws

b.   42 CFR § 482.13 – Patient's Rights

c.   42 CFR § 482.43 – Discharge Planning

d.   42 CFR § 482.60 – Special Provisions Applying to Psychiatric Hospitals

e.   42 CFR § 482.61 - Special Medical Record Requirements for Psychiatric Hospitals

f.   42 CFR § 482.62 – Special Staff Requirements for Psychiatric Hospitals

51.   The Medicare regulations in Title 42 of the Code of Federal Regulation, Part 424, Conditions for Medicare Payment, also clearly state the "major" role that physicians like GOLCHINI, KHOSSOUSSI, MALLARE and MARKIE are required

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

---

AMENDED COMPLAINT          14          CASE NO:  CV-12-00960 RSWL (SHX)

KELLER GROVER LLP

1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

1   to play in providing services to beneficiaries.  "The physician has a major role in

2   determining utilization of health services furnished by providers.  The physician

3   decides upon admissions, orders tests, drugs, and treatments, and determines the

4   length of stay."  42 CFR § 424.10.  Accordingly, sections 1814(a)(2) and 1835(a)(2)

5   of the Act establish as a condition for Medicare payment that a physician certify the

6   necessity of the services and, in some instances, recertify the continued need for

7   those services.  42 CFR § 424.10.  *See e.g.* 42 CFR § 410.40 and 42 CFR § 424.14.

8   52.   Federal regulations also require providers to maintain medical records

9   that are accurately written, promptly completed, properly filed and retained, and

10  accessible.  42 USC § 482.24(b).  Hospitals must use a system of author

11  identification and record maintenance that ensures the integrity of the authentication

12  and protects the security of all record entries.  *Id.*  Hospitals must retain their

13  medical records in their original or legally reproduced form for at least five years for

14  each inpatient.  42 CFR § 482.24(b)(1).

### 2.   Medicare Part A – Inpatient Psychiatric Care

16  53.   CMS administers the hospital insurance benefits program, commonly

17  referred to as "Medicare Part A."  42 U.S.C. §§1395c – 1395i-5.  Medicare Part A

18  "provides basic protection against the costs of hospital, related post-hospital, home

19  health services, and hospice care."  42 U.S.C. §1395c.  Benefits include services

20  provided by psychiatric hospitals.  42 U.S.C. §1395d(c).

21  54.   To assist in the administration of Medicare Part A, CMS contracts with

22  "fiscal intermediaries."  42 USC § 1395h; 42 USC § 1395pp(f).  Fiscal

23  intermediaries, typically insurance companies, are responsible for processing and

24  paying claims and cost reports.

### (c)   Limited Mental Health Benefits

26  55.   Unlike ordinary hospitalization benefits, Medicare mental health

27  benefits are limited.  Medicare Part A will only pay for up to 190 days of inpatient

28  psychiatric hospital services during the beneficiary's lifetime.  42 CFR § 409.62.  In

1   addition, Medicare Part A measures a beneficiary's use of hospital services

2   (including services a beneficiary gets in a psychiatric hospital) and skilled nursing

3   facilities ("SNF") in benefit periods.  42 CFR § 409.63.  A benefit period begins the

4   day a beneficiary is admitted as an inpatient in a hospital or SNF.  The benefit period

5   ends after the beneficiary has not had any inpatient hospital care or skilled care in a

6   SNF for 60 days in a row.  If a beneficiary goes into a hospital or SNF again after 60

7   days, a new benefit period begins, and the patient must pay a new deductible for any

8   inpatient hospital services.

9           **(d)    Medical Necessity for Inpatient Psychiatric Services**

10       56.    As with other hospitalizations, Medicare requires a showing of medical

11   necessity for payment of any claim for inpatient mental health services.  The Social

12   Security Act provides under the title "Conditions of and Limitations on Payment for

13   Services" that:

14       payment for services furnished an individual may be made only to providers of
     services which are eligible therefor … only if …

15

16       (2) a physician … certifies (and recertifies, where such services are furnished

17   over a period of time, in such cases, with such frequency, and accompanied by such
     supporting material, appropriate to the case involved, as may be provided by

18   regulations, except that the first of such recertifications shall be required in each case
     of inpatient hospital services not later than the 20th day of such period) that—

19

20       (A) in the case of inpatient psychiatric hospital services, such services are or
     were required to be given on an inpatient basis, by or under the supervision of a

21   physician, for the psychiatric treatment of an individual; and (i) such treatment <u>can</u>

22   <u>or could reasonably be expected to improve the condition for which such treatment</u>

23   <u>is or was necessary</u> or (ii) inpatient diagnostic study is or was medically required and
     such services are or were necessary for such purposes.

24

25       42 USC 1395f (a)(2)(A) (emphasis added).

26       57.    The implementing regulations make clear the certification requirements

27   for psychiatric care differ from those for other kinds of care "because the care

28   furnished in psychiatric hospitals is often purely custodial and thus not covered

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

1   under Medicare.  The purpose of the [physician] statements, therefore, is to help

2   ensure that Medicare pays only for services of the type appropriate for Medicare

3   coverage.  Accordingly, Medicare Part A pays for inpatient care in a psychiatric

4   hospital <u>only if</u> a physician certifies and recertifies the need for services." 42 CFR

5   § 424.14 (emphasis added).

(e)    **Medicare Reimbursement for Mental Health Care**

7       58.    Medicare pays providers for inpatient psychiatric services on a per diem

8   basis using a prospective payment system.  42 USC § 1395ww(s).  The Prospective

9   Payment System ("PPS") for inpatient psychiatric services was implemented for cost

10  reporting periods beginning on or after October 1, 2002.  *Id.* at (c).

11      59.    Under the PPS per diem system, providers of psychiatric services must

12  meet Medicare's recordkeeping and cost reporting requirements generally applicable

13  to all Part A providers.  42 CFR 412.404(e).  Psychiatric units within hospitals that

14  also provide acute care are subject to additional requirements.  *See* 42 CFR § 412.25

15  and 42 CFR § 412.27.  *See also* CMS Form 437 (psychiatric unit criteria work

16  sheet).

### 3.    Yearly Cost Reporting Requirements

18      60.    Cost reports are the final claim that a provider submits to the fiscal

19  intermediary for items and services rendered to Medicare beneficiaries during the

20  prior year.  After the end of the psychiatric hospital's fiscal year, it files its hospital

21  cost report (form CMS-2252) with the fiscal intermediary, stating the amount of

22  reimbursement the provider believes it is entitled to for the year.  *See* 42 USC §

23  1395g(a); 42 CFR §§ 413.20, 413.24(f).  *See also* 42 CFR § 405.1801(b)(1).

24  Medicare relies on the cost report to determine whether the provider is entitled to

25  more reimbursement than already received through interim payments, or whether the

26  provider has been overpaid and must reimburse Medicare.  42 CFR §§ 413.60 and

27  413.64(f)(1).

28  ///

---

AMENDED COMPLAINT            17        CASE NO:  CV-12-00960 RSWL (SHX)

61.    LAMMC was, at all relevant times up to and including the time that it closed, required to annually submit a hospital cost report to its fiscal intermediary.

62.    During the relevant time period, Medicare payments for inpatient psychiatric services were calculated using Medicare's per diem payment amount. *See* 42 CFR §§ 412.22, 412.424, 412.426, 412.428, 412.432.  On the hospital cost report, Medicare liability for services is totaled with any other Medicare liabilities to the provider.  This total determines Medicare's liability for services rendered to Medicare beneficiaries during the course of a fiscal year.  From this sum, the payments made to the provider during the year are subtracted to determine the amount the provider owes to the Medicare program or the amount the Medicare program owes to the provider.

63.    At all times relevant to this complaint, the applicable rules provided that Medicare, through its fiscal intermediaries, had the right to audit the hospital cost reports and financial representations made by LAMMC to ensure their accuracy and preserve the integrity of the Medicare Trust Funds.  This right includes the right to make retroactive adjustments to hospital cost reports previously submitted by a provider if any overpayments have been made.  42 CFR § 413.64(f).

64.    Every hospital cost report contains a "Certification" that must be signed by the chief administrator of the provider or a chief financial officer.  42 CFR § 413.24.  The preface to the cost report certification sets forth the following warning:

> Misrepresentations or falsification of any information contained in this cost report may be punishable by criminal, civil, and administrative action, fine and/or imprisonment under federal law.  Furthermore, if services identified in this report were provided or produced through the payment directly or indirectly of a kickback or were otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result.

65.    The individual signing the cost report must confirm having read the warning and attest to the accuracy of the information in the cost report as follows:

/ / /

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

I hereby certify that I have read the above certification statement and that I have examined the accompanying … cost report … and that to the best of my knowledge and belief, this report and statement are true, correct, complete and prepared from the books and records of the provider in accordance with applicable instructions, except as noted.  I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

42 CFR § 413.24.  The certification is required to obtain and retain Medicare funds from the federal Government.

66.    A hospital is required to disclose all known errors and omissions in its claims for Medicare reimbursement (including its cost reports) to its fiscal intermediary.  Section 1320a-7b(a)(3) of Title 42 specifically creates a duty to disclose known errors in cost reports:

Whoever … having knowledge of the occurrence of any event affecting (A) his initial or continued right to any such benefit or payment … conceals or fails to disclose such event with an intent fraudulently to secure such benefit or payment either in a greater amount or quantity than is due or when no such benefit or payment is authorized … shall in the case of such [concealment or failure] be guilty of a felony.

42 USC § 1320a-7b(a)(3), (a)(6).

67.    LAMMC submitted cost reports during the period covered by this complaint.

**4.    Medicare Part B**

68.    Medicare Part B is a 100% federally subsidized health insurance benefit.  Eligible persons aged 65 or older may enroll in Part B of the Medicare Program to obtain benefits in return for payments of monthly premiums as established by DHHS. The benefits covered by Part B of the Medicare program include medical treatment and services by physicians and ambulance services.  No payment may be

/ / /

/ / /

/ / /

KELLER GROVER LLP

1965 Market Street, San Francisco, CA 94103

Tel. 415.543.1305 | Fax. 415.543.7861

made under Part B for services that are not "reasonable and necessary for the diagnosis or treatment of illness or injury." 42 USC § 1395y(a)(1)(A).

69.     As with Part A, HHS contractually assigns to private insurance carriers the task of processing and paying Part B claims from the Medicare Trust Fund. 42 USC § 1395u.

### (f)     All Part B Providers' Obligations to Medicare

70.     In making a claim for payment under Part B, a physician or other entity seeking reimbursement must meet certain obligations. These obligations include duties to:

a.     Bill Medicare for only reasonable and necessary medical services. 42 USC § 1395y(a)(1)(A).

b.     Not make false statements or misrepresentations of material facts concerning requests for payment under Medicare. 42 USC § 1320a-7b(a)(1) & (2); 1320a-7; 1320a-7a.

c.     Provide evidence that the service given is medically necessary. 42 USC § 1320c-5(a)(3).

d.     Provide economical medical services, and then, only where medically necessary. 42 USC § 1320c-5(a)(1)

e.     Assure that such services are not substantially in excess of the needs of such patients. 42 USC § 1320a-7(b)(6)

f.     Certify when presenting a claim that the service provided is a medical necessity. 42 USC § 1395n(a)(2)(B)

### (g)     Physician Services

71.     Medicare provides reimbursement for physician services based on a fee schedule. Medicare reimburses 80% of the "allowed amount" on covered claims. The remaining 20%, the co-payment, may be covered by a patient's secondary insurance plan, by Medi-Cal, or by the patient.

/ / /

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

72.     Enrolled individuals who obtain a covered medical service can either pay for the medical service themselves, and request reimbursement of 80% of the reasonable charge, or assign the right to reimbursement to the physician providing the service, who collects as an assignee of the beneficiary under 42 U.S.C. § 1395a(b). Funds to reimburse claims for reimbursement originate from the Medicare Trust Fund.

73.     Providers, including physician providers submitting claims under Part B, must furnish "such information as may be necessary in order to determine the amounts due" to receive Medicare payment.  42 USC § 1395a(e).  For every service billed, providers must indicate the specific sign, symptom, or patient complaint necessitating the service. *Id. See also* 42 CFR §§ 411.15(k)(1) and 424.5(a)(6) describing sufficient information to determine payment.

74.     Amounts payable to physicians under Part B are provided in the Medicare physician fee schedule ("MPFS").  42 USC § 1395w-4.  CMS uses the American Medical Association's ("AMA") "Current Procedural Terminology" ("CPT") as the uniform coding system for all physician services, including mental health services.

75.     At all times relevant to this complaint, Medicare's fiscal intermediary reviewed and approved claims submitted for medical reimbursement by Medicare providers, including claims submitted or caused to be submitted by Defendants GOLCHINI, KHOSSOUSSI, MALLARE and MARKIE as physician-providers. The fiscal intermediary made payment on those claims which appeared to be eligible for reimbursement under the Medicare Part B program.

### (h)     Ambulance Services

76.     Ambulance services are also covered under Medicare Part B.  42 CFR § 410.40.  Part B pays for emergency ambulance services to or from a hospital or a skilled nursing facility when other transportation could endanger the health of the beneficiary. *Id.* Medicare Part B may also pay for nonemergency transportation by

1   ambulance when the beneficiary's attending physician provides a written order that

2   the transportation is medically necessary. 42 CFR § 410.40(d).

3       77.    In all cases, Medicare will only cover ambulance services to the nearest

4   medical facility that is able to provide the beneficiary the required care. If the

5   beneficiary is transported to a facility farther away, Medicare will only pay the base

6   charge to the closest appropriate facility. 42 CFR § 410.40(e).

7       78.    At all times relevant to this complaint, Medicare's fiscal intermediary

8   reviewed and approved claims submitted for medical reimbursement by Medicare

9   providers, including claims submitted or caused to be submitted by ambulance

10   services in which Defendants GOLCHINI, KHOSSOUSSI, MALLARE and

11   MARKIE made certifications of medical necessity for ambulance transportation.

12   The fiscal intermediary made payment on those claims which appeared to be eligible

13   for reimbursement under the Medicare Part B program.

14   **B.**     **THE MEDI-CAL PROGRAM**

15       79.    California implemented the Medi-Cal program in 1966, based on the

16   provisions of Title XIV, the Medicaid legislation that provided federal matching

17   funds to states that implemented a comprehensive health care system for the poor

18   under the administration of a single state agency. Medi-Cal provides payment for

19   health care services to California residents when no other alternative is available,

20   including when federal Medicare mental health benefits have been exhausted.

21       **1.**     **Controlling Law**

22       80.    As a joint federal-state program, both federal and state laws govern the

23   administration of Medi-Cal. As with Medicare:

24       a.     Healthcare providers must complete a provider agreement before

25   becoming providers for the Medi-Cal program. *See* Forms DHCS 9098i

26   (Institutional Provider Agreement) and DHCS 6208 (Provider Agreement).

27       b.     Every provider must certify compliance with all state and federal and

28   regulatory requirements for certification of claims, including 42 CFR §§ 438.604,
438.606 and 438.608. *See also,* 9 CCR § 1840.112.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

c.      The Medi-Cal program only provides compensation for those health care services "which are reasonable and necessary to protect life, to prevent significant illness or significant disability, or to alleviate severe pain through the diagnosis or treatment of disease, illness or injury…." 22 CCR §51303(a). *See also* 9 CCR § 1820.205 (defining medical necessity criteria for inpatient psychiatric services).

d.      "Inpatient services in hospitals are covered only when provided on the signed order of the physician … responsible for the care of the patient." 22 CCR §51303(d). *See also* 22 CCR § 70717 (describing various requirements on acute care hospitals regarding the admission, transfer and discharge of patients).

e.      Reimbursable psychiatric inpatient hospital services are calculated on a per diem basis.  9 CCR § 1820.100 (c).

f.      Ambulance services are only covered "when the beneficiary's medical and physical condition is such that transport by ordinary means of public or private conveyance is medically contraindicated, and transportation is required for the purpose of obtaining needed medical care." 22 CCR §51323(a).

g.      Each provider must "keep, maintain, and have readily retrievable, such records as are necessary to fully disclose the type and extent of services provided to a Medi-Cal beneficiary," and that "[s]uch records shall include, but not be limited to… (2) Treatment authorization requests (3) All medical records, service reports, and orders prescribing treatment plans … (7) Identification of the person rendering services." 22 CCR §51476(a).

81.     The Department of Health Care Services (DHCS) administers Medi-Cal. DHCS delegates administrative responsibility for specialty mental health services to county departments of mental health.  Title 9 of the California Code of Regulations, Division 1, Chapter 11 sets forth Medi-Cal regulations for specialty mental health services.  *See* 9 CCR §§ 1810.100 – 1850.535.

82.     Mental health services provided under Medi-Cal include the assessment necessary to determine eligibility for specialty mental health services, urgent care services when required, and treatment services required by the assessment.

/ / /

/ / /

KELLER GROVER LLP

1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

### 2.     Medi-Cal Funding Sources

83.     For services meeting Federal Financial Participation ("FFP") cost-sharing requirements, the cost of mental health services is paid through a combination of county, State, and Federal funds. The FFP sharing ratio is determined on an annual basis and is known as the Federal Medical Assistance Program (FMAP) percentage.  The county share is funded by a combination of State realignment funds, State managed care allocations, State General Fund (SGF) monies, local county funds and other sources such as local grants.

84.     At all times relevant to this complaint, each of the Provider Defendants was an approved Medi-Cal provider.

## VI.   APPLICABLE LAWS

### A.     FALSE CLAIMS ACTS

#### 1.     The Federal False Claims Act

85.     The federal False Claims Act (the "FCA") was originally enacted during the Civil War, and substantially amended in 1986.  It has also been amended twice more recently, in 2009 and 2010.  Congress enacted this series of amendments to enhance the Government's ability to recover losses sustained as a result of fraud against the United States, after finding that fraud in federal programs was pervasive and that the FCA was in need of modernization to more effectively combat such fraud.  Congress has characterized the FCA as the primary tool for combating fraud against the Government.

#### (a)     Liability Provisions

86.     The liability provisions of the FCA provide that any person who knowingly submits, or causes the submission of, a false or fraudulent claim for United States funds for payment or approval, or who makes or causes to be made

/ / /

/ / /

/ / /

---

AMENDED COMPLAINT          24          CASE NO:  CV-12-00960 RSWL (SHX)

false records and statements in support of such claims, is liable for a civil penalty, plus three times the amount of damages sustained by the Government.[1]

a.    The pre-FERA FCA, 31 USC § 3729, provides in relevant part:

False Claims. (a) Liability for certain acts.  Any person who –

(1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government … a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;

(3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid …

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person …

b.    The post-FERA FCA, 31 USC § 3729, provides in relevant part:

False Claims. (a) Liability for certain acts. (1) In general. Subject to paragraph (2), any person who –

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

---

[1]    Relator's action covers conduct during the period 2004-present.  The FCA was amended in 2009 by the Fraud Enforcement and Recovery Act of 2009, Public Law 111-21 ("FERA"). Relator's allegations about the conduct prior to the effective date of FERA, May 20, 2009, are brought under the FCA pre-FERA, while allegations about the conduct after that date are brought under the FCA as amended by FERA.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

is liable to the United States Government for a civil penalty of not less than $5,500 and not more than $11,000, … plus 3 times the amount of damages which the Government sustains because of the act of that person.

### (b) The Qui Tam Provisions

87. The "qui tam" provisions of the FCA allow any person having information about violations of the liability provisions of the Act to bring an action for herself and the Government, and to share in any recovery.

88. Under 31 U.S.C. §3730, a *qui tam* complaint is to be filed *in-camera* and remains under seal for a period of at least sixty (60) days after the United States receives both the complaint and the material evidence and information (without service on the defendant during that time) to allow the Government time to conduct its own investigation and to determine whether to join the suit. That time may be extended by order of the Court.

### (c) The Statute of Limitations

89. The statute of limitations for violations under the federal FCA is at least six years from the date of the violation and as long as ten years after such violation, provided that, for claims over six years old, United States government officials charged with responsibility to act under the circumstances were not on actual or constructive notice of such older violations sued upon for more than three years before the claims were brought regarding these older violations. Separate limitations periods run with respect to each distinct false claim made (or other substantive False Claims Act violation).

90. To Relator's knowledge, no federal government official of any kind was on actual or constructive notice of any of the misconduct currently alleged in this Complaint before Relator brought these matters to their attention. The period of time alleged to be relevant to the claims raised in this Complaint is thus at least the six-year period, and presumptively the 10 year period immediately prior to the filing of Relator's original complaint in this action.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

## 2. California's False Claims Act

91. The California False Claims Act was adopted in 1987 to serve similar purposes as the federal False Claims Act for the State of California and its political subdivisions. The California FCA is modeled largely on the federal False Claims Act. Cal. Gov't Code §§ 12650 *et. seq.*

92. The California FCA provides that any person who (1) knowingly presents or causes to be presented false or fraudulent claims for payment or approval to the Government, (2) knowingly makes, uses or causes to be made or used false records and statements to induce the Government to pay or approve false or fraudulent claims, or (3) conspires to violate the CFCA, is liable for a civil penalty for each such claim, plus three times the amount of the damages sustained by the Government. Cal. Gov't Code § 12651.

93. The California FCA also allows any person with information about a violation of the statute to bring an action on behalf of the State, and to share in any recovery. The California FCA, like the federal FCA, requires that the complaint be filed under seal for a minimum of 60 days (without service on the Defendants during that time) to enable the Government to conduct its own investigations without the Defendants' knowledge and to determine whether or not to join in the action. Cal. Gov't Code § 12652(c)(2). The statute of limitations under the CFCA, like the federal FCA, is at least six years from the date of the violation and as long as ten years after such violation. Cal. Gov't Code § 12654. Separate limitations periods run with respect to each distinct false claim made.

## B. THE ANTI-KICKBACK LAWS

### 1. Federal Anti-Kickback Laws

94. The federal Government seeks to ensure that decisions about federally-funded medical care are made on the basis of sound medical judgment and not on the basis of personal financial gain. Concerned that payoffs to those who can influence healthcare decisions corrupts professional healthcare decision-making and

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

1  may result in federal funds being diverted to pay for goods or services that are

2  medically unnecessary, of poor quality, or even harmful to a vulnerable patient

3  population, Congress enacted the federal Anti-Kickback Statute ("AKS"), 42 USC §

4  1320a-7b(b), and the federal Stark Statute ("Stark"), 42 USC § 1395nn, to prohibit

5  certain transactions that Congress has concluded render it more likely than not that

6  improper reasons influenced healthcare decision-making and to protect the integrity

7  of the Medicare program from these difficult to detect harms.  Compliance with

8  these laws and policies is critical to ensuring the integrity of the federal healthcare

9  system.

### (a)  The Anti-Kickback Statute

10

11  95.  First enacted in 1972, the AKS was strengthened in 1977 and 1987 to

12  ensure that kickbacks masquerading as legitimate transactions do not evade its reach.

13  *See* Social Security Amendments of 1972, Pub. L. No 92-603, §§ 242(b) and (c); 42

14  USC § 1320a-7b, Medicare-Medicaid Anti-fraud and Abuse Amendments, Pub. L.

15  No. 95-142; Medicare and Medicaid Patient Program Protection Act of 1987, Pub.

16  L. No. 100-93.

17  96.  At its core, the AKS prohibits pay-for-patient referral schemes.  It

18  applies to physicians or others who refer, recommend, turn over, select or give

19  business to a particular recipient, and reaches even minor actors in a kickback

20  scheme.  As long as one of the purposes of the offer or payment is to induce

21  Medicare or Medicaid patient referrals, it violates the Anti-Kickback Statute.

22  97.  All Medicare providers certify compliance with the AKS in enrolling to

23  be and continuing to be a Medicare provider eligible to receive payments from the

24  Medicare program.  *See* Form CMS-855A.

### (1)  What the AKS Prohibits

25

26  98.  At all times relevant to this Complaint, the AKS has prohibited any

27  person or entity from making or accepting payment to induce or reward any person

28  / / /

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

---

AMENDED COMPLAINT     28     CASE NO:  CV-12-00960 RSWL (SHX)

1  for referring, recommending or arranging for federally-funded medical items and

2  services, including items and services provided under the Medicare program.

3      99.    In relevant part, the AKS states:

4      (b)(1) whoever knowingly and willfully solicits or receives any remuneration

5  (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind

6

7      (A)    in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made

8  in whole or in part under a Federal health care program, or

9

10      (B)    in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item

11  for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony…

12

13      (2) whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly,

14  in cash or in kind to any person to induce such person

15

16      (A)    to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in

17  part under a Federal health care program, or

    (B)    to purchase, lease, order, or arrange for or recommend purchasing,

18  leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

19      shall be guilty of a felony and upon conviction thereof, shall be fined not more

20  than $25,000 or imprisoned for not more than five years, or both.

21      42 U.S.C. § 1320a-7b(b)(1) and (2).

22            **(2)    Recent Amendments to the AKS**

23      100.   By the Patient Protection and Affordable Care Act (PPACA) of 2010,

24  Congress amended the language of the AKS to make clear that claims submitted in

25  violation of the AKS automatically constitute false claims for purposes of the FCA.

26  Pub. L. No. 111-148, sec. 6402(f)(1), Stat. 119, 759 (amending 42 USC § 1320a-7b).

27  *See*, 42 USC § 1320a-7b(g). Even before Congress acted to clarify the AKS,

28  / / /

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

1   numerous courts of appeal and district courts had reached the same conclusion.

2   FCA cases can properly be premised on kickback violations alone.

3       101.   By PPACA, Congress also amended the AKS to make clear that neither

4   actual knowledge nor specific intent is required to commit a violation of this act. 42

5   USC § 1320a-7b(h).

6       102.   For purpose of the Anti-Kickback Statute, "Federal health care program"

7   includes the Medicare and Medi-Cal programs. 42 U.S.C. §1320a-7b(f)(1) and (2).

8               **(3)    AKS's Safe Harbor Provisions**

9       103.   The Anti-Kickback Statute contains statutory exceptions known as "Safe

10   Harbors" that exempt certain transactions from its prohibitions. Each exception

11   requires that strict standards are met. For example: all arrangements must be in

12   writing. There are regulatory safe harbors for space rental, equipment rental,

13   personal services and management contracts.

14       104.   The personal services or management contracts safe harbor applies to

15   payments to an agent if there is a written agreement, and the agreement is "intended

16   to provide for the services of the agent on a periodic, sporadic or part-time basis"

17   with schedules, interval, and costs expressly stated in the contract, and compensation

18   "consistent with fair market value in arms-length transactions and is not determined

19   in a manner that takes into account the volume or value of any referrals or business

20   otherwise generated between the parties…" 42 C.F.R. § 1001.952(d). Thus, where

21   no written agreement exists and/or compensation purportedly is paid for personal

22   services or management that are not provided and are made with the intent to reward

23   referrals, the Anti-Kickback Statute has been violated.

24               **(b)    The Stark Statute**

25       105.   The Stark Statute was enacted as an amendment to the Social Security

26   Act and prohibits an entity that provides designated health services ("DHS") from

27   submitting Medicare claims for payment based on patient referrals from physicians

28   / / /

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

1  who have a prohibited financial relationship (as defined in the statute) with the

2  entity.

3      106.   The purpose of the Stark Statute was to respond to concerns that

4  excessive use of some services is encouraged when physicians have a financial

5  relationship with the entities to which they refer patients.  135 Cong. Rec. H240

6  (Feb. 9, 1989) (statement of Rep. Pete Stark).

7      107.   Stark provides that if a physician has a financial relationship with a

8  healthcare entity, then:

9

10     (A)    the physician may not make a referral to the entity for the furnishing of
       designated health services for which payment otherwise may be made under this

11     subchapter, and

12     (B)    the entity may not present or cause to be presented a claim under this

13     subchapter or bill to any individual, third party payor, or other entity for designated
       health services furnished pursuant to a referral prohibited under subparagraph (A).

14     42 USC § 1395nn.

15     108.   Compliance with the Stark Act is a condition of payment by the United

16  States.  42 USC § 1395nn(g)(1).

17

18              (1)     Stark Enforcement

19     109.   CMS is the agency authorized to implement Stark and has promulgated

20  regulations interpreting Stark, including regulations defining certain "safe harbors"

21  for payment practices that will not give rise to Stark liability.  42 CFR § 411.350 *et*

22  *seq.*  These safe harbors generally require that even when a payment potentially falls

23  into an exempt category, the payment must be based upon fair market value and not

24  provided for the purpose of influencing referrals.  The implementing regulations also

25  require that providers who have collected Medicare payments for a healthcare

26  service "performed under a prohibited referral must refund all collected amounts on

27  a timely basis." 42 CFR § 411.353.

28  / / /

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

110.   Stark defines "referral" as "the request or establishment of a plan of care by a physician which includes the provision of the designated health services." 42 USC § 1395nn(h)(5)(B).  The regulations interpreting Stark also broadly define "referral" to include, among other things "a request by a physician that includes the provision of any designated health service for which payment may be made under Medicare, the establishment of a plan of care by a physician that includes the provision of such a designated health service." 42 CFR § 411.351.  A referring physician is defined in the same regulation as "a physician who makes a referral as defined in this section or who directs another person or entity to make a referral or who controls referrals made by another person or entity." *Id.*

111.   Stark defines financial relationship as any compensation paid directly or indirectly to a referring physician or any ownership or investment interest, including debt. 42 USC § 1395nn(a)(2).  Stark also identifies specific transactions that will not trigger its referral and billing prohibitions.  42 USC § 1395nn(b-e).

112.   Stark defines "fair market value" as the "value in arm's length transactions, consistent with general market value." 42 USC § 1395nn(h)(3).  The regulations interpreting the statute further define "general market value" as "the price that an asset would bring as the result of *bona fide* bargaining between well-informed buyers and sellers who are not otherwise in a position to generate business for the other party, or the compensation that would be included in a service agreement as the result of *bona fide* bargaining between well-informed parties to the agreement who are not otherwise in a position to generate business for the other party, on the date of acquisition of the asset or at the time of the service agreement." 42 CFR § 411.351.  The regulations further provide that fair market price is usually the price "at which *bona fide* sales have been consummated for assets of like type, quality and quantity in a particular market at the time of acquisition, or the compensation that has been included in *bona fide* service agreements with comparable terms at the time of the agreement, where the price or compensation has

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

1   not been determined in any manner that takes into account the volume or value of

2   anticipated or actual referrals." *Id.*

3       113.   Once the government has demonstrated each element of a violation of

4   Stark, the burden shifts to the defendant to establish that the defendant's conduct was

5   protected by a safe harbor or exception.  The Government need not prove that the

6   defendant's conduct does not fit within a safe harbor or exception.

7                    **(2)    Stark Violators Subject to Exclusion**

8       114.   Violation of Stark may subject the billing entity to exclusion from

9   participation in federal healthcare programs, as well as financial penalties.  42 USC

10  §§ 1395nn(g)(3), 1320a-7a(a).

11              **2.    California's Anti-Kickback Laws**

12      115.   California prohibits kickbacks in healthcare programs through several

13  different laws.

14              **(a)    Welfare and Institutions Code section 14107.2**

15      116.   The California counterpart to the federal Anti-Kickback Statute is

16  Welfare and Institutions Code section 14107.2.  It prohibits any person from:

17      solicit[ing] or receiv[ing] any remuneration, including, but not restricted to any
    kickback, bribe, or rebate, directly or indirectly, overtly or covertly, in cash or in
18  valuable consideration of any kind, either:

19
    (1) In return for the referral or promised referral, of any individual to a person
20  for the furnishing or arranging for the furnishing of any service or merchandise for
    which payment may be made, in whole or in part, under [the Medi-Cal program]; or
21

22  (2) In return for the purchasing, leasing, ordering, or arranging for or
    recommending the purchase, leasing, or ordering of any goods, facility, service or
23  merchandise for which payment may be made, in whole or in part, under the [Medi-
    Cal program]…
24

25      Cal. Wel. & Inst. Code § 14107.2(a).

26      117.   The statute also prohibits "offer[ing] or pay[ing] any remuneration,

27  including, but not limited to, any kickback, bribe, or rebate, directly or indirectly,

28  overtly or covertly, in cash or in valuable consideration," in return for referring

1  patients for medical services or purchasing or ordering goods or services, payment

2  for which may be made by the Medi-Cal program.  Cal. Wel. & Inst. Code

3  § 14107.2(b).

4        118.   The statute specifically defines the term "kickback" as meaning "a rebate

5  or anything of value or advantage, present or prospective, or any promise or

6  undertaking to give any such rebate or thing of value or advantage, with a corrupt

7  intent to unlawfully influence the person to whom it is given in actions undertaken

8  by that person in his or her public, professional, or official capacity."  Cal. Wel. &

9  Inst. Code §14107.2(d).

10       119.   The California Anti-Kickback statute has no express "knowing and

11  willful" requirement which has been interpreted to mean that a showing of a specific

12  intent to violate the law is not necessary.

13                  **(b)     California Health and Safety Code § 445**

14       120.   California Health and Safety Code § 445 also expressly prohibits the

15  referral of patients for profit.  It provides in relevant part that:

16       No person, firm, partnership, association or corporation, or agent or employee
     thereof, shall for profit refer or recommend a person to a physician, hospital, health-
17   related facility, or dispensary for any form of medical care or treatment of any
18   ailment or physical condition.

19       Cal. Health and Safety Code § 445.

20       121.   California law also provides that "the imposition of a fee or charge for

21  any such referral or recommendation creates a presumption that the referral or

22  recommendation is for profit."  *Id.*

23       122.   A violation of this code section is a criminal offense punishable as a

24  misdemeanor.  *Id.*

25                  **(c)     Business and Professions Code § 650**

26       123.   Similarly, a physician's offer or acceptance of consideration for the

27  referral of patients is specifically prohibited by Business and Professions Code

28  § 650.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

1    [T]he offer, delivery, receipt, or acceptance by any person licensed under this
2    division … of any rebate, refund, commission, preference, patronage dividend,
3    discount, or other consideration, whether in the form of money or otherwise, as
     compensation or inducement for referring patients, clients, or customers to any
4    person, irrespective of any membership, proprietary interest or coownership in or
     with any person to whom these patients, clients, or customers are referred is
5    unlawful.

6        Cal Bus. & Prof. C. § 650(a).

7        124.   A violation of this provision is a criminal offense punishable as a felony

8    or misdemeanor.  Cal Bus. & Prof. C. § 650 (g).

9        125.   The Legislature "enacted section 650 to protect the public from

10   excessive health care costs, referrals upon consideration other than the best interests

11   of the patients, deceit and fraud, and payment to a licensee where professional

12   services have not been rendered.  77 Opinions of the Cal. Att'y General 143, 144

13   (1994).  As the California Court of Appeal has remarked: "The evil to be proscribed

14   by section 650 … 'is not just the payment for the referral, but also any relationship

15   where the referral may be induced by considerations other than the best interests of

16   the patient…' [citation] 'Certainly a sick patient deserves to be free of any reasonable

17   suspicion that his doctor's judgment is influenced by a profit motive.'"  *Beck v.*

18   *American Health Group Int'l, Inc.*, 211 Cal. App. 3d 1555, 1564 (1989).

19       126.   The California Supreme Court has held that Bus. & Prof. C. § 650 is a

20   general intent statute.  *See, People v. Hering*, 20 Cal. 4th 440 (1999)

21       127.   The elements of a violation of section 650 are (1) a physician offered,

22   delivered, received, or accepted (2) any consideration (3) as compensation or

23   inducement (4) for referring patients (5) to any person.  89 Opinions of the Cal. Att'y

24   General 25, 27 (2006).  "Person" as used in section 650 includes "an individual,

25   firm, partnership, association, corporation, limited liability company, or cooperative

26   association."  Cal. Bus & Prof. Code § 653.

27       128.   "The use of the indefinite adjective 'any' [before the description of

28   consideration] indicates that the section's coverage was meant to be very broad with

1 respect to the types of consideration or inducements a physician might now receive
2 for his or her referrals." 68 Opinions of the Cal. Att'y General 28, 31 (1985).

3     129.   "Section 650, by its reference to 'any unearned rebate, refund,
4 commission, preference, patronage dividend, discount or other unearned
5 consideration, prohibits any offer or payment related to referral regardless of its
6 characterization.'" *Mason v. Hosta*, 152 Cal. App. 3d 980, 986 (1984). Since "the
7 prohibition extends to offer and delivery as well as receipt or acceptance, only one
8 of the two parties in a referral fee transaction need be a licensee in the healing arts
9 for the transaction to be illegal." *Id.* at 986.

        **(d)   California's Business & Professions Code § 2273(a)**

11     130.   In addition, California's Business & Professions Code also provides that,
12 "[e]xcept as otherwise allowed by law, the employment of runners, cappers, steerers,
13 or other persons to procure patients constitutes unprofessional conduct." Cal. Bus.
14 & Prof. Code § 2273(a). Violation of this section is a criminal offense punishable as
15 a misdemeanor. Cal. Bus. & Prof. Code §§ 2314 and 2315.

16    **C.    THE EXCLUSION LAWS**

17     131.   HHS has authority to exclude individuals and entities from participation
18 in Federal health care programs. 42 USC § 1320a-7. HHS has delegated that
19 authority to the Office of the Inspector General (OIG). Congress mandated
20 exclusion from participation in Medicare and Medicaid of providers convicted of
21 program related crimes. 42 USC § 1320a-7(a). *See also* 42 CFR § 1001.2 (defining
22 terms including conviction and exclusion); 42 CFR § 1001.1901(a)(describing the
23 scope of exclusion).

24     132.   OIG guidance on the exclusion law makes clear that an excluded
25 provider may not furnish:

26     Federal program beneficiaries items or services for which Federal health care
27 program payment is sought … and a provider or entity that receives Federal health
care funding may only employ an excluded individual … where the provider is both
28 able to pay the individual exclusively with private funds or from other non-federal

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

1  funding sources, and where the services furnished by the excluded individual relate
2  solely to non-federal program patients.

3      OIG Bulletin, http://oig.hhs.gov/fraud/docs/alertsandbulletins/effected.htm.

4      133.   "Providers and contracting entities have an <u>affirmative duty</u> to check the
5  program exclusion status of individuals and entities prior to entering into
6  employment or contractual relationships." *See* http://exclusions.oig.hhs.gov (OIG's
7  online exclusion database).  All Medicare providers and suppliers must certify that
8  they are not "employing or contracting with individuals or entities that [are] …
9  [e]xcluded from participation in any Federal health care programs … [or] [d]ebarred
10 by the General Services Administration (GSA) from any other Executive Branch
11 procurement or nonprocurement programs or activities."  42 CFR § 424.516(a)(3).

12     134.   California follows the federal law.  *See also*, Cal. Wel. & Instit. Code §
13 14043.61(a) (describing penalties for providers who use an excluded provider).

14     135.   Thus, Medicare and Medicaid will not pay for items or services
15 furnished to program beneficiaries involving an excluded provider.  Any providers
16 found to be contracting with excluded parties can be subject to significant penalties
17 and recovery of funds by state/federal governments.

18     136.   TRIGGIANI was excluded from the Medicare and Medi-Cal programs
19 in June, 2008.

20 **D.     STATE LAW GOVERNING MEDICAL CARE**

21     **1.     California's Medical Practice Act**

22     137.   Under the California Medical Practice Act, it is unlawful for any person
23 to "diagnose … any ailment, blemish, deformity, disease, disfigurement, disorder,
24 injury, or other physical or mental condition of any person, without having at the
25 time of doing so a valid, unrevoked, or unsuspended [physician's] certificate … or
26 without being authorized to perform the act pursuant to a certificate obtained in
27 accordance with some other provision of law…" Cal. Bus. & Prof. Code § 2052(a).
28 / / /

138.    A violation of this section is a criminal offense punishable as a felony or misdemeanor. Cal. Bus. & Prof. Code § 2052(a). "Any person who conspires with or aids or abets another to commit any act described in subdivision (a)" is subject to the same penalties. *Id*. at (b).  Section 2052 also expressly provides that it does not preclude any other remedy provided by law. *Id*. at (c).

139.    For purposes of Section 2052, "diagnosis" is defined as including "<u>any undertaking</u> by any method, device or procedure, whatsoever, and whether gratuitous or not, <u>to ascertain or establish whether a person is suffering from any</u> physical or <u>mental disorder</u>." Cal. Bus. & Prof. Code § 2038 (emphasis added).

140.    The Business and Professions Code also prohibits:

a.    "employing, directly or indirectly, the aiding or the abetting of any unlicensed person … to engage in the practice of medicine or any other mode of treating the sick or afflicted which requires a license to practice constitutes unprofessional conduct." Cal. Bus. & Prof. Code § 2264.

b.    "Knowingly making or signing any … document directly or indirectly related to the practice of medicine … which falsely represents the existence or nonexistence of a state of facts, constitutes unprofessional conduct." Cal. Bus. & Prof. Code § 2261.

c.    "[C]reating any false medical record, with fraudulent intent, constitutes unprofessional conduct." Cal. Bus. & Prof. Code § 2262.

141.    A violation of any of the foregoing provisions, by a person licensed to practice medicine or not, is a criminal offense punishable as a misdemeanor. Cal. Bus. & Prof. Code §§ 2314, 2315.

**2.    California's Lanterman Petris Short Act**

142.    The laws governing psychiatric holds are enacted by the states. In California, psychiatric holds are governed by the Lanterman Petris Short ("LPS") Act. Cal. Wel. & Inst. Code §5000, *et. seq*. The Los Angeles Department of Mental Health ("LADMH") notes that:

/ / /

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

the [1967] law was hailed across the country as the most progressive and humane piece of legislation to date.  It mandated that a mentally disabled person be treated in the <u>least restrictive setting</u> and given the right, just as any person has, to be heard in court when detained involuntarily."  The purpose of the Act was: "[t]o end the inappropriate, indefinite, and involuntary commitment of mentally disordered persons, developmentally disabled persons and persons impaired by chronic alcoholism."  The Legislature emphasized that "the Act intends to <u>end involuntary commitment</u>.

### (a)     Legal Criteria to be Involuntarily Committed

143.   The LPS Act provides that: "[w]hen any person, <u>as a result of mental disorder</u>, is a danger to others, or to himself or herself, or gravely disabled, a peace officer, member of the attending staff … of an evaluation facility designated by the county, designated members of a mobile crisis team …, or other professional person designated by the county may, upon probable cause, take, or cause to be taken, the person into custody and place him or her in a facility designated by the county and approved by the State Department of Mental Health as a facility for 72-hour treatment and evaluation."  Cal. Wel. & Inst. Code §5150 (emphasis added).

144.   Gravely disabled means "a condition in which a person, <u>as a result of a mental disorder</u>, is unable to provide for his or her basic personal needs for food, clothing, or shelter."  Cal. Wel. & Inst. Code § 5008(h)(1) (emphasis added).  The term "gravely disabled" does not include mentally retarded persons by reason of being mentally retarded alone.  Cal. Wel. & Inst. Code § 5008(h)(3).  To support a finding of gravely disabled, therefore, there must be a causal link between the person's mental disability and his/her inability to provide for food, clothing and shelter and the failure to meet these needs must result in physical danger or harm to the person.  A person is not "gravely disabled" if that person can survive safely without involuntary detention with the help of responsible family, friends, or others who are willing and able to help provide for the person's basic personal needs for food, clothing, or shelter.  Cal. Wel. & Instit. Code § 5250(d)(1).  *See also,* ¶ 193.

///

1  below (LAMMC's explanation for why patients who are gravely disabled do not

2  need to come in to the hospital).

3       145.   However, if in the judgment of the professional person conducting the

4  5150 evaluation, "the person can be properly served without being detained; he or

5  she shall be provided evaluation, crisis intervention, or other inpatient or outpatient

6  services on a voluntary basis." Cal. Wel. & Inst. Code §5151 (emphasis added).

7       146.   Thus, a 5150 evaluation conducted pursuant to the LPS Act may have

8  three outcomes: (1) if the patient meets criteria, the patient must be placed on a

9  "5150 Hold," the term commonly used to describe the legal status of a person held

10 involuntarily for up to 72 hours in a psychiatric facility for evaluation pursuant to the

11 LPS law. If the patient does not meet criteria for a 5150 hold, (2) the patient may

12 choose to admit herself voluntarily for psychiatric evaluation; or (3) the patient must

13 be provided information regarding outpatient or other available services. Cal. Wel.

14 & Inst. Code §§ 5150-5151.

15      147.   The LPS law specifically provides that persons authorized to initiate

16 these holds must be so designated by the county where the evaluation is taking

17 place. Significantly, a fully licensed doctor or nurse may not lawfully initiate a hold

18 pursuant to the law if that person is not certified by the county. In completing the

19 "Application for 72-Hour Detention for Evaluation and Treatment," the county-

20 certified evaluator must describe the circumstances she observes which establish the

21 basis for a 5150 hold. The county-certified evaluator must sign and date the

22 application providing that "based upon the above information it appears that there is

23 probable cause to believe that said person is, as a result of mental disorder [either] a

24 danger to himself/herself; a danger to others; [or a] gravely disabled adult/minor."

25      148.   The Los Angeles County Department of Mental Health describes the

26 seriousness of the involuntary commitment process as follows:

27      Statements made on the form need to be anchored in observable, describable

28 behavior that substantiate a finding of probable cause to believe the person is a
   danger to self, others, or is gravely disabled because of a mental disorder. In other

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

AMENDED COMPLAINT          40          CASE NO:  CV-12-00960 RSWL (SHX)

words, what the person said and did to indicate that he or she met the detention criteria. The ability to place a person on an involuntary hold in the community is the <u>only</u> situation outside of law enforcement where an individual may take away another individual's civil right to freedom and detain him or her against his or her will. <u>This is a serious responsibility and the decision should never be made lightly.</u>

LPS Training Manual, Los Angeles Dept. of Mental Health (emphasis added).

**(b)** **Patient's Right to Voluntarily Commit for Treatment**

149. Consistent with the LPS Act's purpose to end <u>involuntary</u> commitment, a patient exercising her right to voluntarily commit herself for psychiatric evaluation must consent to such admission. At all times relevant to this complaint, LAMMC used a standard form entitled "Request for Voluntary Admission and Authorization." The patient must sign and date below the following statement:

The undersigned hereby requests admission to the Mental Health Unit and consents to such care as is ordered by the undersigned's attending physician or his/her associates. If my request is granted, I agree to conform to all the rules and regulations of the unit.

150. LAMMC's Voluntary Admission form also requires the patient's attending physician to sign and date a certificate of the patient's ability to consent to the voluntary admission and treatment, which states:

I hereby certify that I am the attending physician of the above named patient, that I have examined the patient with reference to mental condition and based on that examination, it is my opinion that the patient understands the nature of the admission … and the care and treatment to be rendered and that the patient was mentally competent at the time of the examination to make this application for admission. This certification does not represent a warranty to the Hospital.

151. The LPS Act further sets forth the rights of a patient subject to a 5150 Hold and the responsibilities of any peace officer, member of the attending staff of an evaluation facility designated by the county, designated members of a mobile crisis team, or other professional person designated by the county committing a patient to a 5150 hold. *See*, Cal. Wel. & Instit. Code §§5150.05-5157.

/ / /

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

## VII. FACTUAL BACKGROUND

152.   Defendant PHC operated LAMMC, including its Hawthorne and Western campuses until April, 2013.  Beneficiaries of both Medicare and Medi-Cal made up the vast majority of the patients treated at LAMMC, including on its locked psychiatric units.

153.   Serving predominantly Medicare and Medi-Cal beneficiaries meant LAMMC treated the poorest and most vulnerable in our society, including the elderly.  It also meant that LAMMC could not negotiate its rates for care for these patients.  LAMMC was required, instead, to accept payment according to the government health care programs' parameters.

### A.    LAMMC – Filling Its Beds by Defrauding the Government

154.   Constrained by LAMMC's patient population and the government's payment structure for their care, LAMMC's financial model was to keep its beds filled and to bill the Medicare and Medi-Cal programs to the fullest extent possible. Indeed, in 2012 LAMMC ranked fifth in the nation for hospitals whose patients cost Medicare the most – both during their stays and for all services in the months afterward.

155.   To keep its beds full, however, LAMMC engaged in several unlawful schemes that bilked hundreds of millions of dollars from the federal and state government health programs.

### 1.    The Skid-Row Scheme

156.   Starting in approximately April 2004, PHC joined in an unlawful scheme to use marketers to procure patients to fill LAMMC's general care beds.  The marketers recruited homeless people in the Skid Row area of Los Angeles and arranged for them to be transported to LAMMC, purportedly for care and treatment. Pursuant to the Skid Row scheme, Medicare and Medi-Cal were billed, and paid for, millions in patient care tainted by the fraudulent scheme.  On August 6, 2008, the

/ / /

1    FBI raided LAMMC as part of an investigation of the Skid Row Scheme. At that

2    time, the government was unaware of the Psych Hold Scheme described below.

3        157.   Ultimately, several of the Skid Row defendants were sentenced to jail

4    time. In 2012, PHC agreed to pay the government $16.5 million for its alleged role

5    in the illegal kickback scheme to recruit homeless people to become patients at

6    LAMMC, and one of its affiliates, Los Angeles Doctors Hospital, Inc., pled guilty to

7    conspiracy for its role in the illegal kickback scheme.

8        158.   The Los Angeles City Attorney's Office also filed a complaint in state

9    court against numerous defendants relating to the Skid Row Scheme. *See, People of*

10   *the State of California v. Pacific Health Corporation, et. al.*, L.A. Sup. Ct. case no.

11   BC395757. Judgment and permanent injunctions against numerous defendants,

12   including PHC, were filed on January 17, 2013. Judgment and permanent

13   injunctions were filed against numerous other defendants, including TRIGGIANI,

14   on May 24, 2013. As part of the stipulated judgment, TRIGGIANI was assessed a

15   civil penalty of $1,100,100 and agreed to pay $275,000.

16       **2.     The Psych Hold Scheme**

17       159.   Starting in 2004, at approximately the same time as the Skid Row

18   scheme, DEFENDANTS initiated a <u>different</u> scheme - the Psych Hold Scheme - to

19   fill the beds in LAMMC's locked psychiatric units using unlawful psychiatric holds

20   to bring the patients in and thereafter bill Medicare and Medi-Cal for Health Care

21   Services.

22       160.   Through the use of an excluded provider as a marketer and case

23   manager, unlawful kickbacks and medically unnecessary care and treatment,

24   DEFENDANTS and their agents and employees knowingly presented and caused to

25   be presented to the federal and state governments fraudulent claims, records, and

26   statements to obtain reimbursement for Health Care Services provided under the

27   Medicare and Medi-Cal programs, and conspired to get these false and fraudulent

28   claims paid.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

161. Knowing that the federal and state governments rely on DEFENDANTS to deal honestly in their contracts with the government health care programs for costs and services billed, DEFENDANTS concealed their fraudulent scheme. DEFENDANTS concealed, disguised and covered up the Psych Hold Scheme and/or the nature and extent of their own involvement in it by, among other things, falsifying patient records and other paperwork related to the care and services provided to these patients, retaliating against employees who tried to expose the scheme, modifying how they secured the unlawful psychiatric holds and lying and concealing the unlawful scheme from regulators and law enforcement. This concealment prevented the federal and state governments from discovering DEFENDANTS' systematic fraud.

(a)    **The Psych Hold Scheme Begins**

162. Relator was employed as a member of LAMMC's Psychiatric Evaluation Team ("PET") from approximately April, 2003 until July, 2012. At all times relevant to this complaint, Relator was designated/credentialed by the County of Los Angeles to conduct psychiatric evaluations and to involuntarily commit on a locked psychiatric unit for 72-hour evaluation anyone she evaluated who met the legal criteria set forth in Cal. Welf. & Instit. Code § 5150. Relator is a registered nurse. She and other nurses like her who were credentialed by the County acted as PET Clinicians for LAMMC. Their job was to conduct psychiatric evaluations when LAMMC's Intake dispatched them to see a particular patient and to initiate a 5150 hold if the patient met the legal criteria. *See* ¶ 146, above (describing potential outcomes for evaluation initiated pursuant to the LPS law).

(1)    **LAMMC's Policies for PET Clinicians**

163. In her first few months at LAMMC, Relator was instructed on policies and procedures relevant to her job as a PET Clinician.

164. At a PET meeting on or about December 31, 2003, Alex Moreno ("Moreno"), Director of LAMMC's PET, gave Relator a LAMMC memo he drafted

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

1   for the Intake Department, dated December 31, 2003, describing the County

2   Department of Mental Health Procedures for PET Evaluations.  Among other things,

3   the memo described that "Private PET [like Relator] may respond to clients with

4   Medicare provided they have A and B coverage," and that LAMMC "services areas

5   4 (Metropolitan), 6 (South Central), 7 (East), and 8 (South)."  The memo also

6   pointed out that the County "will not monitor any voluntary admissions."

7         165.  On or about February 25, 2004, Relator received another LAMMC

8   memo from Moreno to the PET clinicians summarizing LAMMC's procedures for

9   how PET calls would be dispatched among the PET clinicians on duty.  It stated:

10   "The first Clinician on the schedule who is not in the field should be called first by

11   Intake.  The calls will then be rotated throughout the day, according to the posted

12   schedule."

13               (2)     MARKIE and MALLARE Arrive at LAMMC

14         166.  On or about May 4, 2004, Relator attended another meeting at

15   LAMMC's Hawthorne campus.  There were at least five attendees at the meeting,

16   including Moreno, Norman Basilio ("Basilio") (a PET clinician), Betty Gray

17   ("Gray") (a PET Clinician), Relator and one other PET clinician.  Moreno read a

18   memo to them and gave each of them a copy. The memo stated:

19         Two new psychiatrists will be joining L.A. Metropolitan Medical Center
20   starting in May.  Dr. Markie will be admitting his patients at the Western campus.
        Dr. Mallare will have privileges at both Hawthorne and Western Campuses.  Please
21   have active communication with Dr. Mallare and Dr. Markie if there [sic] patients do
        not meet criteria.  If these patients do not meet criteria, each clinician will page the
22   doctor for the disposition and further consultation.  (emphasis added)

23

24         167.  At the May 4, 2004 meeting, Moreno stressed the importance of calling

25   MARKIE and MALLARE with every 5150 evaluation of their patients.  MARKIE

26   and MALLARE's procedure, set forth in LAMMC's memo and stressed by the PET

27   Director, was contrary to the LPS law that requires a psychiatric evaluation (and any

28   subsequent hold) to be based on what the evaluator is observing at the time of the

1  evaluation and not "active communication" or "pag[ing] the doctor for the

2  disposition" or "further consultation" with anyone, including a doctor.

3  <center>**Patient 51, Age 44**</center>

4  168.  The very next day, on or about May 5, 2004, Relator was called to do an

5  evaluation of **Patient 51**,[2] age 44, at Longwood Manor ("Longwood"), a Board &

6  Care ("B&C") in Los Angeles.  Relator evaluated Patient 51 and found no criteria

7  for a 5150 hold.  After finding no criteria for an involuntary hold, the Charge Nurse

8  brought Relator into the Administrator's office and telephoned MALLARE.  The

9  Charge Nurse informed Relator that MALLARE did not agree with Relator's

10  assessment and demanded that Patient 51 be placed on a 5150 hold and admitted to

11  LAMMC.  Longwood's Administrator was also present during the phone call and

12  complained to Relator that many nurses over the past months had gone on leave

13  because of burn out over this patient, and that the patient was causing the facility to

14  lose lots of money. The Administrator then handed the phone to Relator to speak to

15  MALLARE.  MALLARE demanded that Relator place the patient on a 5150 hold

16  and admit the patient to LAMMC's locked psychiatric unit.  MALLARE said he

17  would not accept "no criteria" for a 5150 hold on Patient 51, despite Relator's

18  assessment.  LAMMC's Consultation Summary form indicated that the patient was a

19  Medicare and Medi-Cal beneficiary.

20  169.  Approximately two weeks after the May 4, 2004 meeting, Relator met

21  with Moreno in his office at the Hawthorne campus where they discussed the new

22  procedure for MARKIE and MALLARE's patients.  Moreno told Relator that

23  Hospital Administration wanted all of the new doctors' patients to be admitted to

24  LAMMC's locked psychiatric units and that David Widom, a PET clinician who

25  came with MARKIE and MALLARE, would do all their calls.  Moreno told Relator

26  that it was a package deal requested by the doctors and agreed to by the Hospital.

27  ───────────────

28  [2]  All patients will be identified by number only in order to protect confidentiality.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

1    The "package deal" Moreno described contradicted Moreno's February 25, 2004

2    memo describing how PET calls would be allocated.

3        170.    Thereafter, Relator occasionally took calls for patients of MARKIE and

4    MALLARE if Widom was not on the schedule and was not able to do the call, or if

5    an Intake staffer gave her the call notwithstanding LAMMC's separate procedure for

6    MARKIE and MALLARE's patients.  When Relator did evaluate MARKIE or

7    MALLARE patients she faced threats if she did not find criteria to admit them on an

8    involuntary hold.

9        171.    For example, Relator spoke to MALLARE several times on the phone

10   about patients of his that she evaluated who did not meet criteria for 5150 holds.

11   During one such call, in middle to late 2004, MALLARE told Relator that he was

12   sick of Relator and Gray, another PET clinician, not admitting his patients.  He also

13   told her that LAMMC's Administration promised him that Relator would never do a

14   psychiatric evaluation on his patients again.  On other calls, MALLARE would yell

15   and curse at Relator, call her incompetent, and instruct her to leave because he was

16   going to send another PET clinician to do the evaluation.

17       172.    In approximately the same time frame, 2004, Relator received a phone

18   call from Mike Ellis ("Ellis"), one of LAMMC's marketers, demanding that she go

19   back to a facility where she had evaluated a patient and found no criteria for a 5150

20   hold.  Ellis said that Relator's failure to admit the patient was "unacceptable" and

21   that she was to go back and admit the patient.  Relator refused.

22                              **Patient 38, Age 73**

23       173.    On or about October 11, 2004, Relator was called to evaluate **Patient**

24   **38**, age 73, at Beverly Hills Garden, a B&C in Los Angeles.  This was one of

25   MARKIE's patients.  In dispatching Relator, Moreno told Relator to bring this

26   patient in.  He told her to bring the patient in as a voluntary admission or a 5150 and

27   to call him if there was any problem.  He said, "You want to make money, right?"

28   and "We want to keep our jobs, right?"  This patient agreed to be admitted

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

AMENDED COMPLAINT          47          CASE NO:  CV-12-00960 RSWL (SHX)

1  voluntarily.  Patient 38 was a Medicare and Medi-Cal beneficiary and the cost of this

2  patient's care was billed to government health care programs.

3      174.   On or about October 26, 2004, Relator complained to Moreno about

4  MARKIE and MALLARE threatening her that if she did not admit their patients, she

5  would not get any more calls as well as Ellis' comments.  Later that same day,

6  Relator attended a meeting along with Moreno, Gray, Basilio and LAMMC's Human

7  Resources Director, Sylvia Cloud ("Cloud").  Cloud instructed the PET clinicians

8  that if they had any trouble with any of the psychiatrists they should inform

9  KHOSSOUSSI since he was the head of the Psychiatric Board of Directors.

### Patient 54

11      175.  On or about November 1, 2004, Relator was evaluating **Patient 54**, one

12  of KHOSSOUSSI's patients at Huntington Healthcare Center in Los Angeles, one of

13  the outside facilities.  Relator called KHOSSOUSSI to ask a question concerning

14  patient care.  While on the phone, KHOSSOUSSI asked Relator why he had not seen

15  or heard much from her lately.  Relator told KHOSSOUSSI that since MARKIE and

16  MALLARE came she was not getting many PET calls because Widom took their

17  calls even when she was on call.  KHOSSOUSSI told Relator he had heard about

18  that and that he wanted to make her an offer.  KHOSSOUSSI told her that if she

19  wanted to make more money he would make sure that she got most of his PET calls.

20  He stressed that he would guarantee she would make more money but only as long

21  as she would promise to admit all the patients.  He said he did not want to hear "no

22  criteria."  KHOSSOUSSI told Relator he would make sure that LAMMC's Intake

23  Department knew, and that he would keep her cell phone number with him.  Relator

24  told him no, that she would be doing the same thing that MARKIE, MALLARE, and

25  Widom were doing, and that it was not right.  KHOSSOUSSI told Relator the offer

26  "still stands" and "to think about it" and let him know.  KHOSSOUSSI's "offer"

27  made clear that the unlawful conduct was, at a minimum, being permitted by

28  KHOSSOUSSI, and, more likely, directed by him as the Head of the Psychiatric

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

1   Department. Since HR Director Cloud told Relator to report problems to

2   KHOSSOUSSI, reporting this incident per LAMMC 's procedures would have been

3   useless. Patient 54 was a Medi-Cal beneficiary and the cost of the patient's care was

4   billed to government health care programs.

5       176.   From 2004 until Relator was fired in 2012 she witnessed the Psych Hold

6   Scheme evolve even though the purpose of the scheme never changed –

7   DEFENDANTS' goal was to fill LAMMC's psychiatric beds with Medicare and

8   Medi-Cal patients whose care and services would be paid for by the federal and state

9   funded health care programs.

10                  **(3)    Assigning Clinicians to Rig Evaluation Outcomes**

11      177.   After Relator rejected KHOSSOUSSI's "offer" she increasingly

12   witnessed other PET Clinicians preferentially assigned calls for KHOSSOUSSI,

13   MARKIE and MALLARE as well as other doctors notwithstanding Moreno's

14   December 31, 2003 memo describing how PET calls would be assigned.

15      178.   Meanwhile, Widom continued to take evaluation calls for MARKIE and

16   MALLARE until Widom left LAMMC in 2009. When Widom left, Mark Aiken

17   ("Aiken"), LAMMC's Intake Director, reallocated MARKIE and MALLARE's calls.

18   Aiken wrote on a schedule in the Intake Department that no matter who was on call

19   that all of MARKIE and MALLARE's calls were to go to Jimmy Loya ("Loya"). If

20   Loya was busy then all MALLARE and MARKIE calls were to go only to Marlo

21   Bautista ("Bautista").

22      179.   Despite Relator's repeated complaints to LAMMC's management,

23   LAMMC continued its practice of assigning PET clinicians to rig the outcomes of

24   the psychiatric evaluations.

25                  **(4)    Relator Banned From Referral Sources**

26      180.   KHOSSOUSSI, MARKIE and MALLARE were not the only ones who

27   were selectively assigning PET clinicians to evaluate patients. As the scheme

28   continued Relator was banned from doing evaluations at outside facilities that served

---

AMENDED COMPLAINT          49          CASE NO:  CV-12-00960 RSWL (SHX)

as the primary referral sources for the scheme after she refused to bring patients in without legal criteria.  For example:

### MARKIE and MALLARE Facilities

a.      In either late 2006 or early 2007, Relator was on call standing by to go out on 5150 evaluations.  She was waiting in the LAMMC Western Campus parking lot.  As the day went on she noticed she was not getting any calls.  Relator went inside to see Pinky Bartolome ("Bartolome"), LAMMC's Director of Gero-Psych/PET Nursing.  Relator met with Bartolome in her office and asked why she had not been sent on any 5150 calls.  She also complained about the rigged arrangement for MARKIE and MALLARE calls.  Bartolome called Leah Hyman ("Hyman"), LAMMC's Marketing Director/Community Liaison, on the speakerphone.  Bartolome asked Hyman about MARKIE and MALLARE not sending Relator on 5150 evaluations.  Hyman said "they" don't want her because she won't admit their patients.  From that time forward, Relator's calls to Alta Vista Gardens, Beverly Hills Gardens, Villa Poinsettia, Villa Stanley, Golden Manor and Fine Gold Manor were limited to instances where the Intake staff mistakenly followed LAMMC's written policy and not the MARKIE and MALLARE's arrangement and dispatched Relator as the clinician on call.  Months before the speaker phone conversation with Relator and Hyman, Bartolome sent a memo dated March 23, 2006 reinforcing Moreno's February 25, 2004 memo on the allocation of calls to PET clinicians.  Bartolome's memo had no effect.  Relator continued to be banned from these "MARKIE and MALLARE facilities" – how LAMMC staff described outside facilities that were common referral sources for these doctors.

### Commonwealth Royale Guest Home

### Patient 50, Age 73

b.      On or about July 2, 2008, Relator was called to evaluate **Patient 50**, age 73, at Commonwealth Royale Guest Home in Los Angeles, another B&C known as a MARKIE facility.  Relator evaluated Patient 50 and did not find sufficient criteria

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

1   for a 5150 hold. The owner and Executive Director of the B&C, Gary Kitt ("Kitt"),

2   had MARKIE on speaker phone. Kitt instructed Relator that she was no longer

3   allowed to evaluate patients at the facility. Kitt told Relator: "Dr. Markie wants him

4   in your hospital, so he is going one way or another." Anna Rompel, a staff member

5   at the facility, told Relator: "Dr. Markie is on the phone and he is sending someone

6   else to get the patient anyway." Kitt threatened Relator by saying that she would be

7   fired.

8                          **South Pasadena Convalescent**

9       c.      In April, 2010, the charge nurse at South Pasadena Convalescent banned

10  Relator from further evaluations at that facility after Relator witnessed and objected

11  to a patient being removed from the facility by ambulance in restraints when there

12  was no 5150 hold in place and the patient was refusing, indeed vehemently

13  protesting, being taken away. The South Pasadena employee told her not to worry

14  about it. They did not need her to do evaluations there any longer. *See* ¶ 242, below

15  (describing Patient 6). Patients referred from South Pasadena were frequently

16  patients of GOLCHINI and KHOSSOUSSI.

17                          **Longwood Manor Convalescent**

18                              **Patient 49, Age 82**

19      d.      On or about July 27, 2010, Relator was called to evaluate **Patient 49**,

20  age 82, at Longwood Manor Convalescent ("Longwood Convalescent"), a SNF in

21  Los Angeles. Relator evaluated the patient and found no criteria for a 5150 hold.

22  As Relator prepared to leave, a nurse told Relator that the Administrator wanted to

23  talk to her. Relator met with Longwood Convalescent's Administrator who told

24  Relator that if she did not admit Patient 49 she would not be allowed back to do

25  evaluations at Longwood Convalescent. Relator did not change her mind and left

26  without initiating a hold on this patient. Thereafter, MALLARE informed Relator

27  that she was not allowed to do evaluations at Longwood Convalescent. This patient

28  was a Medicare and Medi-Cal beneficiary.

---

AMENDED COMPLAINT          51          CASE NO: CV-12-00960 RSWL (SHX)

## Rosecrans Villa Residential Care

## Patient 59

e.    In approximately October 2010, Relator saw **Patient 59** at Rosecrans Villa Residential Care in Hawthorne ("Rosecrans Villa"), a B&C where Relator commonly saw TRIGGIANI's sister, Trish Pedroza, working. Rosecrans Villa was also well-known as a "Karen Facility," a facility that was a common TRIGGIANI referral source. When Relator arrived at the facility, PROCARE (Pedroza's ambulance company) was already on location. Relator evaluated the patient and did not find criteria for a 5150 hold. Pedroza demanded that Relator admit the patient to LAMCC's locked psychiatric unit. Relator refused, got in her car and left. Shortly thereafter, Aiken called Relator's cell phone and told her KHOSSOUSSI was on the phone. KHOSSOUSSI then demanded that she go back and admit Patient 59. When Relator refused, KHOSSOUSSI told her she was no longer allowed to evaluate patients at Rosecrans Villa. Pedroza did not want her there. Aside from a few calls on weekends when Intake personnel unfamiliar with the ban were on duty, Relator did not do any further calls at Rosecrans Villa.

## Sunrise Convalescent Home

f.    During a surprise meeting in November, 2011, Ahmed Imran, LAMMC's Corporate Compliance Officer, banned Relator from doing evaluations at Sunrise Convalescent Home ("Sunrise"). Sanchez was also at the meeting and confirmed the ban. Within a day, Aiken had posted a handwritten note on the Intake white board saying, "Julie cannot go to Sunrise Conv." The ban was triggered after she refused to initiate a 5150 hold on **Patient 1**, age 60. Relator was also brought up on disciplinary action for failing to initiate the 5150 hold.

## Patient 1, Age 60

Relator was called to Sunrise to evaluate Patient 1 on or about September 28, 2011. Patient 1 had broken several rules and called the administrator, Tara Hupp ("Hupp"), names. Hupp had given Patient 1 a written 30-day eviction notice on

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

1   September 27, 2011.  Relator evaluated Patient 1 and found no criteria for a 5150

2   hold and Patient 1 refused to be admitted to LAMMC on a voluntary basis.

3   LAMMC's PET Team Assessment Form identifies KHOSSOUSSI as one of Patient

4   1's current treating doctors. It also documents Hupp threatening Patient 1 by stating

5   "I'm going to do anything I can to get you out of here."  Relator kept copies of pages

6   from Patient 1's chart as part of her Consultation Summary for the patient's

7   evaluation.  There was no evidence in the chart of Patient 1 having threatened any

8   one.  After Relator refused to initiate the hold, Hupp called KHOSSOUSSI and both

9   Hupp and KHOSSOUSSI attempted to pressure Relator to admit Patient 1 to

10  LAMMC.  A therapist at the facility, Dr. Partovi, was also present during the

11  KHOSSOUSSI call and also tried to pressure Relator.  However, at no time did Dr.

12  Partovi say that he had been threatened by the patient.  Nor did Dr. Partovi's patient

13  notes identify any threats.  Relator stayed with her decision of no criteria.  When

14  Relator would not bring Patient 1 in, KHOSSOUSSI and Aiken arranged for another

15  PET Clinician to do a follow up evaluation.  The PET clinician who did the follow

16  up evaluation initiated the 5150 and admitted her to LAMMC.  Relator learned this

17  when she saw Patient 1 on the locked psychiatric unit several days later.  Relator

18  could see in the chart that Gray had initiated a 5150 hold on September 30, 2011 at

19  11:00 a.m. – two days after Relator had seen her.  Gray had been sent to do the

20  evaluation because "staff says patient is delusional/paranoid and threatened to strike

21  Dr. Partovi."  Gray's stated reason for the 5150 hold included the patient's threat that

22  she would kill the doctor – but the threat was purportedly made before Relator

23  evaluated Patient 1.  Since Relator's copy of the progress reports for Patient 1 from

24  October 28 made no reference to threats, this 'threat' was back-charted into the

25  patient's record before the second PET evaluation.  When Relator saw Patient 1 on

26  October 2, 2011, the patient had been placed on the longer 5250 hold (14 day hold)

27  at LAMMC even though KHOSSOUSSI had not seen her.  Patient 1 also was not

28  notified of her change in status or her right to a hearing before the longer hold was

1    initiated.  The psychiatric symptoms noted in support of the 5250 falsely reflected

2    that the woman was "gravely disabled."  Patient 1 was a Medicare and Medi-Cal

3    beneficiary and the cost of this patient's illegal confinement was billed to

4    government health care programs.

5         181.   Because Relator was unwilling to participate in the scheme, the

6    Defendants concealed the full extent of their unlawful conduct from her.  Her call

7    volume (and pay) dropped as a direct result, too.  PET clinicians willing to write the

8    rigged holds continued to get calls, however.  In Relator's experience, therefore, the

9    scope of the Psych Hold scheme extends beyond the patients she personally

10   witnessed to thousands of patients who were admitted to LAMMC during the

11   relevant time period.

<div align="center">(b)      The Psych Hold Scheme Escalates</div>

12

13        182.   While the Psych Hold Scheme started on or around the time that

14   MARKIE and MALLARE came to LAMMC in May 2004, the scheme escalated in

15   2005 with changes in LAMMC's administration, including the arrival of a new Chief

16   Executive Officer, John Fenton.

<div align="center">(5)      Reorganizing LAMMC's Intake Department</div>

17

18        183.   Fenton became the CEO at LAMMC in approximately June, 2005.

19   Aiken came to LAMMC as Director of LAMMC's Intake Department at the same

20   time.  In setting Aiken up as the Director of Intake, LAMMC replaced Lillian

21   Johnson ("Johnson") who had been the Director of Intake at Hawthorne.  LAMMC's

22   policies and procedures changed drastically with Aiken's arrival to facilitate

23   DEFENDANTS' ability to perpetrate the Psych Hold scheme.  For example:

24        a.     Sometime early in 2005, before Aiken arrived at LAMMC, Relator had a

25   conversation with Johnson at the back of the Intake office.  During that

26   conversation, Johnson told Relator not to let the marketers, including TRIGGIANI,

27   "intimidate you" into putting a patient on a 5150 hold.  Johnson told Relator to come

28   / / /

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

AMENDED COMPLAINT          54          CASE NO:  CV-12-00960 RSWL (SHX)

1   tell her if that happened.  Two months later, Fenton and Aiken were in charge, and

2   Johnson was gone.

3          b.      On July 13, 2005, just weeks after Aiken's arrival, the Intake Department

4   circulated an "Update" referred to as the "Hot Sheet."  Item 2 on the "Hot Sheet"

5   said:

6          REJECTED ADMISSIONS: The Intake Department needs to write down

7   specific reasons why patient is rejected by an R.N., or others.  We want to avoid
    'Accidental Rejections' and 'Bossy People Rejections' who may attempt to keep

8   patients from coming in.

9          "Bossy People" is a direct reference to Relator and anyone else who refused to

10  admit a patient without proper legal criteria.  Since the County LPS Evaluation form

11  and the patient's records themselves both document why a patient is not subjected to

12  a 5150 hold, Intake's new procedure was solely intended to track who the "Bossy

13  People" were "keep[ing] patients from coming in."

14                  **(6)     Procare's Role: We Are No Longer EMT's Just**
15                           **Two People in a Van Kidnapping Old People**

16         184.   By 2005, the scheme's participants included the hospital and doctors

17  taking patients from outside referral sources, marketers sending the patients

18  (described in more detail below), and PET clinicians initiating holds even when

19  patients did not meet criteria.  To close the loop on the complete transfer of the

20  patients between LAMMC and the various outside facilities, however, the scheme's

21  participants needed an ambulance service that would look the other way when a

22  patient did not have criteria, or when the patient resisted coming in all together.

23         185.   With Aiken's arrival at LAMMC, PROCARE largely assumed this role.

24  PROCARE facilitated the transfer of patients between the outside facilities and

25  LAMMC as part of the Psych Hold Scheme.

26         186.   As of September 10, 2006, PROCARE was partially owned by Trish

27  Pedroza, TRIGGIANI's sister.  Relator also saw Pedroza working at Rosecrans Villa

28  in Pasadena.  Pedroza was the President of Rosecrans and one of the owners.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

AMENDED COMPLAINT          55        CASE NO:  CV-12-00960 RSWL (SHX)

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

1  Zinovy Ganopolsky, a co-owner of PROCARE with Pedroza, also has ownership

2  interest in Rosecrans.  *See*, ¶ 21, above.

3      187.   PROCARE ambulances were on call for LAMMC at all times of the day

4  and night and PROCARE employees referred to the time they spent at LAMMC

5  waiting to be dispatched as "holding up the wall."  Relator commonly saw multiple

6  "rigs" parked in LAMMC's parking lot waiting to be dispatched.

7                  **(c)     What PROCARE Medics Were Authorized to Do Under**

8                          **the Law**

9      188.   Under the controlling laws, ambulance transport would be warranted

10  after a county-certified evaluator initiated a 5150 hold.  *See* ¶ 76-77 (describing

11  Medicare and Medi-Cal reimbursement for transportation).  Ambulance transport

12  would assure that the patient was safely taken to the psychiatric facility for the 72-

13  hour hold and possible treatment.  LAMMC's written policies and procedures

14  provided that after completing an evaluation the PET clinician was supposed to call

15  back to Intake and request an ambulance for transport, if necessary.  The PET

16  clinician was then responsible for staying with the patient until the patient was safely

17  transferred to the ambulance.

18      189.   Significantly, while the PROCARE employees in the ambulances were

19  trained medics, or carried whatever certifications they needed to operate the

20  ambulance for transport, none of them were certified by the County to initiate 5150

21  holds.  They also were not authorized to restrain a patient unless the county-certified

22  evaluator, like Relator, had signed off calling for the restraint.  They were permitted

23  to transport a patient when there was a lawful 5150 hold in place.  In the case of a

24  voluntary admission, they could transport if the patient consented to come in <u>and</u> the

25  patient's physician certified the medical necessity of the transport.

26  / / /

27  / / /

28  / / /

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

**(d)    What PROCARE Medics Actually Did As Part of the Psych Hold Scheme**

190.   In reality, LAMMC's Intake staff would call for the ambulance at the same time they called the PET clinician to go out to do the evaluation.  Relator regularly arrived at a facility to find PROCARE already there.  Relator complained to Aiken about this repeatedly between 2005 and 2012.  In one phone conversation, on or about March 16, 2011, Relator demanded to know why Aiken kept sending PROCARE to the facilities before she arrived.  She explained that if the patient did not meet criteria then she had to cancel them and the PROCARE dispatcher got mad at her.  Aiken responded that the other clinicians "appreciated" it.

191.   Notwithstanding the clear and unambiguous dividing line between safely transporting a patient for psychiatric evaluation and kidnapping or abduction, PROCARE medics regularly crossed the line.  It was an open secret among PROCARE medics that their job was actually to transfer patients between LAMMC and these outside facilities without legal basis as a part of the Psych Hold Scheme.

a.     In early 2010 Relator spoke to a PROCARE medic at Brier Oak Skilled Nursing Facility in Los Angeles, after evaluating a patient referred by TRIGGIANI.  PROCARE was already on location waiting to take the patient when Relator arrived.  She complained about this to the PROCARE medics since she had not even evaluated the patient.  One of them took her aside and said he agreed.  He tried to explain that they had to be quick with the TRIGGIANI patients they brought in because TRIGGIANI and the facility owners stressed it.  But in his view what they did was "chase them down, tackle them and strap them in restraints."  This medic left PROCARE shortly thereafter.

b.     Indeed, one PROCARE medic described their job as "We Are No Longer EMT's Just Two People in a Van Kidnapping Old People."  This made a list of favorite quotes on a social media site for PROCARE employees.

/ / /

**(7)  LAMMC Documented One Procedure But Act According to Different Procedures**

192.  Use of ambulances was not the only instance where LAMMC staff and administration documented one thing (in compliance with applicable laws) but operated by different policies and procedures.

193.  On or about August 4, 2005 LAMMC held a meeting for Intake Staff and Psychiatric Directors.  The purpose of the meeting was purportedly "to discuss problems involved in getting patients admitted through Intake and onto the units."  The meeting agenda properly identified how calls <u>should</u> be handled.  For example:

- If the patient at the Board and Care or home has no symptoms or history of any physical illness, they do not need medical clearance.

- [P]atients at skilled nursing facilities must demonstrate DTS, or DTO. <u>The patients who are gravely disabled do not need to come into the hospital because their grave disability is taken care of at the nursing home</u>.  Many times the facilities want a patient to leave because they are yelling or spitting etc.  They can be medicated or [sic] the Skilled Nursing Facilities (SNF's) as easily as at the hospital.

- <u>We do not take …Developmentally disabled patients</u> who are over a level one.

- All patients must be either (1) danger to self (2) danger to others or (3) gravely disabled.  You must be able to state actual behaviors to support any of the above.

(emphasis added).  *See also* ¶ 144 above describing definition of gravely disabled.

194.  In reality, these were not LAMMC's policies and procedures for admitting patients.  As described below, LAMMC's Administration, including CEO Fenton and his successor Ron Stinnett, and the Intake Department, knowingly participated in "bringing the patients in" improperly.  LAMMC admitted patients the Marketing Defendants arranged to send in from the outside facilities, PROCARE transported them, and the Doctor Defendants signed off on their supposed care so

/ / /

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

AMENDED COMPLAINT          58          CASE NO:  CV-12-00960 RSWL (SHX)

1 | the Defendants could fill the psychiatric beds and bill, or cause the billing, to
2 | Medicare and Medi-Cal for Health Care Services.

3 |     (e)  **The Illegal Kickbacks for Patients Referrals**

4 |       (8)  **TRIGGIANI's Role In Illegal Patient Referrals**

5 |   195. To "bring the patients in," LAMMC relied heavily on marketers.

6 | Starting in at least 2004 and continuing well after her exclusion from Medicare and

7 | Medi-Cal in 2008, TRIGGIANI and LAMMC had an agreement whereby

8 | TRIGGIANI referred patients to LAMMC.  For example:

9 | <div align="center">**Patient 61, Age 20**</div>

10 |   a.  On or about February 11, 2004, Relator was called to do an evaluation of

11 | **Patient 61,** age 20, at Daniel Freeman Hospital in Inglewood.  LAMMC's

12 | Consultation Summary form reflects the caller requesting the evaluation as "Karen."

13 | The patient was admitted on a voluntary basis.  The patient is identified as a Medi-

14 | Cal beneficiary and the cost of the patient's care was billed to government health

15 | care programs.

16 | <div align="center">**Patient 62, Age 47**</div>

17 |   b.  On or about June 29, 2005, Relator was called to do an evaluation of

18 | **Patient 62**, age 47, at Nu-Life Residential Care, in Los Angeles.  According to

19 | LAMMC's Consultation Summary form, the caller, the referral source for the

20 | patient, was "Karen (SGG)" and the relationship to the call was identified as "SGG."

21 | The Relator found criteria for a 5150 hold and the patient was admitted to LAMMC.

22 | The patient is identified as a Medicare and Medi-Cal beneficiary and the cost of the

23 | patient's care was billed to government health care programs.  *See also* ¶ 258 below

24 | (Relator's conversation with Nu-Life's owner describing the deal between Nu-Life

25 | and TRIGGIANI).

26 | <div align="center">**Patient 63, Age 72**</div>

27 |   c.  On or about August 23, 2005, Relator was called to do an evaluation of

28 | **Patient 63**, age 72, at Country Villa Lynwood Health Center in Lynwood.

---

AMENDED COMPLAINT   59   CASE NO:  CV-12-00960 RSWL (SHX)

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

LAMMC's Consultation Summary form reflects the caller requesting the evaluation as "Karen." KHOSSOUSSI is identified as the current treating physician. PROCARE is identified as the ambulance transporting the patient. Relator found criteria for a 5150 hold and the patient was admitted to LAMMC. The patient is identified as a Medicare and Medi-Cal beneficiary and the cost of the patient's care was billed to government health care programs.

196. LAMMC's employees, including the Intake staff and the PET clinicians, openly referred to outside facilities where TRIGGIANI was the referral source as "Karen Facilities."

**(f) TRIGGIANI's Agreement With LAMMC**

197. A LAMMC Memo dated August 18, 2005 from Hyman, LAMMC's Marketing Director/Community Liaison, to the Intake Staff regarding "Geriatric Psychiatry Admissions Age 55 Admissions Criteria" also openly described TRIGGIANI's role as providing referrals to LAMMC, stating:

As discussed with Administration, referrals from Karen Tridgiani [sic] who fall within the age ranges of 50-54 will be accepted for the geriatric psychiatric unit. This only applies when the patients have been hospitalized on the Geriatric Psychiatric Unit in the past, treated by Dr. Khossoussi. (emphasis added).

**(g) TRIGGIANI's Agreements with Referral Sources**

198. The referring facilities, including SNFs and B&C's, also had agreements with TRIGGIANI. For example: a January 7, 2005 memo hanging in the nurses' station at Monterey Care Center, in Rosemead, a known "Karen Facility" said:

ALL 5150 ONLY CONTACT KAREN TRIGGIANI (888) 510-8800 WHEN DOCUMENTING PLEASE FOCUS ON 'STRIKING OUT, AGITATION, PROVOKING OTHER RESIDENTS, NOT ABLE TO REDIRECT, 1:1 MONITORING, ETC.' THANK YOU FOR FOLLOWING THIS PROTOCOL.

Relator saw similar memos hanging at other "Karen Facilities" including Huntington Care Center and at Brighton Convalescent.

199. It was also well-known among the staff at LAMMC that TRIGGIANI "kept the beds full." Even though DEFENDANTS tried to bar her from facilities

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

where many of the patients originated, Relator still witnessed TRIGGIANI's ongoing role in sending patients in to LAMMC from April 2004 into 2011 – years after her exclusion from Medicare, as described below. *See also* ¶ 180(a.-f.), above (describing Relator being banned from facilities).

<div align="center">

**(9)     TRIGGIANI Indicted on Medicare Fraud Charge**

</div>

200.   On April 14, 2006, the United States Attorney filed a Criminal Information in United States District Court in Florida against TRIGGIANI for Conspiracy to commit Medicare fraud. While the Florida charge related to Medicare fraud, it was unrelated to the ongoing Psych Hold Scheme in California.

201.   Almost immediately after the Florida charge was filed against TRIGGIANI, LAMMC staff initiated steps to conceal TRIGGIANI's continuing involvement with the Psych Hold Scheme. For example: on or about June 12, 2006, Aiken wrote a memo to the Intake Staff with copies to Hyman, Bartolome, and Fenton. The typed memo discussed the closing of Huntington Healthcare. However, the copy Aiken actually circulated to Relator and others included a handwritten "PS" from Aiken that read:

Call Karen T on each referral @ (626) 216-8178 and ask her if it is a placement issue. If it is, do not accept. If it is OK then you may admit the patient.

202.   After her indictment, TRIGGIANI continued to refer patients to LAMMC. For example:

<div align="center">

**Patient 64, Age 51**

</div>

203.   On or about October 19, 2006, Relator was called to do an evaluation of **Patient 64**, age 51, at Rosecrans Villa in Hawthorne. LAMMC's Consultation Summary form reflects the caller requesting the evaluation as "Karen." The form also identified the current or treating physician(s) as GOLCHINI and KHOSSOUSSI. The patient was admitted to LAMMC on a 5150 hold. The patient was identified as having Medicare and Medi-Cal benefits and the cost of the patient's care was billed to government health care programs.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

**(10)    SGG's Role In Illegal Patient Referrals After TRIGGIANI's Indictment**

204.    On or about April 1, 2007, LAMMC entered into a written contract with SGG ("SGG Contract") even though SGG had been involved in patient referrals before that time. See ¶ 195(b) (describing Patient 62 Karen/SGG referral)  Fenton signed for LAMMC.  TRIGGIANI signed the contract as President of SGG.

**(h)    The SGG-LAMMC Written Contract**

205.    The SGG Contract provides:

1.2 **Services**.  As requested and approved by the CEO, Consultant shall provide the following professional services (the "Services") for Hospital:

(a) <u>Community Relations.</u> Development of a comprehensive community relations program, including educational seminars for skilled nursing facilities, adult residential care facilities and community participants.

(b) <u>Case Management Services.</u>  Coordinate with the Hospital's discharge planners and utilization resource management the development of discharge plans and placement for Hospital patients.  Develop strategies and action plans enabling Hospital to respond to the health care needs of individuals residing in the Hospital services area.  At least fifty percent of (50%) the Services provided will encompass case management services for the Hospital's gero-psych population.

(c) <u>Marketing/Advertising.</u> Assist in the development of advertising materials, and identify strategic media best able to achieve promotional goals of Hospital.

(d) <u>Program Consultation</u>.  Assist Hospital in the development of quality improvement indicators for medical outcomes.  Develop effective means for communicating to the Hospital feedback from the community and physicians regarding quality and effectiveness of hospital programs, including gero-psychiatric services, young adult behavioral service, well women's health care, and the outpatient geriatric clinic.

(e) <u>Physician Recruitment/Development</u>.  Assist Hospital in identifying prospective physicians for medical staff membership; inform physicians of new Hospital services and programs; and assist Hospital in physician staff development.

***

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

1.10 **Solicitation.** Under no circumstances shall consult engage in any activities, such as 'door-to-door' marketing, that would violate California Welfare & Institutions Code Section 14107.2, the Medi-Cal Anti-Kickback Statute (the "Act"). Consultant acknowledges that any 'direct solicitation' activity will be conducted <u>only</u> by employees of Hospital whose scope of employment includes the "provision of covered items or services" as defined by the Act. In the performance of services hereunder, Consultant shall not offer, deliver, receive or accept any rebate, refund, commission, or other consideration as compensation or inducement for referring or causing others to refer patients, residents, clients, or customers to Hospital, or to recommend or arrange for such referrals. Consultant shall hold Hospital harmless from any violation, in whole or in part, of the foregoing covenant and condition.

\*\*\*

5.3 **Referrals.** No term of this Agreement shall be construed as requiring or inducing Consultant to refer patients to Hospital. Consultant's rights under this Agreement shall not be dependent in any way on the referral of patients or business to Hospital by Consultant.

206.  Pursuant to the SGG Contract, LAMMC agreed to pay SGG $40,000 per month. From May 2007 through August 2009, LAMMC paid SGG at least $935,000 for services provided under the written contract. As of December 17, 2009, LAMMC owed SGG $385,000 pursuant to the terms of the written contract. After December 17, 2009, SGG continued to provide referral services to LAMMC pursuant to the sham contract and LAMMC continued to pay SGG for improper referrals.

### (i)    The SGG Contract Is a Sham Contract

207.  Although the language of the written contract provides for payment to SGG for "community relations," "case management services," "marketing/advertising," "program consultation," and "physician recruitment/development," these services were merely pretext, and were not the primary reason why, or the basis upon which, LAMMC entered into the SGG contract and paid remuneration to SGG under the agreement. The SGG contract was a sham agreement designed to conceal the underlying financial motive, which was

/ / /

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

1 for LAMMC to purchase TRIGGIANI/SGG's referrals of patients for Health Care

2 Services.

3     208.   Prior to and at the time LAMMC entered into the SGG contract

4 LAMMC was acutely aware that TRIGGIANI and SGG recruited patients from

5 outside facilities and referred them to LAMMC for Health Care Services in

6 exchange for money. *See* ¶ 195(b) (describing Patient 62 and the referral source as

7 "Karen/SGG"). *See also* ¶¶ 195-199 (describing TRIGGIANI's referrals to

8 LAMMC) and ¶ 258 below (Relator's conversation with Nu-Life's owner describing

9 the deal between Nu-Life and TRIGGIANI).

10     209.   LAMMC entered into this sham agreement with SGG in 2007 to

11 continue the mutually beneficial referral arrangement with TRIGGIANI that it had

12 been using for at least several years but to obfuscate the connection between

13 LAMMC and TRIGGIANI, who was indicted for Medicare fraud in June 2006.

14     210.   Under the sham agreement with SGG, LAMMC received increased

15 revenue from Medicare and Medi-Cal eligible beneficiaries that SGG referred. The

16 Doctor Defendants who provided professional services for patients unlawfully

17 referred by SGG/TRIGGIANI also billed Medicare and Medi-Cal. PROCARE, too,

18 billed government health care programs for the transport of patients being moved

19 pursuant to the unlawful referral arrangement. The net impact of the LAMMC-SGG

20 arrangement (including when SGG was owned by TRIGGIANI, BARRETT and

21 GOLCHINI) was to increase Medicare and Medi-Cal utilization and dollars paid to

22 Defendants to the detriment of the government health care programs and the

23 American taxpayers.

24     211.   As a PET clinician who evaluated patients in both the outside facilities

25 and LAMMC's units, Relator witnessed SGG's role in referring patients and

26 coordinating discharge placements of these patients back out to B&Cs and SNFs.

27 ///

28 ///

- SGG was listed as the referral source in the consultation summary forms that dispatched her to evaluate patients. *See e.g.* ¶¶ 195(b); 199(b); 232; 234; 243; 244(a); 244(b); 248; 249; and 253.

- The Doctor Defendants used SGG to coordinate patient admissions to LAMMC and commonly used SGG's phone number as the contact number. *See e.g.* ¶¶ 195(b); 232(a); 241; 242; 244(a) & (b); 250; 251; 252; 253; 254; 261; 263.

- "SGG Crisis Cards" hung at the nurses' stations in the outside facilities, directing their staff to call SGG to arrange for 5150 evaluations.

- SGG's phone numbers were also posted at the nurses' stations in the outside facilities for quick reference.

- SGG's active role arranging the discharge plans for individual patients who were beneficiaries under government health care programs.

### (11)    TRIGGIANI Convicted of Medicare Fraud

212.    On November 29, 2007, TRIGGIANI was convicted for Conspiracy to commit Medicare fraud, stemming from the 2006 Florida charge. TRIGGIANI was given three years' probation ending November 28, 2012.

213.    On or about December 27, 2007, Robert Barrett, TRIGGIANI'S husband, acquired 100% of the shares of SGG.

214.    On or about April 1, 2008, July 1, 2008 and May 2009, the SGG and LAMMC contract was renewed with each renewal signed by LAMMC's CEO and President, John Fenton, and SGG's sole shareholder, BARRETT.

215.    Despite her sentencing and ongoing probation for Medicare fraud, and after her husband took over as owner of SGG, TRIGGIANI continued to refer psychiatric patients to LAMCC, at least in part through SGG.  In fact, LAMMCs own internal documents showed TRIGGIANI involved in patient admittance and discharge placement at this time.  For example:

a.    During Relator's orientation with Moreno in 2003, he instructed Relator to check every potential patient against the "Intensive Review List" and not to sign

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

1   off on a hold for anyone on the list.  This was commonly known among LAMMC

2   employees as "the IRL" and served as LAMMC's "Do Not Admit List."  The IRL

3   identified each patient by name, why the patient was not to be admitted, and who

4   entered the information blocking this person from being admitted.  LAMMC's

5   "Intensive Review List" (revised November 8, 2008) shows a patient added on April

6   2, 2008 by KHOSSOUSSI. His instruction said "Patient is a placement issue check

7   with Karen T first."  LAMMC Operating Policies and Procedures regarding

8   Discharge Planning make clear that discharge planning and coordination of

9   placement is an integral part of patient care.

10      216.   Indeed, from the time charges were filed in April, 2006 until the time of

11  her exclusion from Medicare, TRIGGIANI steadily referred patients to LAMMC

12  which involved both admission decisions and discharge planning.  According to a

13  "June Admission Referral List" from LAMMC on or before TRIGGIANI's

14  exclusion, Relator attributes at least 125 of the listed referrals to TRIGGIANI, a

15  "Karen Facility" or to SGG.  Relator, who was banned from many of the outside

16  facilities and walled off from the scheme, conservatively estimates that she still had

17  at least a half dozen evaluations related in some way to TRIGGIANI from April

18  2006 until June 2008.

19                **(12)   TRIGGIANI Excluded From Medicare**

20      217.   On June 19, 2008, TRIGGIANI was excluded from Medicare.

21      218.   On June 26, 2008, TRIGGIANI set up a blog advertising her experience

22  as a qualified medical consultant with extensive experience working with different

23  medical facilities.  She described herself, saying:

24      Triggiani's insight into the challenges of the contemporary health care market
        place allows her clients to feel confident about her advice.  Triggiani specializes in
25      healthcare marketing for a vast amount of healthcare providers ranging from
        physicians to medical groups to health care facilities."
26      [http://karentriggiani.blogpost.com]  The blog soliciting business as a health care
27      consultant did not disclose that TRIGGIANI was excluded from Medicare.

28

---

AMENDED COMPLAINT          66          CASE NO:  CV-12-00960 RSWL (SHX)

1    219.    Even though TRIGGIANI did not disclose in her new blog that she was
2    an excluded provider, DEFENDANTS should have known that TRIGGIANI was
3    excluded. TRIGGIANI's exclusion was a matter of public record and she was listed
4    in the OIG database. Indeed, DEFENDANTS conduct after TRIGGIANI's exclusion
5    demonstrates that the DEFENDANTS did, in fact, know of her exclusion.

6           **(j)    LAMMC Openly Discussed Its Ongoing Needs to Fill**
7                  **Psychiatric Beds After TRIGGIANI's Exclusion**

8    220.    While TRIGGIANI was excluded, from 2008 forward LAMMC needed
9    to fill its psychiatric beds. LAMMC administrators and staff openly discussed that
10   LAMMC's general acute care beds did not matter anymore and they needed to fill
11   the psychiatric beds to bill for psychiatric care.   For example:

12                            **LAMMC'S Intake Director**

13   a.       On or about August 7, 2008, a day after the FBI raid at LAMMC
14   relating to the Skid Row Scheme, Relator prepared to bring a letter to LAMMC's
15   Human Resources department reporting what she then suspected was illegal activity
16   arising out of the way LAMMC was admitting patients who did not meet the legal
17   criteria for 5150 Holds. She showed the letter to Aiken. Aiken warned Relator that
18   if she went to the Hospital's administration they would ignore her complaints
19   because it was the hospital's administration's orders that he and others were
20   following.

21                            **LAMMC's Interim CEO**

22   b.       On or about July 20, 2010, Relator attended a meeting run by interim
23   CEO, Shannon Jones. Jones was serving as the interim CEO after Fenton's
24   departure and before Ronald Stinnett would take over as CEO. Also present were
25   Jackie Sanchez (HR) Basilio, Gray, Aiken, Bautista, and Gina Espinoza, LAMMC's
26   Admissions Director. In addition to discussing the arrival of the new CEO, they
27   discussed the need to keep referral sources happy. Jones stressed that the PET
28   clinicians needed to be "nicer." Jones stressed that these referral sources were "their

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

1  customers" and that they needed all the psychiatric patients they could get.  She

2  informed them that she had been to a meeting with Hospital administration and that

3  the Hospital makes more money on psychiatric patients than medical/surgery

4  patients so they have to keep the psychiatric units full.  Jones informed the attendees

5  that the third floor would soon be ready to open as another gero-psych unit.

6  ## MALLARE

7  ### Patient 5, Age 75

8      c.      On or about August 11, 2010, Relator went to Temple Community

9  Hospital in Los Angeles to evaluate **Patient 5**, age 75.  The patient's chart showed

10  that he was unable to communicate related to a history of traumatic brain syndrome,

11  head injury and advanced "severe" dementia.  According to LAMMC's Consultation

12  Summary, Stephanie from LAMMC's intake department, said: "Pt gd, Dr. Filart

13  wants pt tx to Gero [Psych]."  Relator evaluated Patient 5 and found no criteria to

14  initiate a 5150 hold.  Because the patient was non-responsive he was also unable to

15  consent to admit himself voluntarily.  Relator called Aiken to report her findings.

16  Aiken told Relator that if she did not send the patient in on a 5150 hold that he

17  would just send another PET clinician to do it.  He stressed that MALLARE and Dr.

18  Filart wanted the patient brought to LAMMC's locked Gero-psych unit.  Aiken

19  instructed Relator to call MALLARE.  Relator called MALLARE and left a message

20  for him to call her.  When he did, MALLARE left a message where he yelled at her

21  telling her that this should have been a "no-brainer" decision to bring the patient in.

22  Relator refused to initiate the involuntary hold.  The patient was a Medicare

23  beneficiary.

### LAMMC's Director of Business Development

24

25      d.      On or about May 26, 2011 Brian Wilson, LAMMC's Director of

26  Business Development, circulated an email to Aiken, Espinoza, Sergio Aguirre, Paz

27  Buttung, and Dan Rolwing (LAMMC Director of Business

28  Development/Intake/Admissions), cc'ing Stinnett and Jones.  The email was

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

1  announcing a new doctor to the hospital.  Wilson asked recipients to establish a

2  close relationship with the new doctor because he is "very close with the ER at

3  Olympia and has many patients at surrounding nursing homes.  He will send many

4  direct admits and patients through our ER."

5  <div align="center">**LAMMC's Nursing Supervisor**</div>

6       e.       On or about September 11, 2011 Relator had a conversation with

7  "Boots," a nursing supervisor, in the nursing office when Relator went to pick up a

8  paycheck.  They began discussing whether Relator was busy since there were no

9  psychiatric beds available at LAMMC.  They then discussed what Boots would do if

10  Relator initiated a hold with no available psychiatric beds.  Boots told Relator that if

11  any psychiatric patients came in that they would have to go to the medical/surgical

12  floor.  She told Relator that the medical/surgical floor did not matter anymore and

13  that they have to keep the locked gero-psych 4th floor full.  She told Relator there

14  was a "long" waiting list of patients to be transferred from medical to psychiatric so

15  that "we can stay in business."   She too explained that the hospital's third floor had

16  been empty for almost 2 years and that the plan was to quickly open it as another

17  locked gero-psychiatric unit.  She told Relator that was the only way they could

18  make money.

19  <div align="center">**LAMMC Director of Business Development/Intake/Admissions**</div>

20  <div align="center">**Patient 66, Age 55**</div>

21       f.       On April 23, 2012, Relator was called to evaluate **Patient 66**, age 55, in

22  LAMMC's ER, Western Campus.  She found no criteria for a 5150 hold but the

23  patient was agreeing to come in voluntarily.  Relator called Rolwing with a question

24  about where to admit the patient, the Hawthorne unit or gero-psych.  Rolwing began

25  yelling and cursing at her, asking her why she was not placing the patient on a 5150

26  hold.  She tried to explain that the LPS laws and patients' rights both dictate that the

27  patient has a right to come in voluntarily.  Rolwing interrupted her and told her that

28  no other PET clinician did things like her.  He told her, "Just write the f***'ing

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

5150." When she tried to explain she was following the LPS laws he yelled back that he didn't care about "your damn laws. We have a business to run."  Rolwing continued, telling Relator that she thought she was so smart with "the f***'ing LPS laws" and that if she was really that smart then she would be able to figure out by now why they didn't give her any more calls. He concluded by saying, "If you can't play the game right with the rest of the team then get the hell off the court!" Then Rolwing hung up. Patient 66 was a Medi-Cal beneficiary and the cost of this patient's care was billed to government health care programs.

### (k)    TRIGGIANI Kept Their Beds Full

221.    While keeping the psychiatric beds full was LAMMC's goal, LAMMC also knew that TRIGGIANI was the one who did it. As described below, LAMMC continued to use TRIGGIANI in order to keep its beds full even though she was an excluded provider.

### (13)    DEFENDANTS' Knowing Use of an Excluded Provider to Provide Illegal Patient Referrals

222.    Rather than making sure that TRIGGIANI was not connected in any way to the care DEFENDANTS were providing to government health care program beneficiaries, DEFENDANTS continued with the scheme, including TRIGGIANI.

223.    Just weeks after TRIGGIANI's exclusion, Relator was called to do evaluations for two patients where TRIGGIANI made the requests. The patients were at Rosecrans Villa, the outside facility TRIGGIANI's sister, Trish Pedroza, worked at and owned - the same person with an ownership interest in PROCARE.

### Patient 67, Age 52

a.      On or about July 23, 2008, Relator was called to do two evaluations at Rosecrans Villa in Hawthorne. Relator was called to evaluate **Patient 67**, age 52. LAMMC's Consultation Summary form reflects the caller requesting the evaluation as "Karen," and identifying her as "staff." The form also identified KHOSSOUSSI under the disposition/plan. Relator admitted the patient on a 5150 hold. The patient

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

1  is identified as a Medicare beneficiary and the cost of this patient's care was billed to

2  government health care programs.

3  ### Patient 68, Age 77

4       b.     Relator was also called to evaluate **Patient 68**, age 77.  LAMMC's

5  Consultation Summary form reflects the caller requesting the evaluation as "Karen,"

6  identifying her as "staff."  The form also identified "Karen/Golchini/Tehrani-

7  Khossoussi" as current treating physicians.  Relator admitted the patient on a 5150

8  hold.  The patient is identified as a Medicare/Medi-Cal beneficiary and the cost of

9  this patient's care was billed to government health care programs.

10       **(l)     Defendants Attempt to Conceal TRIGGIANI's Role**

11       224.   After her exclusion from Medicare, DEFENDANTS developed ways to

12  hide TRIGGIANI's connection to them, demonstrating that DEFENDANTS <u>knew</u>

13  TRIGGIANI should not be involved in any care for Medicare or Medi-Cal patients.

14  For example:

15       •     They wrote the letter T with a circle around it on documents identifying

16  the source of a referral.  Relator saw the circled T next to B&Cs and SNFs that she

17  recognized as TRIGGIANI referral sources on lists of outside facilities maintained

in LAMMC's Intake Department and on intake forms and patient records.

18

19       •     They used other names besides TRIGGIANI's – but still used

TRIGGIANI's phone number.  Relator saw this on intake forms and patient records.

20

21       225.   On or about August 1, 2009, GOLCHINI became sole shareholder of

22  SGG, and the primary beneficiary of the SGG contract with LAMMC.  The change

23  in SGG's ownership removed the prior connections between LAMMC, SGG and

24  TRIGGIANI even though her role in the unlawful referral arrangement was

25  continuing.

26       a.     Even though TRIGGIANI and BARRETT no longer "owned" SGG,

27  TRIGGIANI remained actively involved in SGG's continuing referrals with the

28  knowledge and participation of its new owner, GOLCHINI, and the other

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

1  DEFENDANTS.  *See* ¶¶ 217-264 describing TRIGGIANI's ongoing role in SGG

2  referrals after exclusion.

3        b.    Significantly, at the time GOLCHINI assumed sole ownership of SGG,

4  he was on probation with the California State Medical Board.  As a term of that

5  probation, GOLCHINI agreed to "obey all federal, state and local laws, all rules

6  governing the practice of medicine in California and remain in full compliance with

7  any court order, ordered criminal probation, payments and other orders."

8  GOLCHINI's active role in facilitating the concealment of TRIGGIANI's ongoing

9  role in the unlawful scheme by assuming sole ownership of SGG violated federal,

10  state and local laws, and by extension, the terms of his probation.

11          **(m)**   **Referral Sources Openly Use TRIGGIANI**

12      226.   The outside facilities made less effort to conceal TRIGGIANI's

13  continuing involvement in their referrals of patients to LAMMC.  For <u>years</u> after

14  TRIGGIANI'S exclusion from Medicare, Monterey Care Center in Rosemead and

15  Brighton Convalescent Center in Pasadena, among others, continued to post signs

16  requiring all 5150 evaluations to be handled through TRIGGIANI.  *See* ¶ 198,

17  describing sign posted at Monterey Care Center.  Relator also continued to see SGG

18  and TRIGGIANI and TRIGGIANI's phone number on consultation summaries,

19  intake forms and other documents related to the referrals for these patients long after

20  TRIGGIANI was an excluded provider.  Indeed, TRIGGIANI continued to make

21  these unlawful referrals while on probation for her prior Medicare fraud conviction.

22      227.   In a May 17, 2009 memo Alex Macabuhay of Brighton Convalescent

23  Center in Pasadena, instructed "ALL License Nurses" that: "All psyche [sic] patient

24  [sic] should be transfer to LA Metro and Please Notify Maris or Judy. Then call

25  Karen as Direct Contact 626-216-8178.  Do not transfer to Huntington Hospital

26  regardless who's [sic] the attending physician."  The phone number, 626-216-8178,

27  was TRIGGIANI'S phone number.

28

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

AMENDED COMPLAINT      72     CASE NO:  CV-12-00960 RSWL (SHX)

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

a.      The referral arrangement between LAMMC and Brighton documented in Macabuhay's memo did not just involve the excluded provider, TRIGGIANI.  It also violated the County Guidelines Moreno highlighted in his December 31, 2003 memo.  *See* ¶ 164, supra.  Pasadena was not in LAMMC authorized area for taking PET calls.  Huntington Hospital in Pasadena <u>should have been the hospital contacted</u> about any 5150's for a Pasadena facility – not specifically prohibited.  Defendant routinely violated this aspect of the County's Guidelines (among others) in arranging to send psychiatric patients to LAMMC.  Even with the number of facilities that banned her over the years, Relator went to Pasadena facilities over <u>fifty-one (51)</u> <u>times</u> during the time period from 2004 until she was terminated in 2012.

b.      LAMMC administrators, including CEO Fenton, knew that the County Guidelines were the basis of its designation as an LPS operational facility and that it was required to adhere to LPS laws to maintain that status.  On October 26, 2007, LAMMC CEO Fenton circulated a memo stating: "[P]lease find recent revisions to the LPS Guidelines submitted to you last July.  <u>Please review these</u> <u>changes/modifications carefully, as they are the basis of our LPS operational facility</u>. (emphasis added).  The distribution list included: MARKIE, MALLARE, KHOSSOUSSI, Jones, Aiken and PET clinicians, including Relator, among others. DEFENDANTS, including LAMMC, through its staff and administrators, regularly acted in willful disregard of the county guidelines.

### (n)      TRIGGIANI's Ongoing Involvement in 2009

228.  TRIGGIANI was not just referring patients to LAMMC.  Long after her exclusion from Medicare and Medi-Cal TRIGGIANI continued to be directly involved in admission and discharge placement decisions for LAMMC patients who were government health care program beneficiaries.

### Patient 69, Age 55

229.  On or about May 26, 2009, Relator was called to do an evaluation of **Patient 69**, age 55, at Rosecrans Villa in Hawthorne.  According to LAMMC's

1  Consultation Summary form, KHOSSOUSSI and GOLCHINI were the patient's
2  doctors. Relator found criteria to admit the patient on a 5150 hold. PROCARE
3  provided the transportation. On July 12, 2009, Relator was called to do another
4  evaluation of this patient, this time at Litehouse Healthcare Center in Los Angeles.
5  According to LAMMC's Consultation Summary form, the caller from the referral
6  source was "Karen/Khossoussi." The call to Relator was cancelled before Relator
7  arrived at the facility because the patient agreed to be admitted voluntarily. Patient
8  69's medical records identify her as a Medicare and Medi-Cal beneficiary and the
9  cost of this patient's care was billed to government health care programs.

### Patient 70, Age 49

11  230.  On or about June 10, 2009, LAMMC admitted **Patient 70**, age 49, from
12  Hyde Park Convalescent Hospital in Los Angeles. According to LAMMC's "Intake
13  Inquiry" form, the caller's name was "Karen/Sue." However, next to the name was a
14  T with a circle around it. The admitting doctors were KHOSSOUSSI and
15  GOLCHINI. The patient was admitted voluntarily. PROCARE transported the
16  patient. The patient was a Medicare/Medi-Cal beneficiary and the cost of this
17  patient's care was billed to government health care programs.

### Patient 71, Age 90

19  231.  On or about June 25, 2009, Relator was called to do an evaluation of
20  **Patient 71**, age 90, at Rosecrans Villa in Hawthorne. According to LAMMC's
21  Consultation Summary form, the caller for the referral source was
22  "Sandra/GOLCHINI" as "staff/md." The treating physicians were GOLCHINI and
23  KHOSSOUSSI. This patient was purportedly coming in voluntarily. However,
24  according to LAMMC's "Intake Inquiry" form, the admittance was a "Direct Admit"
25  and the referral source was identified as "Tony." Next to Tony's name there was a T
26  with a circle around it. The patient was a Medicare and Medi-Cal beneficiary and
27  the cost of this patient's care was billed to government health care programs.

28

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

**Patient 72, Age 53**

232. On or about September 13, 2009, Relator was called to do an evaluation of **Patient 72**, age 53, at Van Nuys Health Care Center in Van Nuys. LAMMC's Consultation Summary form reflects the caller for the referral source was again "Karen Triggiani." The treating physicians were KHOSSOUSSI, GOLCHINI and Dr. Gary Grimes. This patient was admitted on a 5150 hold.

a. Relator was called to evaluate this patient again, on October 29, 2009. This time Relator found Patient 72 at Verdugo Valley Convalescent in Montrose. During this evaluation Relator was able to trace what had happened to this patient after the September 13, 2009 evaluation. According to the LAMMC Consultation Summary, the patient was admitted to LAMMC from October 20 to 28, 2009, and then discharged. One day later Relator was called for another evaluation. The Consultation Summary gave KHOSSOUSSI, Grimes and GOLCHINI as Current Treating Physicians and listed (888) 510-8800, SGG's phone number, as their phone number. Relator found criteria and initiated a 5150 hold on this date. The patient was identified as a Medicare beneficiary and the cost of this patient's care was billed to government health care programs.

**Patient 73, Age 52**

233. On or about October 18, 2009, Relator was called to do an evaluation of **Patient 73**, age 52, at Rosecrans Villa in Hawthorne. LAMMC's Consultation Summary form reflects the caller requesting the evaluation as "Ashley/Karen." The form also identified the current or treating physician(s) as GOLCHINI and KHOSSOUSSI. The medical records at the facility identified GOLCHINI as the house doctor and KHOSSOUSSI as the house psychiatrist. The patient was admitted on a 5150 hold. The patient was identified as a Medicare beneficiary and the cost of this patient's care was billed to government health care programs.

AMENDED COMPLAINT            75            CASE NO: CV-12-00960 RSWL (SHX)

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

**Patient 74, Age 47**

234.   On or about December 13, 2009, Relator was called to evaluate **Patient 74**, age 47, at Longwood Manor in Los Angeles.  According to LAMMC's Consultation Summary form, the caller for the referral source was "Karen T" and "Relationship: Staff."  The treating physicians were KHOSSOUSSI and Jimmy Huang.  Relator determined that the patient did not meet criteria for a 5150 hold.

(o)   **LAMMC, Including Its CEO Fenton, Admitted TRIGGIANI Still Involved in Care of LAMMC Patients in 2009**

235.   TRIGGIANI's ongoing role in the care of patients treated at LAMMC and the role PROCARE played in bringing in these patients – after TRIGGIANI's exclusion from Medicare - was known by officers at PHC and the Hospital's administration.  On or about August 13, 2009, Relator participated in a meeting at LAMMC with Fenton (CEO), Jones (RN/COO/VP of Patient Care Services), Sanchez (Human Resource Director), LaCrease Belk (RN Director of ER), Gray (RN/PET), Basillio (RN/PET), Bautista (RN/PET), Aiken (Intake Director), Stephanie Garland Pulliam (Intake Coordinator), Velma Young (Intake Coordinator), Joan Crawford (Intake Coordinator) and an HR assistant.  Kristen Wild, RN (PHC's Corporate Compliance Officer) participated by phone.  At the meeting Fenton was discussing the rotation of ambulance companies for bringing patients in.  Aiken said that Intake was rotating between ambulance companies for patient transports, just as had been suggested.  Relator voiced disagreement with Aiken.  She said that Intake and PET clinicians were instructed by Aiken and others to only use PROCARE to transport all of GOLCHINI's and KHOSSOUSSI's patients.  Fenton followed by stating that he told "Karen Triggiani and her group of doctors" to stop using only PROCARE.  He then said he would have to call her ASAP.  Belk commented that they had to use PROCARE because of the contract LAMMC had with PROCARE.  Wild responded that there is "no contract."  Wild

AMENDED COMPLAINT          76          CASE NO:  CV-12-00960 RSWL (SHX)

1   then told the meeting attendees to move on with the next issue on the agenda. While

2   someone had been assigned to take the minutes of the meeting, no minutes of this

3   meeting were ever circulated.

4        236.   However, there was an arrangement with PROCARE.

5        a.      Two years later, Gina Espinosa circulated an email titled "Taxi

6   Vouchers" instructing recipients on how to avoid the unnecessary expense of high

7   dollar invoices from taxi companies for patient transport. She instructed them –

8   instead of using the taxis to "use ProCare ambulance when possible, even if the

9   patient is ambulatory but needs minimal assistance ProCare may be called to

10  transport the patient." LAMMC had a deal with PROCARE that made it cheaper for

11  them to use PROCARE than to use ordinary taxis, which is how ambulatory patients

12  should have been transported. Relator is informed and believes and on that basis

13  alleges that PROCARE agreed to provide free transports to the patients who should

14  have been in taxis in exchange for keeping LAMMC's Medicare and Medi-Cal

15  business. This agreement or arrangement was an illegal kickback.

16       b.      In or around May, 2012, Relator called LAMMC's Intake Department

17  and spoke to Velma Young, Intake Coordinator. Relator gave Young a patient's

18  information and asked for an ambulance to transport the patient to LAMMC, as was

19  the usual procedure. Young told Relator that they (Intake) are no longer allowed to

20  arrange ambulance transportation for the patients and that they are to ask the facility

21  to arrange the ambulance now. Relator said, "that's a new thing, I have never heard

22  that before." Young agreed. She added that she wasn't sure what they were going to

23  do about the deals that they have with GOLCHINI and PROCARE, and Drs. Gadson

24  and Johnson and Rescue One.

25       **(p)    TRIGGIANI's Ongoing Involvement in 2010**

26       237.   On January 26, 2010, TRIGGIANI declared under penalty of perjury

27  (while on probation for Medicare fraud) in a lawsuit filed by SGG against LAMMC

28  for failure to pay SGG pursuant to the SGG Contract, that:

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

AMENDED COMPLAINT        77        CASE NO:  CV-12-00960 RSWL (SHX)

From April 1, 2007 and continuing up [sic] June 2008, SGG provided and delivered the Services to LAMMC pursuant to the Agreement.  In June 2008, I resigned from my position as a director and officer of S.G.G. prior to my exclusion from the Medicare Program. … <u>From June 2008 through the present, I have not been affiliated with SGG.  I started a separate entity, K.S.T. & Associates, Inc. and have in no way done any work on behalf of SGG.</u> (emphasis added)

However, LAMMC's own phone directory, dated May 22, 2009, identified "SGG (Tony or Karen) (213) 216-8821."  And after signing this declaration TRIGGIANI continued to be involved in referral and discharge planning for LAMMC's patients - including through SGG.

### Patient 75, Age 77

238.   On or about January 28, 2010 - just days after TRIGGIANI signed and filed her court declaration under penalty of perjury, Relator was called to do an evaluation of **Patient 75**, age 77, at Dreier's Nursing Care Center in Glendale. LAMMC's Consultation Summary form reflects the referral source (the person who called in the psychological evaluation) for this patient as "Joy/Karen."  Relator did not find criteria to initiate an involuntary hold and Patient 75 refused to come in voluntarily.

### Patient 76, Age 36

239.   On or about January 30, 2010, Relator was called to do an evaluation of **Patient 76**, age 36, at Brighton Convalescent Center in Pasadena.  LAMMC's Consultation Summary form reflects the referral source for the patient evaluation was again named "Karen" and the phone number given was (626) 216-8178, TRIGGIANI's phone number.  Two of the current treating physicians were identified as KHOSSOUSSI and GOLCHINI.  Relator did not initiate a hold.  This patient was a Medicare/Medi-Cal beneficiary.

### Patient 77, Age 46

240.   On or about February 17, 2010, Relator was called to do an evaluation of **Patient 77**, age 46 at Brighton Convalescent Center in Pasadena.  LAMMC's

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

1   Consultation Summary form reflects the referral source was again named "Karen."
2   The treating physicians were KHOSSOUSSI and GOLCHINI.  This patient was
3   admitted to LAMMC's locked psychiatric unit.  The patient is identified as a
4   Medicare/Medi-Cal beneficiary and the cost of this patient's care was billed to
5   government health care programs.

**Patient 78, Age 67**

7   241.  On April 2, 2010 **Patient 78**, age 67, a resident of Verdugo Valley
8   Convalescent in Montrose agreed to be admitted voluntarily to LAMMC's
9   Hawthorne Campus.  Patient 78 was transported by PROCARE.  Verdugo's
10  Admission and Discharge Summary form, dated April 1, 2010, identifies
11  GOLCHINI as Patient 78's doctor and (888) 510-8800, SGG's phone number, as the
12  contact number.  In LAMMC's "Discharge Planning" Records, the notes provide:
13  "04/05/10 … Wanda admission, Verdugo Valley (818) 248-6856, writer spoke to
14  Wanda who stated 'Can you call Karen Please.   [Patient 78] does not want to be
15  here, she wants to go to Haiti.  She's refusing her medication.'  Writer to coordinate
16  with discharge planner to place PT in appropriate level of care."  On LAMMC's
17  Intake form, "Tony" is identified as the referral caller with a circled T next to his
18  name.  On or about April 6, 2010, four days after being admitted voluntarily to
19  LAMMMC's locked psychiatric unit, Patient 78 demanded to be discharged.
20  Relator was called to LAMMC to do an evaluation.  Relator evaluated the patient
21  and found criteria for a 5150 hold.  Patient 78's status was changed from voluntary
22  to a 5150 hold.  According to LAMMC's Consultation Summary form,
23  KHOSSOUSSI and GOLCHINI were identified as current treating doctors.  The
24  phone number next to their names was identified as (888) 510-8800, SGG's number.
25  Patient 78 had also been previously admitted on January 28 - February 10, 2010.
26  Patient 78 was identified as a Medi-Cal beneficiary and the cost of this patient's care
27  was billed to government health care programs.

28

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

KELLER GROVER LLP

1965 Market Street, San Francisco, CA 94103

Tel. 415.543.1305 | Fax. 415.543.7861

**Patient 6, Age 66**

242.   On or about April 17, 2010, Relator was called to do an evaluation of **Patient 6**, age 66, at South Pasadena Convalescent Hospital in Pasadena.  Upon arrival at the facility, Relator met with a nurse who informed Relator that Patient 6 was volunteering to be admitted to LAMMC's locked psychiatric unit.  Relator noted the voluntary status on the Consultation Summary.  After Relator spoke to the nurse, Relator went to evaluate the patient in person and found the patient in the hall strapped down to an ambulance cart with restraints.  The patient was yelling for the medics to let him go.  When Relator inquired to the charge nurse as to what was going on, she told Relator that "Karen Triggiani Dr. Golchini's nurse" told her to go ahead and send the patient to the hospital.  Relator informed the medics that she had not done the evaluation for the hold yet, and there was no legal status to hold the patient.  Relator wrote in the Consultation Summary "Per RN—'Karen said to go ahead & bring pt in. —Vol Status?'  RN said 'he has to he has no choice.'"  Relator asked Patient 6 whether he was volunteering to go to LAMMC's locked psychiatric unit.  Patient 6 said no.  Relator reviewed the patient's medical chart and did not find any criteria to place Patient 6 on a 5150 hold.  Notwithstanding the lack of criteria for a 5150 hold and the Patient's refusal to be admitted voluntarily, the ambulance took the patient.  The patient was admitted to the locked Gero-psych unit at LAMMC's Western campus purportedly as a voluntary admission.  The nurse's notes for the patient, dated April 17, 2010 at 10:00 a.m., reflect that the nurse "Called MD @ 888 510-8800 spoke to Karen…." and at 2:30 p.m., "Karen from Dr. Golchini called back õ an order to transfer resident to LA Metro for further eval…"  Relator's LAMMC Consultation Summary form identified the referral source as "Karen" and the caller of the evaluation identified was KHOSSOUSSI.  The summary also identified GOLCHINI as the current treating doctor, with a phone number of (888) 510-8800, SGG's phone number.  Patient 6's medical records identify this patient as

a Medicare and Medi-Cal beneficiary and the cost of this patient's unlawful confinement was billed to government health care programs.

### Patient 79, Age 34

243.   On or about May 22, 2010, Relator was called to do an evaluation of **Patient 79**, age 34, at Verdugo Valley Convalescent in Montrose.  LAMMC's Consultation Summary form reflects the caller of the referral source was again named "Karen Triggiani" and under "Relationship:  Staff/Golchcini-MD."  The treating physicians were KHOSSOUSSI and GOLCHINI.  Relator found criteria for a 5150 hold and the patient was admitted.  Relator spoke to KHOSSOUSSI who stated "no need for ER. Direct admit."  Verdugo's Admission and Discharge Summary had Dr. Ladines and Dr. Joshua Koh (Psychiatrist) as the patient's doctors.  Patient 79 was a Medicare and Medi-Cal beneficiary and the cost of this patient's care was billed to government health care programs.

244.   On or about June 19, 2010, Relator was called to Verdugo Valley Convalescent Hospital ("Verdugo") in Montrose.  While there, she evaluated three patients referred by TRIGGIANI.

### Patient 30, Age 51

a.   Relator evaluated **Patient 30**, age 51, and did not find criteria for a 5150 hold and the Patient refused to be admitted voluntarily.  According to his LAMMC Consultation Summary form, the referral source was "Karen T" with instructions to "Send to Hawth" and that "Karen T" reported on the Precipitating Factors/Presentment Problems, that the patient had a fight with his peer.  The Treating Physician was GOLCHINI and KHOSSOUSSI.  GOLCHINI's phone number listed was (888) 510-8800, the number for SGG.  Further, on Verdugo Valley Skilled Nursing Admission and Discharge Summary form for this patient, dated May 26, 2010, GOLCHINI is identified as the patient's doctor and his phone number was listed again as (888) 510-8800, SGG's number.  The patient was a Medicare and Medi-Cal patient.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

**Patient 32, Age 65**

b.      Relator also evaluated **Patient 32**, age 65.  She did not find criteria for a hold for this patient either.  Patient 32 also refused to be admitted voluntarily. According to the LAMMC Consultation Summary form, however, the referral source was "Karen T."  The form also identified GOLCHINI as one of the treating physicians.  However, both GOLCHINI and KHOSSOUSSI were identified as the treating doctors when the patient was admitted to LAMMC psychiatric unit June 1-8, 2010.  On LAMMC's June 1, 2010 admission form, KHOSSOUSSI is identified as the Patient's admitting doctor.  On Verdugo's Admission and Discharge Summary dated June 14, 2010, GOLCHINI'S's phone number listed was (888) 510-8800, the number for SGG.  The patient was a Medicare and Medi-cal beneficiary.

**Patient 31, Age 48**

c.      Relator evaluated **Patient 31**, age 48, after evaluating Patients 30 and 32, and found criteria for a 5150 hold.  According to the LAMMC Consultation Summary, GOLCHINI was one of the current treating doctors.

245.   While at Verdugo evaluating Patients 30, 31 and 32 on June 19, 2010, the facility's Director of Nursing, Linda Catocotan, called Relator angry for only finding criteria to admit just Patient 31 to LAMMC.  Catocotan informed Relator, that "If you don't take all three of these patients, you cannot have the one [Patient 31]."  Catocotan further stated that "Karen promised that you would take all three of these patients. If you don't, I will call Karen and see to it that you will never do psychiatric evaluations at my facility again." When Relator refused to admit Patients 30 and 32, Catocotan cancelled the psychiatric evaluation on Patient 31 and the patient was not admitted to LAMMC.  Because the psychiatric evaluation was cancelled the Relator did not complete the Consultation Summary for Patient 31 to identify the source of the call as TRIGGIANI.  Catocotan told the Relator that she was going to send Patient 31 to East Valley Hospital in Glendora for the 5150 hold. This conversation with Catocotan is documented in the Consulting Summary which

1    provides: "then Linda DON [Director of Nursing] (called) (Not all (3) pts then

2    none). Send pt to East Valley Hospital."

3        246.   The next day, June 20, 2010, at approximately 10:45 p.m., Relator had a

4    phone conversation with KHOSSOUSSI regarding a different patient. During this

5    conversation, KHOSSOUSSI asked what happened to the three patients from

6    Verdugo Valley Convalescent from the night before. He said she was supposed to

7    admit them. He told her she should thank God that after she left one of the patients

8    didn't kill or hurt another patient or staff member. He told her she would be liable

9    for that and he and the hospital would not back her up. He told her that would all be

10   on her license. He wanted to know whether she wanted to lose her license, and told

11   her she could be sued and possibly go to jail. In the end he concluded telling her:

12   "We have to start bringing these patents in."

### Patient 80, Age 66

14       247.   On or about June 22, 2010, Relator was called to do an evaluation of

15   **Patient 80**, age 66, at Marlinda Nursing Home in Lynwood.  Relator's LAMMC

16   Consultation Summary form identified the person calling for the evaluation as

17   "Karen Triggiani for Mallare." The patient was admitted to LAMMC on a 5150

18   hold. The patient was a Medicare beneficiary and the cost of this person's care was

19   billed to government health care programs.

### Patient 81, Age 68

21       248.   On or about June 23, 2010, Relator was called to do an evaluation on

22   **Patient 81**, age 68, at Flower Villa Nursing Home in Los Angeles. The LAMMC

23   Consultation Summary gave "Karen T/Mallare" as the person calling for the

24   evaluation. The consultation summary identifies MALLARE as the current treating

25   doctor. The patient was admitted to LAMMC on a 5150 hold and Relator's County

26   Hold form also identified KHOSSOUSSI as involved in the patient's care. Patient

27   81 was a Medicare beneficiary and the cost of this patient's care was billed to

28   government health care programs.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

AMENDED COMPLAINT          83          CASE NO:  CV-12-00960 RSWL (SHX)

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

### Patient 14, Age 62

249.   On or about July 22, 2010, Relator was called to do an evaluation of **Patient 14**, age 62, at San Marino Wellness Center in Pasadena.  According to LAMMC Consultation Summary, the person calling for the evaluation was named "Bellia."  However, under relationship "'marketer' Karen T" is identified. KHOSSOUSSI is identified as one of the current treating doctors.  Relator was met, upon arrival, by a social worker for the patient who told Relator that "your marketer" had promised that LAMMC would get him out of the facility because he was belligerent and no one wanted to be his roommate.  The social worker told her "the plan" was for him to go to LAMMC and then be transferred to St. Vincent's.  Relator noted this in her records for this patient.  Relator further noted in the Consultation Summary "Karen/Khossoussi" as the "marketer" the social worker was referencing. Relator did not find criteria for a 5150 hold.  A few days later, Basilio, another PET clinician, initiated a 5150 hold on this patient and admitted him to LAMMC.  Patient 14 was a Medicare beneficiary and the cost of this patient's care was billed to government health care programs.

### Patient 40, Age 57

250.   On or about September 1, 2010, Relator was called to do an evaluation of **Patient 40**, age 57, at Valley View Retirement Center ("Valley View") in Panorama City.  When Relator arrived at the facility, Relator met with Gloria Padilla ("Padilla"), the facility owner, in her office.  During this meeting, Relator witnessed Padilla making multiple calls to (888) 510-8800, SGG's main toll free number, and having multiple phone conversations with "Karen" on speaker phone trying to negotiate a patient's admission to LAMMC.  It was TRIGGIANI on the phone. Relator witnessed Padilla complaining to TRIGGIANI because LAMMC was not willing to take a patient who had no Medicare days left.  Padilla complained to Relator that Valley View paid all this money to these vendors, referring to TRIGGIANI, and they say to call if they need a patient to go to the hospital.  But

TRIGGIANI was refusing this one because they could not bill Medicare. Padilla wanted TRIGGIANI to "do her this favor." LAMMC's Consultation Summary form for this patient identified "Tony at Karen Triggiani's Office" as the referral source for the patient evaluation and further identified the relationship as "Tony/staff at SGG." GOLCHINI was identified as the current treating physician. The Summary further provided: "No-M-Cal & No M-Care days left" …"Cancelled 'wrong insurance per Stephanie (Intake) No MCare days left & No M-Cal." Relator was called back a few minutes later and initiated the 5150 hold.

a.    This was not the first time Relator had evaluated this patient. On or about October 13, 2009, Relator was called to evaluate this patient at LAMMC, Western Campus. LAMMC's "Intake Inquiry" dated the day before, October 12, 2009, identified the caller's name for the referral as "Tony" with a circled T next to it. The patient had come in from Rosecrans Villa in Hawthorne voluntarily by PROCARE ambulance. LAMMC's Consultation Summary form for the psychiatric evaluation also noted that the caller requesting the evaluation was identified as "Tony" with a T with a circle around it. KHOSSOUSSI and GOLCHINI were identified as the admitting doctors. Relator found criteria for a 5150 hold and admitted the patient. The patient was identified as having Medicare and the cost of this patient's care was billed to government health care programs.

### Patient 82, Age 48

251.  On or about September 11, 2010, Relator was called to do an evaluation of **Patient 82**, age 48, at Longwood Manor in Los Angeles. LAMMC's Consultation Summary form reflects the referral source for the patient evaluation was again named "Karen" and the relationship of the caller to the referral source was "SGG." The treating physician was Dr. Wong. Relator did not find criteria for the 5150 hold, but the patient was admitted voluntarily. The patient was a Medicare/Med-Cal beneficiary and the cost of this patient's care was billed to government health care programs.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

**Patient 39, Age 41**

252.  On or about September 25, 2010, Relator was called to evaluate **Patient 39**, age 41, at Monterey Care Center in Rosemead.  As part of Relator's evaluation on September 25, 2010, Relator reviewed the nurse's notes at Monterey Care entitled Multidisciplinary Progress Record ("MPR") for that day, which documented at 11:00 a.m. that "Called Karen Triggiani again to check what happened –PET Team have not arrived.  Karen states 'there is a problem PET team will be there at 4:00 p.m. and states give resident something to … calm her down.'"  According to Monterey Care's Admission and Discharge Summary dated September 21, 2010, the patient's doctors were Dr. Paul Lui and Dr. Adoracian Palisoc.  However, according to Monterey Care's MPR, Patient 39 had been admitted to LAMMC's psychiatric unit twice previously under the care of GOLCHINI and KHOSSOUSSI, on August 27, 2010 and again on September 10, 2010.  Relator initiated the 5150 hold and noted on the County's 5150 hold form as the basis for the evaluation that she had been "Called to Monterey Care Center by SGG Crisis, Karen to evaluate…"  This patient was a Medicare and Medi-Cal beneficiary and the cost of this patient's care was billed to government health care programs.

**Patient 83, Age 57**

253.  On or about September 25, 2010, Relator was called to do an evaluation of **Patient 83**, age 57, at Rosecrans Villa in Hawthorne.  According to LAMMC's Consultation Summary form, the person from the referral source calling for the patient's evaluation was "Karen Triggiani" and also identified TRIGGIANI's relationship as "SGG/staff."  Relator found criteria to admit the patient on a 5150 hold.  KHOSSOUSSI was identified as the patient's current treating physician.  The patient was a Medicare and Medi-Cal beneficiary and the cost of this patient's care was billed to government health care programs.

---

AMENDED COMPLAINT            86        CASE NO:  CV-12-00960 RSWL (SHX)

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

**Patient 84, Age 70**

254.   On or about October 2, 2010, Relator was called to do an evaluation of **Patient 84**, age 70, at St. Vincent's Health Care Center in Pasadena.  According to the nurse's notes, at 1:00 p.m., "Called Dr. Golchini.  MD said call Robert.  Placed a call to Robert.  Robert said, he said will send out 5150 team."  On the LAMMC's Consultation Summary form, "Robert õ Dr. Golchini" was identified as the caller of the referral source and under relationship the form identifies "SGG Crisis." GOLCHINI and KHOSSOUSSI are identified as the treating doctors.  Relator's signed County 5150 Hold form also identified GOLCHINI and KHOSSOUSSI.  On the facility's Admission and Discharge Summary, GOLCHINI is identified as the doctor, with a phone number of (888) 510-8800, SGG's phone number.  The patient was admitted to LAMMC on a 5150 hold and transported by ambulance.  Patient 84 was a Medicare and Medi-Cal beneficiary and the cost of this patient's care was billed to government health care programs.

**Patient 23, Age 70**

255.   On or about November 6, 2010, **Patient 23**, age 70, was transported by ambulance from Bellflower Christian Retirement Center, in Bellflower to the emergency room at LAMMC's Western campus.  Dr. Tom Nguyen, the ER doctor, asked Relator to do a psychiatric evaluation of this patient.  The medics who transported the patient told Relator that he was to go to the ER at Western and be admitted to the locked Gero-psych unit, per "Karen."  Both medics told Relator and others in the ER that "Karen" said to make sure no one brings up her name, and that "Karen" told them that the patient was to go to a skilled nursing home after he was discharged from the hospital.  The medics were very secretive about using TRIGGIANI's name, and one admitted that he would get fired if he told anyone that TRIGGIANI was coordinating this admission.  Relator did the evaluation and concluded that the patient did not meet criteria for a 5150 hold.  The patient also refused to agree to come in voluntarily.  As noted in the LAMMC's Consultation

1  Summary form, the patient was alert, oriented and able to answer all questions.  The
2  patient had a decreased appetite, but stated that he was eating and had not lost
3  weight.  Patient was also blind.  After concluding the evaluation, Relator called
4  Bellflower and spoke to "Gloria."  The Relator instructed "Gloria" to come pick up
5  the patient, or he would be transported back by ambulance since he didn't meet
6  criteria for a 5150 hold and wasn't agreeing to a voluntary admission.  The patient
7  was confused as to why he was even sent to the ER.  Gloria told the Relator that
8  "Karen" said to admit the patient and then she would help arrange a skilled nursing
9  home upon discharge.  Dr. Nguyen called Dr. Samonte to see what he wanted him to
10  do with the patient because he didn't have any legal criteria for a 5150, and refused
11  voluntary admission.  Dr. Samonte told Dr. Nguyen to admit the patient to the
12  Med/Surg 5th floor with a diagnosis of dehydration, a false diagnosis.  Dr. Nguyen
13  followed Dr. Samonte's orders.  However, the patient continued to refuse to be
14  admitted.  The ER nurse who was assigned to the patient could not obtain a signature
15  from the patient because he did not want to be admitted.  In the absence of his
16  consent, the ER nurse wrote "Pt. unable to sign, Blind and Confused." Then her
17  initials, MM, and the date 11/6/10 at 22:05.  The patient was not confused at all; he
18  just refused to be admitted.  Over the patient's objection, the patient was admitted to
19  the 5th floor Med/Surg and then later transferred to the locked gero-psych unit on
20  the 4th floor.  This patient was a Medi-Cal beneficiary and the cost of this patient's
21  unlawful confinement was billed to government health care programs.

<div align="center">**Patient 86, Age 59**</div>

22  

23       256.  On or about November 24, 2010, **Patient 86**, age 59, was admitted to
24  LAMMC after being transported by ambulance from Temple Community Hospital
25  in Los Angeles.  On this patient's Admission and Discharge Summary, dated
26  December 1, 2010, the patient's doctor is identified as GOLCHINI and "Trigani,
27  Karen (CASE MANAGER)."  On or about February 5, 2011, the Patient was
28  admitted again, this time coming in from Longwood Manor, in Los Angeles.  On

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

1  Longwood Manor's Physician's Orders for the patient, dated January 27, 2011, under

2  "Golchini, Keivan MD (310) 588-2829" it had "Trigani, Karen (CASE MANAGER)

3  (626) 216-8178." Patient 86 was a Medi-Cal beneficiary and the cost of this

4  patient's care was billed to government health care programs.

5  <center>**Patient 85, Age 60**</center>

6      257. On or about November 20, 2010, Relator was called to do an evaluation

7  of **Patient 85**, age 60, at Brighton Convalescent Center in Pasadena. LAMMC's

8  Consultation Summary form reflects the caller for the referral source for the patient

9  evaluation was again named "Karen." The treating physicians were KHOSSOUSSI

10  and Dr. Marcel Filart. Relator initiated a 5150 hold and her signed hold form

11  identifies in the criteria that Relator was "Called to Brighton Conv SNF by Karen for

12  Dr. Filart and Khossoussi to evaluate a 60 y/o AA female...." While the Relator was

13  at Brighton Convalescent Center, she noticed that SGG's Crisis Cards were all taken

14  down from the nurse's stations. Relator asked a nurse, "Erin," why all of

15  TRIGGIANI's information was removed from the nursing stations. The nurse said

16  that one day the facility removed everything that had TRIGGIANI's name on it and

17  she was told not to write her name anywhere. However, the nurse admitted to

18  Relator that TRIGGIANI had made the call on Patient 85 – the one Relator was

19  evaluating. While "Erin" admitted that TRIGGIANI was the caller on the

20  evaluation, which was identified on the LAMMC Consultation Summary, the chart

21  and intake form for the nursing home did not reflect TRIGGIANI's name. The

22  patient was a Medicare and Medi-Cal beneficiary and the cost of this patient's care

23  was billed to government health care programs.

24  <center>**Patient 52, Age 40**</center>

25      258. On or about December 28, 2010, Relator was called to do an evaluation

26  of **Patient 52**, age 40, at Nu-Life, a Los Angeles B&C. Relator had an

27  approximately 30 minute conversation with the owner of the facility, Carol Lee

28  ("Lee"), in which Lee openly described TRIGGIANI's role in patient referrals from

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

AMENDED COMPLAINT      89      CASE NO: CV-12-00960 RSWL (SHX)

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

1   facilities like hers to LAMMC.  Lee told Relator that GOLCHINI comes to see all of

2   her patients every month at Nu-Life and her other facilities.  Lee told Relator that

3   she had noticed GOLCHINI was not charging Medicare like he used to.  She thought

4   it was strange so she said she had asked TRIGGIANI about it the other day.

5   TRIGGIANI told her that LAMMC takes care of paying GOLCHINI.  Lee said that

6   GOLCHINI was a stomach doctor, so his name cannot show up on the Medicare

7   billings.  TRIGGIANI told Lee that LAMMC directs patients to its psychiatric

8   inpatient services, because they pay better.  Lee also told Relator that LAMMC pays

9   PROCARE directly.  Lee asked Relator if LAMMC's beds on the psychiatric floor

10  were full the day before, December 27.  Lee said that when she called LAMMC they

11  told her they were full and they could not send a PET Clinician to evaluate a patient.

12  So, Lee called TRIGGIANI directly.  Lee said that TRIGGIANI's office called

13  LAMMC, and this is how Lee was able to get a bed at LAMMC's locked psychiatric

14  unit for one of her residents.  According to Lee, TRIGGIANI told her to call her if

15  LAMMC ever said there were no beds available.  Lee admitted to Relator that

16  TRIGGIANI had taken very good care of her for at least ten years, and LAMMC

17  takes very good care of TRIGGIANI.  She said "Very Good" and made a dollar sign

18  with her finger in the air.  She said the Hospital pays TRIGGIANI after they get paid

19  by Medicare for the patients she sends.  Lee admitted that she needed TRIGGIANI –

20  that she had taken care of her rent and billings for the past ten years. Lee told Relator

21  that TRIGGIANI saved LAMMC when the Health Department threatened to shut

22  them down 6 years ago and again 8 months ago.  Lee said that TRIGGIANI saved

23  their (LAMMC) Asses, adding they would not have any patients if not for her

24  (TRIGGIANI).  Lee also stated that TRIGGIANI and GOLCHINI send patients

25  from all over -- many, many skilled nursing facilities and board and cares in Los

26  Angeles.

27       259.   On or about March 25, 2011, Relator spoke to Aiken on the phone.

28  During this call, Relator said, "I'm afraid I won't be getting many calls if Karen

AMENDED COMPLAINT       90       CASE NO:  CV-12-00960 RSWL (SHX)

1  Triggiani doesn't want me at her facilities. That is 90% of our PET calls and
2  admits." Aiken responded that TRIGGIANI had not referred any patients in "6
3  months." Aiken conceded, however, that she had been referring patients until just
4  six months earlier. Thus, TRIGGIANI still continued to make unlawful referrals
5  more than two years after her exclusion.

### (q)    Unlawful SGG Referrals Continue in 2011

7       260.   Even with TRIGGIANI gone, SGG continued to make unlawful referrals
8  to LAMMC.

### Patient 89, Age 60

10      261.   On or about March 6, 2011, Relator was called to evaluate Patient 89,
11 age 60, at Verdugo Valley Convalescent in Montrose. LAMMC's Consultation
12 Summary identified KHOSSOUSSI and GOLCHINI as the current treating doctors.
13 The Summary also identified GOLCHINI's phone number as (888) 510-8800, the
14 SGG number. Relator reviewed the patient's chart and saw that a nurse had called
15 GOLCHINI on February 23, 2011. Relator referenced the note in the chart on the
16 Consultation Summary stating: "then called to G MD office & spoke to Tony."
17 Relator found criteria for a 5150 hold. This patient was a Medicare beneficiary and
18 the cost of this patient's care was billed to government health care programs.

19      262.   On or about October 11, 2011, Relator was evaluating a patient at
20 Longwood Convalescent in Los Angeles. Relator witnessed that all five nurses'
21 stations posted TRIGGIANI's phone number as (626) 216-8178, her fax as (626)
22 844-7026 and GOLCHINI's phone number as (888) 510-8800. The phone number
23 posted at the stations for "Tony" was the same as for GOLCHINI – SGG's number,
24 (888) 510-8800.

25      263.   On or about October 22, 2011, Relator was sent to evaluate **Patient 87**,
26 age 80, at St. Vincent's Health Care in Pasadena. LAMMC's PET Assessment Form
27 identifies the caller from the referral source requesting the evaluation as
28 "Ashley/Lily-Golchini's Secretary." The patient had been previously admitted to

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

LAMMC from August 8-30. 2011.  The assessment form noted that "Ashley arranged PT discharge from LAMMC 8/30/11 to St. Vincents."  The treating physician was GOLCHINI and GOLCHINI's phone number is identified as (888) 510-8800, SGG's phone number.  MARKIE is also listed on the assessment form. This patient was admitted on a 5150 hold.  The patient was a Medicare and Medi-Cal beneficiary and the cost of this patient's care was billed to government health care programs.

264.   As described above, Defendants used unlawful kickbacks and an excluded provider to achieve their goal of "bringing the patients in" from 2004 until at least the end of 2011.  However, at all times relevant to this complaint, Defendants also submitted, or caused to be submitted, to government health care programs claims which were false and fraudulent because the care of these patients was medically unnecessary, and in numerous instances constituted involuntary commitment in violation of California law.

**B.     INVOLUNTARY COMMITMENT AND MEDICALLY UNNECESSARY CARE**

265.   At all times during the Psych Hold Scheme, Relator witnessed elderly and dependent adults, a disadvantaged class as defined by California law, subjected to involuntary psychiatric commitment and medically unnecessary care.  In addition to the examples already described in this complaint, Relator witnessed numerous others.

**1.     Unlawful Custody of Elderly and Dependent Adults**

266.   Defendants arranged for rigged evaluations to guarantee that patients were brought in to LAMMC.  See Section 166-179, above.  However, as the Psych Hold Scheme progressed, rigged 5150 holds were not the only way Defendants took unlawful custody of these patients.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

KELLER GROVER LLP

1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

### (a) Defective 5150 Holds

267. Turning the LPS law on its head, Defendants put patients in locked psychiatric units first then filled in a paper trail. For example:

### Patient 4, Age 62

a. On July 8, 2009, the charge nurse at LAMMC's locked Gero-Psych unit at the Western campus asked Relator to evaluate **Patient 4**, age 62, and see if Relator could or would re-write the 5150 since the one the nurse had for the patient was incomplete. The nurse showed Relator a fax copy of a 5150 form partially filled out by MARKIE. There was no doubt that the form was not original ink. It was a faxed copy. Relator verified this with the charge nurse. There was also a sticky note on the front of the faxed form from Aiken instructing the admitting nurse to fill in the areas on the 5150 form that the doctor had left blank. There also was a copy of the back of a 5150 stapled to the back of the faxed document. An incomplete 5150 form is inadequate to initiate a lawful hold and a faxed copy is never permitted. The nurse on the locked gero-psych unit told Relator that Michele in Intake had brought it to the nurses' station like this and told the nurse that MARKIE will be in tomorrow to "Fix the 5150." The incomplete 5150 did not give any reason for the patient being sent to the psychiatric hospital, let alone a legal reason for a 5150 hold. The patient came from Beverly Hills Gardens, a MARKIE facility where Relator was banned from doing evaluations. See, ¶ 180(a), above. According to LAMMC's Intake form, MARKIE was the patient's admitting psychiatrist and was identified as the source of the request for evaluation. Relator called Michele in Intake to see if she was supposed to do an assessment on this patient since there was no legal hold and the patient had been on the locked unit for a few hours. Michelle told Relator to "not mess with it." MARKIE was coming to fix it himself. Patient 4 was a Medicare and Medi-Cal beneficiary and the cost of this patient's unlawful confinement was billed to government health care programs.

---

AMENDED COMPLAINT          93          CASE NO: CV-12-00960 RSWL (SHX)

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

**Patient 43, Age 47**

b.     On or about January 2, 2011, Relator was called to do an evaluation of **Patient 43**, age 47, after this patient was <u>already</u> locked on the psychiatric unit at LAMMC's Hawthorne Campus. According to LAMMC's Consultation Summary form, Tolwin and Hadadaz were identified as the treating clinicians. The medical file showed Patient 43 had been transported by PROCARE ambulance from LAMMC's Western Campus Emergency Room even though there was no hold in place. During Relator's conversation with Patient 43 he told her that the ER doctor discharged him and the staff told him to "just go stand by the ER door." He told Relator he was confused as to why. Then, an ambulance came and picked him up. He said he was scared and asked "why are you strapping me down?" and "where are you taking me?" Patient 43 stated that the paramedics told him that they were just doing their job, and asked him to just cooperate and get on the cart so there wouldn't be any trouble. Relator found no criteria for a 5150 hold, and there was no voluntary admission consent before Patient 43 was placed on the locked unit.

### (b)    Fake Voluntaries

268.   Defendants also manipulated the voluntary admission process to take patients in to custody on the locked psychiatric units. LAMMC's operating policy on the admission of voluntary patients required the Program Director, the Nursing Director or his/her designee to evaluate patients requesting voluntary admission to determine if "The patient meets admission criteria," and "Alternative less restrictive methods of treatment have proven unsuccessful and/or unsuitable to meet the acute needs of the patient." Indeed, LAMMC's own Voluntary Admission Request form showed that it knew the legal procedures required to admit someone voluntarily to a locked psychiatric unit. *See* ¶ 149-150 above, describing LAMMC's form. However, Defendants also knew the County "<u>will not</u> monitor any voluntary admissions." *See* ¶ 164 (discussing Moreno's December 31, 2003 memo).

---

AMENDED COMPLAINT     94     CASE NO: CV-12-00960 RSWL (SHX)

269.   As the Psych Hold Scheme progressed, Relator witnessed numerous "fake voluntaries" where the patient had not actually given consent to be committed for evaluation and treatment.  She was not the only one.  On or about May 16, 2012, after LAMMC's employees learned that the government was investigating allegations relating to unlawful psychiatric holds, Relator had a telephone conversation with Basilio, another PET clinician, who told her "the smoking gun" was the fake voluntaries.  Even though the LPS law intended to end involuntary commitments, Defendants have used fake voluntaries to involuntarily commit elderly and dependent adults for the purpose of billing government health care programs.  For example:

### Patient 16, Age 48

a.      On August 20, 2010 Relator was in LAMMC's Western campus ER evaluating a patient when she saw the intake sheet for **Patient 16**, age 48.  The Intake sheet reflected that this patient had purportedly come in as a voluntary admission but had to have medical clearance first.  The patient had been transported by PROCARE ambulance at 11:00 a.m.  The Intake form documented that the patient was combative and shouting at the staff.  A registered nurse in the ER signed the Consent to Admission form at 3:14 p.m. indicating that Patient 16 was "too agitated" to sign voluntarily.  Patient 16 was then transferred to the locked psychiatric unit at Hawthorne.  Patient 16 was a Medi-Cal beneficiary and the cost of this patient's unlawful confinement was billed to government health care programs.

### Patient 12, Age 85

b.      On or about December 10, 2010 Relator observed **Patient 12**, age 85, on the locked gero-psych unit.  LAMMC's Intake Inquiry form dated December 10, 2010, for Patient 12's chart showed that Basilio had found no criteria for bringing the patient in, but the patient had been brought in by PROCARE ambulance anyway - ordered by Aiken.  The face sheet indicated that the patient had purportedly come in

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

voluntarily. Relator asked Basilio about Patient 12. Basilio was surprised that Aiken had brought him in because Patient 12 did not meet criteria for a 5150 hold and refused to come in voluntarily. Patient 12 was nonetheless on the locked gero-psych unit, admitted by MARKIE and Dr. Hadadz. Patient 12 was a Medicare and Medi-Cal beneficiary and the cost of this patient's unlawful confinement was billed to government health care programs.

### Patient 15, Age 62

c. On February 5, 2011, Relator observed **Patient 15**, age 62, on LAMMC's locked gero-psych unit. He was KHOSSOUSSI's patient and was purportedly there on a voluntary basis. However, his Consent to Voluntary Admission form was not signed by him. LAMMC staff had completed it. In lieu of his signature the staff person wrote that he was "combative." Patient 15 was a Medicare and Medi-Cal beneficiary and the cost of this patient's unlawful confinement was billed to government health care programs.

### Patient 3, Age 78

d. On February 12, 2011, Relator was called to evaluate **Patient 3**, age 78, at LAMMC's Western Campus, 4th Floor. Patient 3 had purportedly been admitted voluntarily days earlier - on February 8, 2011, from Sunrise Convalescent. However, Patient 3's chart identified the patient's diagnosis as severe dementia, Alzheimer's type. Relator then reviewed the records relating to the supposed "voluntary" admission. According to LAMMC's February 8 Intake form, KHOUSSOUSSI was Patient 3's referral source when Patient 3 was admitted to LAMMC that day and was identified as the patient's treating psychiatrist. It provided "Dr. Khoussoussi requesting transfer to GERO/psych." However, Patient 3 had not signed the Voluntary Admission form on February 8. A nurse had written that the patient was unable to sign due to "disorientation." Nonetheless, KHOSSOUSSI signed his name to the "Certificate of Attending Physician" on

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

February 8, 2011 at 20:35 stating that Patient 3 was mentally competent at the time of examination to make the voluntary application. KHOSSOUSSI signed this certification notwithstanding his notes on Patient 3's diagnosis of severe dementia <u>and</u> the patient's presentment (set forth on the form above his signature) that the patient was unable to sign due to "disorientation." When Relator evaluated Patient 3 on February 12, Relator concluded there were no criteria for a 5150 hold, and that the patient lacked mental capacity to sign in voluntarily due to the diagnosed severe dementia. Patient 3 was a Medicare and Medi-Cal beneficiary and the cost of this patient's unlawful confinement was billed to government health care programs.

270.   On or about September 21, 2011, Relator participated in a meeting at LAMMC with Stinnett, Emanian, Rolwing and Rachel Watkins. Gray, Basillo and Bautista participated by speaker phone. During this meeting, Watkins, a charge nurse on Hawthorne's Unit 2 for many years and a new PET RN in 2011, said she was being pressured to initiate a 5150 on a patient on the med/surg floor so the patient could be transferred to the Gero Psych locked unit. Watkins said the pressure was from the nurse, KHOSSOUSSI and Aiken. Stinnett, Emanian and Rolwing did not address Watkins's concern and Emanian changed the subject quickly. Rolwing further reported during the meeting that the census/admissions were better than ever since he came. Rolwing said "we had the most Admits EVER at our Hawth -257 last month,  r/t <u>aggressive marketing</u>, this month our goal is to have most admits ever on Gero."  (emphasis added)

271.   LAMMC "aggressive marketing" continued to bring these patients in after this meeting, too. For example:

### Patient 7, Age 73

a.     On or about February 4, 2012, Relator was called to do an evaluation of **Patient 7**, age 73, at LAMMC Western Campus ER. Patient 7 had been sent from Bellflower Christian Retirement Center. Relator assessed the patient and found no criteria for a 5150 hold. The patient was suffering from dementia and was confused

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

1  and disoriented, but was not a danger to self or others, and was accepting shelter
2  from Bellflower.  There were no medical issues noted.  According to the LAMMC
3  PET Team Assessment form, the patient was "unable to sign vol r/t demits
4  (confusion)/ disoriented."  The patient's medical records reflect that the patient was
5  returned to Bellflower by PROCARE ambulance just after midnight.  On February 5,
6  2012, at around 9:00 a.m. the patient was sent back to LAMMC's ER by ambulance.
7  The medical notes for the ER provide the patient was brought in a second time for
8  "medical clearance," and "psych evaluation."  Thereafter, the patient was admitted to
9  LAMMC's locked psychiatric unit.  The patient's medical notes provide that the
10  patient was a voluntary admission.  However, the patient's admission form reflects
11  that the patient was "unable to sign (disoriented)." The patient was a Medicare and
12  Medi-Cal beneficiary and the cost of this patient's unlawful confinement was billed
13  to government health care programs.

<p style="text-align:center">2.    <strong>Lack of Medical Necessity</strong></p>

14
15      272.   Relator also witnessed repeated cases of patients admitted for psychiatric
16  care when there was no basis for it.

<p style="text-align:center">(a)    <strong>"Good Candidate for Psych"</strong></p>

17
18      273.   Relator witnessed Aiken and the Intake department <u>plan</u> inter-floor
19  transfers to the locked psychiatric unit days ahead of time notwithstanding the clear
20  purpose of psychiatric holds as a tool for <u>crisis</u> intervention.  These planned transfers
21  were inherently contradictory to the purpose of the LPS laws to respond to sudden
22  and unexpected changes in an individual's baseline condition.  Nonetheless, Aiken
23  would leave notes in the Intake Department directing staff to transfer patients a
24  certain number of days in the future.  For example: "transfer patient X from
25  Med/Surg rm. #500 to Gero-Psych on Monday."  These transfers were executed
26  using either improper 5150 holds or fake voluntary admissions.  At the direction of
27  Aiken and LAMMC's Intake Department, patients on the medical floors who were a
28  "good candidate for transfer to psych" were identified in advance.  When the patient

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

AMENDED COMPLAINT        98        CASE NO:  CV-12-00960 RSWL (SHX)

1  was medically stable they were transferred to the locked psychiatric unit. In fact,

2  LAMMC personnel would write "good candidate for transfer to psych" on a paper

3  attached to the front of a patient's chart where it could be used to perpetrate the

4  scheme without becoming part of the patient's permanent medical record. For

5  example:

### Patient 2, Age 55

7       a.       On June 22, 2009, a registered nurse in LAMMC's Case Management

8  department, "Julie," sent a "Physician/Case Management Communication" to

9  GOLCHINI regarding **Patient 2**, age 55. The "Communication" clearly states that

10  "This is not a part of Medical Record." "Julie" asked GOLCHINI "Do you want

11  intake to eval pt? ~~possible gero~~?" Thereafter, on or about July 1, 2009, Relator was

12  called to evaluate Patient 2 at LAMMC's Western Campus Medical/Surgical floor

13  (5th floor) because the patient was supposedly refusing to eat. According to the

14  LAMMC Consultation Summary, GOLCHINI made the request for a psychiatric

15  evaluation. MALLARE was one of several other doctors consulting on this patient's

16  care. Relator found the patient had been admitted to the med/surg floor 2 weeks

17  earlier and had a gastric feeding tube ("G-tube") in place until July 1, 2009. The

18  nurse's progress reports also made reference to the G-tube. "Julie" had, therefore,

19  prompted GOLCHINI to order a psychiatric evaluation even while the patient had

20  been unable to eat because of the G-tube. As reflected in the chart, Relator was

21  called to evaluate the patient the very day the G-tube came out. Relator found

22  Patient 2 eating with good appetite. Patient 2 was also alert and oriented. Relator

23  described all this in her summary findings. Based on all these factors, Relator

24  concluded there were no legal criteria for a 5150. Patient 2 also refused to admit

25  voluntarily. This is described in Relator's Consultation Summary and the patient's

26  chart. On July 2, 2009 another PET evaluation was ordered. Once again the stated

27  reason for the evaluation was that the patient had been refusing to eat. Gray

28  evaluated Patient 2 and placed the patient on a 5150 for GD (Grave Disability),

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

1  related to refusing food.  Relator spoke to Gray about this patient after Gray initiated

2  the 5150 hold since the patient had only been capable of eating less than 24 hours

3  before, when the G-tube was removed.  Gray explained that she had been told the

4  patient had been refusing to eat for about a week.  Gray indicated that she did not see

5  any evidence of Relator's evaluation the day before, including Relator's Consult

6  Summary, or the G-Tube on the chart.  Patient 2 was transferred to the locked gero-

7  psych unit on the 4th floor on July 2, 2009 after Gray initiated the 5150 hold.

8  Patient 2 was a Medicare and Medi-Cal beneficiary and the cost of the unlawful

9  confinement of this patient was billed to government health care programs.

### Patient 11, Age 61

11         b.        On July 25, 2009 Relator was called to do an evaluation of **Patient 11**,

12  age 61, on the medical/surgical floor.  Patient 11's admitting diagnosis was "failure

13  to thrive," essentially losing weight.  The chart reflected this as refusing food.  The

14  patient's chart also reflected a history of bipolar disorder and hypertension.  This was

15  the patient's baseline.  There was also an order from GOLCHINI dated the day of

16  Relator's evaluation ordering Patient 11's transfer to the locked gero-psych unit.

17  Relator evaluated Patient 11 and found the patient alert and oriented.  Patient 11 was

18  eating and expressed that he wished he could eat but that he did not have teeth and

19  that his stomach was sick.  Relator found he did not meet criteria for a 5150 hold

20  because nothing about his condition showed a dramatic change from the baseline

21  already identified in the chart.  Patient 11 had been there for eight days already, and

22  nothing was different in that time.  Patient 11 seemed to be genuinely physically

23  sick, or simply in need of new teeth that would allow him to eat.  Relator asked him

24  if he wanted to go in to the locked psychiatric unit voluntarily.  Patient 11 refused.

25  Notwithstanding Relator's finding of no criteria, the nurse told Relator that she

26  needed to follow GOLCHINI's order to transfer Patient 11.  This patient was then

27  taken to the locked gero-psych unit per GOLCHINI's order without a hold or a

28  voluntary consent in place.  Patient 11 was a Medicare and Medi-Cal beneficiary and

KELLER GROVER LLP

1965 Market Street, San Francisco, CA 94103

Tel. 415.543.1305 | Fax. 415.543.7861

1  the cost of the unlawful confinement of this patient was billed to government health

2  care programs

3          **(b)**     **Developmentally Disabled Patients**

4     274.  "Good Candidates for Psych" were not the only patients Relator

5  witnessed subjected to unnecessary medical care.  The LPS laws provide that

6  developmental disability alone is insufficient basis to initiate an involuntary hold.

7  Moreover, a person with a developmental disability lacks the mental capacity to

8  voluntarily admit themselves.  Defendants knew this, as documented in LAMMC's

9  August 5, 2005 agenda, and LAMMC's own IRL (reflecting patients with

10  developmental disabilities as inappropriate for inpatient psychiatric care).  LAMMC

11  acknowledged this in its own Operating Policies and Procedures:

12     Admission of patients will be limited to those who can emotionally,

13  behaviorally and physically … participate in the program, and can be expected to
   profit [from] the therapeutic, diagnostic, evaluative, and treatment services offered.

14  … Patients with a primary diagnosis of … developmental disability will not be
   eligible for admission.

15

16     275.  Notwithstanding the clear statement of the law and Defendants'

17  knowledge of the law, persons with developmental disabilities, who were incapable

18  of benefiting from the care provided in an inpatient psychiatric setting, were

19  admitted to the locked psychiatric units for supposed care.  For example:

20                **Patient 8, Age 62**

21     a.    On or about August 25, 2009, Relator was called to evaluate **Patient 8**,

22  age 62, who had been admitted to LAMMC's medical/surgical floor (5th Floor) on

23  August 21, 2009.  KHOSSOUSSI is identified as the treating doctor.  Patient 8's

24  diagnosis was Mental Retardation/Developmentally Disabled.  According to the

25  medical record, the "patient is not self-responsible."  There was no prior psychiatric

26  history noted on Patient 8's chart.  It was charted, however, that she was disruptive

27  and disoriented.  During Relator's assessment, Patient 8 was crying out "I want my

28  Dad" over and over.  Relator found no criteria for a 5150 hold. When Relator would

AMENDED COMPLAINT      101      CASE NO:  CV-12-00960 RSWL (SHX)

1   not initiate the 5150 hold, the nurse taking care of Patient 8 said she was not sure
2   what to do because the doctor had given an order to transfer this patient to the locked
3   gero-psych unit when she was clear to leave the med/surg floor.  As a patient whose
4   diagnosis was Mental Retardation/Developmentally Disabled, and was not "self-
5   responsible," the patient did not have the mental capacity to voluntarily admit
6   herself.  Patient 8 was transferred to the locked gero-psych floor per the doctor's
7   order.  As a patient with severe mental retardation with no history of psychiatric
8   disorder, however, no treatment could reasonably be expected to improve the
9   condition for which such treatment is or was purportedly necessary.  *See* 42 USC §
10  1395f(a)(2)(A).  This patient was a Medicare and Medi-Cal beneficiary and the cost
11  of the worthless services provided to this patient were billed to government health
12  care programs.

<div align="center">**Patient 48, Age 44**</div>

14          b.          On or about September 15, 2011, Relator was in LAMMC's ER when
15  Rosewood Place, a B&C, had one of KHOSSOUSSI's patients, **Patient 48**, age 44,
16  dropped off.  Patient 48's diagnosis was Severe Mental Retardation – in and of itself
17  not grounds for a 5150 hold.  Relator called KHOSSOUSSI.  <u>Over the phone,</u>
18  KHOSSOUSSI pressured Relator to write the hold.  Relator resisted.
19  KHOSSOUSSI then said "he <u>must</u> have PD-NOS." (psychiatric diagnosis – not
20  otherwise specified)  Relator was then obligated to evaluate this patient as someone
21  with a psychiatric diagnosis – and not just developmental disability.
22  KHOSSOUSSI's addition of the psychiatric diagnosis altered the outcome of
23  Relator's evaluation.  By KHOSSOUSSI's addition of the fake diagnosis Relator was
24  forced to initiate the hold.  This was KHOSSOUSSI's goal from the outset of the
25  conversation.  As a patient with severe mental retardation, however, no treatment
26  could reasonably be expected to improve the condition for which such treatment is
27  or was purportedly necessary.  *See* 42 USC § 1395f(a)(2)(A).  Patient 48 was a
28

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

1  Medi-Cal beneficiary and the cost of the worthless services provided to this patient
2  were billed to government health care programs.

### (c) Patients in Genuine Psychiatric Crisis

4  276. The Psych Hold Scheme and the Defendants' goal of keeping the
5  psychiatric beds full at all times created undesirable ripple effects which led to a
6  different category of patient abuse and more medically unnecessary care. Because
7  LAMMC wanted to keep its psychiatric beds full it would not turn away genuine
8  psychiatric patients when the locked units were full. It would admit patients with
9  real and potentially life-threatening psychiatric conditions and put these patients in
10 ordinary, unsecured acute care beds on the medical/surgical floor (or in a utility
11 room in the ER) until a bed on a locked psychiatric unit was available. These were
12 not isolated incidents. This was Defendants' systematic plan to make sure they could
13 always keep the psychiatric beds full. For example:

### Patient 34, Age 75

15 a. On July 18, 2010, Relator evaluated **Patient 34**, age 75, at LAMMC's
16 Western Campus, found criteria for a 5150 hold, and initiated the hold. MARKIE
17 and Haddaz were listed as Patient 34's treating clinicians for this admission. On July
18 29, 2010, Patient 34 was placed on a 5250 hold, a 30-day hold. However, on or
19 about August 6, 2010 but in any event <u>while</u> Patient 34 was on the 30 day hold,
20 Relator found Patient 34 walking the halls on the medical/surgical floor even though
21 Patient 34's chart indicated that she should be on the locked psychiatric unit. Relator
22 spoke with Patient 34 briefly. Patient 34 indicated that she had been transferred up
23 to the medical/surgical floor after Relator placed her on the 5150 hold in the ER and
24 that she had been on the medical/surgical floor ever since. Patient 34 said there were
25 no beds for her on the locked psychiatric unit. Patient 34 was a Medicare and Medi-
26 Cal beneficiary and the cost of the worthless services provided to this patient were
27 billed to government health care programs.

28

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

---

AMENDED COMPLAINT　　　103　　　CASE NO: CV-12-00960 RSWL (SHX)

277.   In approximately August, 2011, Relator spoke on the phone to Velma Logan, an Intake Coordinator.  It was one of the first times Relator spoke to Logan after Relator returned from disability leave in March, 2011.  Logan explained changes around LAMMC that implicated Relator.  Because they both worked weekends they discussed what to do with a patient placed on 5150 hold over a weekend when there was no bed available on the locked psychiatric units.  Logan told Relator, "We are not allowed to turn down any psychiatric patients, especially with Medicare.  So, we admit them to the medical floors until a bed opens on Mondays."  *See* ¶ 220(e), above (describing similar conversation with Boots in September 2011).

278.   In or about October or November, 2011, Relator spoke to one of the nurses from the medical/surgical floor that happened to be in the ER.  Relator was initiating a 5150 hold, but there were no available psychiatric beds.  Relator asked if the patient would be sent to the nurse's medical floor until a psychiatric bed opened up.  The nurse responded, "No way."  She said they could not even "appear to be" doing that anymore.  She said "we" got in trouble for admitting psychiatric patients under a 23 observation status when they are actually on 72-hour hold waiting for a psychiatric bed to open up.  Relator then asked about the patient she was placing on a 5150 hold.  The nurse explained that they needed to "be careful" about how they word it now, and that those are referred to as "Gero-Psych Overflow Patients."  Relator's patient, who was suicidal and homicidal, spent the night in the ER on a small gurney by the exit door.

279.   Thereafter, on or about January 22, 2012, Relator witnessed six patients lined up in the hallway in the basement level at Western outside of the ER.  The line went around the corner by the morgue.  At least two of these patients were on 5150 holds.  An ER staff person told Relator they were "trying" not to put psychiatric patients in med/surg anymore so they were keeping them here instead until a bed opened up in the locked unit.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

---

AMENDED COMPLAINT          104          CASE NO:  CV-12-00960 RSWL (SHX)

280.   While LAMMC was "trying" not to put psychiatric patients on the med/surg floors anymore, the practice continued.  On or about March 3, 2012, Relator was in the ER when the staff was discussing the "psych overflows."  Relator witnessed an ER doctor and the Charge Nurse "Tony" arranging a "psych overflow" patient.  They described how the ER doctor "picks" a medical diagnosis and then admits the patient for 23 hour observation.  The ER doctor, Dr. Nguyen, was not happy doing this.  He gave the nurse several common diagnoses, like chest pain and UTI, and he told the nurse to choose one.  The ER nurse Gus Salazar RN told Relator that this was a daily thing and getting worse.  They admitted five patients that evening to the 5th floor medical floor as "psych overflow" because both psychiatric units were full.

281.   On or about April 7, 2012, when LAMMC again had no available psychiatric beds, Relator again witnessed LAMMC personnel admit psychiatric patients subject to 5150 holds without securing them on the locked units.  Moreover, she witnessed staff being trained on how to hide it.

a.   At about 8:00 p.m. Relator was called to do evaluations of Patients 91 and 92 in the ER at LAMMC's Western campus.  Relator initiated a 5150 hold on each patient.  Both of the patients were suicidal, one was detoxing off cocaine.  However, since there were no beds available on the locked units, these two patients spent the night in the ER in a utility room.  They used the utility room to store broken furniture and biohazard trash.  It also had a few chairs.  Relator asked the charge nurse, "Boots" about this.  Boots told Relator that LAMMC's administration told them not to leave the psychiatric patients in the hall overnight anymore.  In order not to leave them in the hall, they spent the night unattended in chairs in the utility room instead.  The two psychiatric patients on 5150 holds were not even given the empty ER beds.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

AMENDED COMPLAINT          105          CASE NO:  CV-12-00960 RSWL (SHX)

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

### Patient 91, Age 48

**Patient 91**, age 48, was a walk-in at LAMMC's Hawthorne Campus. A PROCARE ambulance transported the patient to LAMMC's Western Campus Emergency Room. During her evaluation the patient said he planned to "overdose on Heroine IV." The patient's ER Chart Labs showed his urine drug screen tested positive for THC, Cocaine, and Benzodiazepine. Relator noted on the P.E.T. Assessment Form the patient was suffering from hallucinations, depression, and anxiety. When Relator asked if the patient wanted to be admitted voluntarily the patient said he wanted "to be admitted to Unit 2" [at Hawthorne]. She admitted the patient on a voluntary status. This was the patient's fourth admission. GOLCHINI was the admitting doctor on his previous three admissions. GOLCHIN AND KHOSSOUSSI were identified as the admitting doctors on this admission. The patient is identified as a Medi-Cal patient.

### Patient 92, Age 44

**Patient 92**, age 44, was a walk-in at LAMMC's Western Campus ER. During the evaluation the patient said if I'm put out of here (ER) I will kill myself, cut my wrist. Relator noted on the P.E.T. Assessment Form the patient was depressed, hearing voices that someone was trying to kill him, and paranoid. She also noted the patient had a suicide plan to cut his wrists. The patient said he wanted to be admitted voluntarily and Relator admitted the patient on a voluntary status.

b. As she sat writing up her paperwork for these two holds, Relator overheard an ER admitting clerk training a new person how to do admissions at the ER desk. The training clerk instructed the new clerk that when a nurse or doctor writes on the papers that the patient is being admitted to the 5th floor and the patient is a psychiatric patient it is "very important" that the computer say the patient is admitted to a psychiatric bed on the 4th floor even though the patient is physically being transferred to the 5th floor. The clerk then instructed the new clerk to enter "Room #418" in the computer in these instances. She explained that Room 418 was

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

a room with a few tables in it that the doctors use to chart patient records and that they could "put" up to three patients there, if needed. The actual patients, however, would be elsewhere in the hospital.

## C.    RETALIATION AGAINST RELATOR

282.    Before filing this *qui tam* action and continuing until she was fired in 2012, Relator experienced extreme harassment, threats and retaliation at her job with the knowledge and consent of her employer for her efforts to expose and stop the Psych Hold Scheme.  Some instances of the retaliation include, but are not limited to, the following:

### 1.    Retaliation in 2008

283.    On August 7, 2008, Relator prepared to bring a letter to her employer's Human Resources department reporting what she then suspected was illegal activity arising out of the way LAMMC's intake staff were admitting patients who did not meet the legal criteria for 5150 Holds.  She showed the letter to Aiken.  Aiken threatened Relator that if she continued to complain about the alleged unlawful 5150 holds she witnessed he would make sure Relator's calls to other facilities would be significantly reduced thereby negatively impacting her pay.  Aiken also warned Relator that if she went to the Hospital's administration they would ignore her complaints because it was the hospital's administration's orders that he and others were following.

284.    Notwithstanding Aiken's threat, Relator went to the hospital's CEO, Fenton, and described the illegal activity.  Fenton told Relator "Not on my watch." He assured Relator that this kind of conduct would not go on while he was running a hospital.  Fenton said he would talk to the staff in Intake and get back to her.  He never did.

285.    On November, 11 2008, when she had not heard anything back from Fenton, Relator contacted the Corporate Compliance hotline for PHC.  On November 20, 2008, when Aiken learned that Relator had contacted the Corporate

Compliance hotline he confronted her and demanded to know what she was trying to do by this "whistleblowing crap" wanting to know if she was trying to "get us all fired." On November 22, 2008, Tom Miller, PHC's Vice President of Corporate Compliance/HR called Relator and left a voice message stating the he would call her back.

286.   On December 15, 2008, when a month had passed and she had not heard from anyone, Relator left a follow up message with Miller, which he never returned.

### 2.   Retaliation in 2009

287.   On February 22, 2009, Relator contacted PHC's Corporate Compliance hotline again.

288.   On March 2, 2009, Miller left Relator another voicemail message informing her that she was not allowed to bring these issues up again. Miller indicated that it was the last he would hear about it.

289.   On August 17, 2009, Relator filed an EEOC claim for gender and age discrimination and retaliation for reporting the unlawful activity to PHC's Corporate Compliance hotline and LAMMC's CEO.

290.   Thereafter, Relator was threatened that she needed to stop any discussion of the unlawful activity, which LAMMC's administrators, including Jones, characterized as "gossip," or Relator would be fired. For example: in the fall of 2009, Relator met with Jones to discuss the unlawful conduct Relator was witnessing as part of the Psych Hold Scheme. Jones told Relator that she was "easily replaceable" and that she needed to stop gossiping. Jones also threatened to remove Relator from the PET team or terminate her employment if she continued.

291.   In approximately October, 2009, LAMMC's administrators began subjecting Relator to a pattern of increased scrutiny and monitoring, tracking everything she did, described below. Other employees were not subjected to the same scrutiny. This escalating pattern of harassment continued throughout 2010, 2011 and 2012.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

### 3.   Retaliation in 2010

292.   On or about October 13, 2010, Relator sent an email to LAMMC's new CEO, Ron Stinnett, describing an incident where Intake sent Relator outside of LAMMC's designated areas, a common occurrence as part of the Psych Hold Scheme.  *See* ¶ 227(a) (describing Relator's regular calls to evaluate patients in Pasadena).  Stinnett replied to Relator's email promising to look into it.  There was no follow up.

293.   In November, 2010, Relator protested to Sophia Emanian, then PET Director, that Emanian had changed Relator's long-time schedule.  Emanian put Relator on shifts that Emanian and others responsible for preparing the PET schedule knew Relator could not cover.

### 4.   Retaliation in 2011

294.   On or about January 4, 2011, Relator wrote to LAMMC administrators, including the HR Director, protesting ongoing harassment and retaliation from Aiken.  Immediately thereafter, Relator was formally written up for deficiencies relating to an evaluation she performed where she found no criteria for a 5150 hold.  The basis of the write up was false information provided by Aiken.

295.   As a result of the severe stress from the threats and harassment, Relator's doctor placed her on temporary disability in March, 2011.

296.   On April 21, 2011, Relator filed a Labor Board Claim for retaliation.

297.   After 10 weeks on disability, Relator was cleared to go back to work at LAMMC.  It took over a month for LAMMC's administrators to put Relator back in the schedule, fabricating reasons why they could not proceed, including that Relator had to carry her own malpractice insurance when she did not.  Relator escalated these issues to PHC's VP/HR Director, Laura Culbertson.  Relator was not paid while she was not able to get on the schedule.

298.   On June 24, 2011, Relator finally got back on the schedule.  But, Intake was giving her even fewer calls than before her medical leave.  The 5150

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

1  evaluations had been turned over to "new" employees willing to participate in the

2  Psych Hold scheme.  Because Relator was 'on call' but did not do evaluations,

3  Relator's pay was reduced to approximately one quarter of what she had previously

4  earned.  And once she returned to work in June 2011, the practices of scrutiny and

5  monitoring started again.  She was again written up for violations based on trumped

6  up information.

7      299.   On or about August 25, 2011, Relator spoke to Rolwing on the phone

8  about an evaluation.  During the call he warned her that the next time she "blocked"

9  a patient from a contract hospital or referral source, it would be her last.

10     300.   In approximately August, 2011, LAMMC modified how it would pay

11 PET clinicians for evaluations they did.  If a PET clinician did not initiate a hold, the

12 new policy calculated if – and how much – the PET clinician would be paid.  These

13 decisions would be made, in part, based on Aiken's input.  By this modification,

14 LAMMC directly incentivized a PET clinician to initiate a hold and thereby

15 guarantee full reimbursement for the call.  For Relator, who refused to initiate holds

16 without legal criteria, it led to further cuts in her pay.

17     301.   In early November, 2011, Relator was called to a surprise meeting with

18 Ashraf Malik (LAMMC's Corporate Compliance Officer), Sanchez, (LAMMC's HR

19 Director), and Ava Paddett-Gillett (Director of Gero-Psych at Western/PET

20 Director).  Paddett-Gillett took over as PET Director from Emanian.  The purpose of

21 the meeting was to discuss Relator's evaluation of Patient 1 at Sunrise Convalescent,

22 finding no criteria for a 5150 hold.  *See*, supra ¶ 180(F).  Malik told Relator she was

23 banned from going to Sunrise to do any evaluations.  Sanchez confirmed it.  Within

24 a day, Aiken had posted a handwritten note on the Intake white board confirming

25 that Relator was not allowed to go to Sunrise.

26     302.   In December, 2011 in response to her Labor Board Claim, a Labor

27 Board Commissioner approved Relator's request to pursue claims of wage

28 violations.

AMENDED COMPLAINT        110        CASE NO:  CV-12-00960 RSWL (SHX)

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

303.   In December 2011, Relator also made repeated requests to Paddett-Gillett for copies of upcoming schedules since Relator was not getting them when they were published.  Basilio told Relator that "sometimes" the schedules were included with paychecks.  However, Relator was not getting a paycheck at all from LAMMC during this same time so she could not know of upcoming shifts purportedly disseminated through paychecks.  Over the course of the next several months, Relator would send numerous emails and make multiple phone calls to HR and Paddett-Gillett about scheduling and her missing paychecks.

### 5.      Retaliation in 2012

304.   On February 4, 2012, Relator filed this action, including her claim for unlawful retaliation under the False Claims Act.

305.   With her complaint under seal, the retaliation against Relator continued. On April 4, 2012, Relator got two block calls with hang ups and no messages while she was on call.  Later, Relator got a message from Michelle Lavender in Intake telling her there was a call for her.  Relator called back immediately.  After Lavender answered she passed the phone to Rolwing without talking to Relator. Rolwing claimed that Lavender had been calling her multiple times and that Relator had not responded so he gave the calls to someone else.  Rolwing said, "You snooze, you lose."  Relator tried to explain about the hang-ups but Rolwing said, "Go tell someone who cares," then hung up the phone.

306.   On April 22, 2012 Relator had another conversation with Rolwing, this time about a patient she was not placing on a 5150 hold.  *See* ¶ 270 supra.  Rolwing began yelling and cursing at her, asking her why she was not placing the patient on a hold.  Rolwing told her that no other PET clinician did things like her.  He told her, "Just write the f***'ing 5150."  When she tried to explain she was following the LPS laws he yelled back that he didn't care about "your damn laws. We have a business to run."  Rolwing continued, telling Relator that she thought she was so smart with "the f***'ing LPS laws" and that if she was really that smart then she would be able

AMENDED COMPLAINT        111      CASE NO:  CV-12-00960 RSWL (SHX)

1   to figure out by now why they didn't give her any calls anymore. He concluded

2   saying, "If you can't play the game right with the rest of the team then get the hell off

3   the court!" Then Rolwing hung up.

4       307. On May 9, 2012, Lavender called Relator and left her a voicemail telling

5   her Intake had a call for her. However, Relator had no reason to know she was on

6   call and did not get the message until the next morning.

7       308. On May 14, 2012, Relator received a phone call from Patricia Cabezas,

8   LAMMC's Director of Medical Staff Office/Credentials at the Western campus.

9   Cabezas told Relator that it was time to renew her LPS designation at LAMMC and

10   that there were additional requirements this time. In addition to two peer reviews,

11   Relator would need an evaluation and recommendation from the Chief of the

12   Psychiatric Department who would decide whether to grant or deny her LPS

13   privileges.

14       309. On May 15, 2012, Relator had a phone meeting with Paddett-Gillett and

15   her assistant "Beverly." Paddett-Gillett told Relator that she had received numerous

16   complaints about Relator from Aiken and Rolwing about missing calls. Even

17   though Paddett-Gillett told Relator this, she was uninterested in hearing Relator's

18   explanation. Rather, Paddett-Gillett told Relator that LAMMC was being

19   investigated relating to the 5150 holds and that she wanted all of Relator's records.

20   Relator reminded Paddett-Gillett again of the problems with the schedule and her

21   missing paychecks.

22       310. On May 17, 2012, Relator received an overnight mail delivery including

23   several LAMMC memos and some – but not all – of Relator's missing paychecks.

24       311. May 30, 2012, a day Relator was not on call, was indicative of the game-

25   playing, harassment and retaliation Relator faced from LAMMC personnel.

26       a.     Relator cleared voicemails from her cell phone at approximately 11:16

27   am. She saw that there were three voicemails from Kim in Intake at 09:11, 09:18,

28   and 09:26. Kim's voicemails from the first two calls were letting Relator know there

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

AMENDED COMPLAINT      112      CASE NO: CV-12-00960 RSWL (SHX)

1   was an evaluation call for her. The third message said since this was the third

2   message she was passing the call on to another clinician.  There was also a voicemail

3   from Kim at 11:13 a.m.  Kim asked if she wanted to take any PET calls since

4   Relator was on call 8-4.  Kim also told Relator that since she was the one on call that

5   she wanted to offer her one of the calls, but they had other clinicians doing PET

6   calls.  Relator called Kim back at 11:17 a.m.  Relator explained that Aiken had told

7   Relator she was not on call May 30, 2012.  Relator also told Kim that since she was

8   not on call she was not even in the area to be able to work.  Kim told Relator it was

9   "ok" because she already had other PET clinicians doing PET calls all morning.

10  Relator then called Paddett-Gillett and left her a message explaining the situation,

11  including that she had never received a schedule, despite numerous requests to

12  Paddett-Gillett and Aiken.

13      b.      Notwithstanding all the calls back and forth that morning, Aiken called

14  Relator that afternoon, at 1:22 p.m., and left a voicemail saying, "I have a call for

15  you.  First call."  At 1:25 p.m. Aiken left a second message saying, "Second call."

16  Then at 1:27 p.m., Aiken called and said "Third message. I'm passing this patient on

17  to another clinician."

18      c.      Two minutes later, Paddett-Gillett called Relator demanding to know

19  why Relator was not calling Aiken back.  Relator attempted to explain.  In response,

20  Paddett-Gillett advised Relator that there was going to be a Medical Staff meeting

21  the next day and that Paddett-Gillett would be taking Aiken's complaints about

22  Relator to the Medical Staff.  She informed Relator that she had complaints and

23  write-ups from Aiken "going back months."  Paddett-Gillett told Relator she needed

24  to remember that "these are the people" that are able to take away your LPS

25  designation.  Paddett-Gillett also told Relator that she would be telling the Medical

26  Staff that Relator was not faxing her availability to be put on the schedule or her

27  patient assessments, including any 5150 holds, in a timely manner.  Paddett-Gillett

28  then told Relator that she was not on the June schedule. "It is done."  Relator

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

AMENDED COMPLAINT        113        CASE NO:  CV-12-00960 RSWL (SHX)

reminded Paddett-Gillett that she had emailed her June availability to Paddett-Gillett on April 23, 2012 with a cc to Rhonda Cipriano in Human Resources and that Cipriano had verified that she received it.  Paddett-Gillett replied that she "did not have time to check her email."  Notwithstanding Relator's clear timeliness in providing her availability, Paddett-Gillett told her it was "too late" and that she would not be on the June schedule.  Paddett-Gillett also told Relator that after the medical staff meeting the next day that "decisions will be made."  Even though the meeting had not yet occurred, Paddett-Gillett informed Relator that she would need to come in to meet with her and HR Director Liz Tran ("Tran").  Relator asked if she would be able to inform Tran of the ongoing harassment and retaliation that she had been subjected to and was tracking.  Paddett-Gillett responded that if Relator was accusing Aiken or Rolwing of verbally abusing and harassing her that they had a right to know what she was saying about them and that Aiken and Rolwing might also be at this meeting to defend themselves.  Paddett-Gillett's insistence that Aiken and Rolwing had a right to hear Relator's accusations stood in stark contrast to Paddett-Gillett's admission just minutes earlier that Aiken and Rolwing would be allowed to present evidence of their purported issues regarding Relator's poor performance directly to the Medical Staff even though Relator had not seen the write ups or complaints and would not be allowed to defend herself before the people who could take away her LPS designation.  Paddett-Gillett concluded that if Relator, Aiken and Rolwing could not work together "then someone needs to change to a different department."

### 6.     **LAMMC Fires Relator**

312.   On or about July 17, 2012, after Relator was not on the June or July schedules, she delivered a letter to Paddett-Gillett by email and US mail return receipt requested.  Relator advised Paddett-Gillett that because of the ongoing course of conduct including the inability for Relator to get on the schedule for successive months that LAMMC had constructively terminated her.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

AMENDED COMPLAINT        114       CASE NO:  CV-12-00960 RSWL (SHX)

313.  Paddett-Gillett responded to Relator by email on July 18, 2012 and by a certified letter dated July 19th, 2012, mailed July 23, 2012.  While LAMMC claimed that Relator was not fired, LAMMC made no efforts to resolve the issues Relator raised or to put her in the schedule.

### D.    HARM TO THE GOVERNMENT

314.  As described above, Defendants' scheme harmed the government health care programs because the Defendants billed, or caused to be billed, false or fraudulent claims for Health Care Services.  The estimates of the amounts paid for psychiatric care alone total hundreds of millions of dollars.  However, as just one of the Health Care Services for which Defendants billed, the totals for psychiatric care are conservative estimates of the total harm to the government caused by Defendants' scheme.

315.  For the fiscal year ending August 2012, LAMMC billed Medi-Cal and Medicare, respectively, $21,933,450 and $33,331,569 for Adult Psychiatric Acute Inpatient care.  Medi-Cal and Medicare paid a significant portion of these billings. LAMCC reported 12,660 and 19,239 patient (census) days attributable to psychiatric care for Medi-Cal and Medicare, respectively.  LAMMC also reported Adult Psychiatric Acute Inpatient care discharges of 1,888 and 1,950 for Medi-Cal and Medicare, respectively.

316.  For the fiscal year ending August 2011, LAMMC billed Medi-Cal and Medicare, respectively, $19,470,578 and $30,643,058 for Adult Psychiatric Acute Inpatient care.  Medi-Cal and Medicare paid a significant portion of these billings. LAMCC reported 11,546 and 18,167 patient (census) days attributable to psychiatric care for Medi-Cal and Medicare, respectively.  LAMMC also reported Adult Acute Inpatient care discharges of 1,498 and 1,818 for Medi-Cal and Medicare, respectively.

317.  For the fiscal year ending August 2010, LAMMC billed Medi-Cal and Medicare, respectively, $16,029,669 and $27,766,200, for Adult Psychiatric Acute

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

1  Inpatient care.  Medi-Cal and Medicare paid a significant portion of these billings.

2  LAMCC reported 9,459 and 16,435 patient (census) days attributable to psychiatric

3  care for Medi-Cal and Medicare, respectively.  LAMMC also reported Adult Acute

4  Inpatient care discharges of 1,114 and 1,585 for Medi-Cal and Medicare,

5  respectively.

6      318.  For the fiscal year ending August 2009, LAMMC billed Medi-Cal and

7  Medicare $13,391,317 and $29,242,457, respectively, for Adult Psychiatric Acute

8  Inpatient care. Medi-Cal and Medicare paid a significant portion of these billings.

9  LAMCC reported 8,116 and 17,584 patient (census) days attributable to psychiatric

10  care for Medi-Cal and Medicare, respectively.  LAMMC also reported Adult Acute

11  Inpatient care discharges of 1,084 and 2,091 for Medi-Cal and Medicare,

12  respectively.

13      319.  For the fiscal year ending August 2008, LAMMC billed Medi-Cal and

14  Medicare $21,837,491 and $35,243,416, respectively, for Adult Psychiatric Acute

15  Inpatient care.  Medi-Cal and Medicare paid a significant portion of these billings.

16  LAMCC reported 11,731 and 20,395 patient (census) days attributable to psychiatric

17  care for Medi-Cal and Medicare, respectively.  LAMMC also reported Adult Acute

18  Inpatient care discharges of 1,262 and 1,970 for Medi-Cal and Medicare,

19  respectively.

20      320.  For the fiscal year ending August 2007, LAMMC billed Medi-Cal and

21  Medicare $24,621,161 and $18,316,338, respectively, for Adult Psychiatric Acute

22  Inpatient care.  Medi-Cal and Medicare paid a significant portion of these billings.

23  LAMCC reported 14,921 and 17,273 patient (census) days attributable to psychiatric

24  care for Medi-Cal and Medicare, respectively.  LAMMC also reported Adult Acute

25  Inpatient care discharges of 1712 and 1653 for Medi-Cal and Medicare, respectively.

26      321.  For the fiscal year ending August 2006, LAMMC, billed Medi-Cal and

27  Medicare $19,935,345 and $22,155,549, respectively, for Adult Psychiatric Acute

28  Inpatient care.  Medi-Cal and Medicare paid a significant portion of these billings.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

AMENDED COMPLAINT    116    CASE NO:  CV-12-00960 RSWL (SHX)

1  LAMCC reported 14,023 and 17,111 patient (census) days attributable to psychiatric

2  care for Medi-Cal and Medicare, respectively. LAMMC also reported Adult Acute

3  Inpatient care discharges of 1,800 and 1,731 for Medi-Cal and Medicare,

4  respectively.

### COUNT I

**Presentation of False or Fraudulent Claims In**

**Violation of the False Claims Act - 31 U.S.C. § 3729(a)(1)(A)**

**(Against All Defendants)**

9  322. Relator realleges and incorporates by reference the allegations made in

10  Paragraphs 1 through 321 of this Complaint.

11  323. Relator, on behalf of the United States, is asserting pre and post FERA[3]

12  FCA claims against the Provider Defendants for violations of the FCA during the

13  applicable time periods before and after the FERA amendments. Thus, the pre-

14  amendment and amended versions of the FCA are relevant and applicable to this

15  claim for relief.

16  324. As Medicare and Medi-Cal providers, the Provider Defendants are liable

17  under the FCA because they knowingly submitted to federal and state health program

18  false or fraudulent claims that are prohibited by 42 U.S.C. §§ 1320, et seq.

19  325. The Provider Defendants in concert with the other Defendants, who

20  facilitated such claims for each of the Provider Defendants, submitted false or

21  fraudulent claims to the government for payment when they repeatedly submitted

22  claims for services which were procured in violation of the anti-kickback laws, the

23  exclusion laws, the False Claim Act and controlling federal and state health care

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

---

[3] On May 20, 2009, the False Claims Act was amended pursuant to Public Law 111-21, the Fraud Enforcement and Recovery Act of 2009 ("FERA"). Section 3729(a)(1)(B) was formerly Section 3729(a)(2), and is applicable to this case by virtue of Section 4(f) of FERA, while Sections 3279(a)(1) and 3279(a)(3) of the statute prior to FERA, and as amended in 1986, remain applicable here.

---

AMENDED COMPLAINT        117        CASE NO: CV-12-00960 RSWL (SHX)

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

1  provider regulations.  As alleged above and incorporate herein, at all times relevant to

2  this complaint, Defendants violated:

3        a.     the anti-kickback laws;

4        b.     the exclusion laws; and

5        c.     the regulations governing the provision of government health care

6  programs.

7        <u>The Anti-Kickback Laws</u>

8       326.   A claim that includes items or services resulting from a violation of the

9  Anti-Kickback Statute constitutes a false or fraudulent claim.  42 USC § 1320(a)-

10  7b(g).

11       327.   At all times relevant to this complaint, each of the Defendants engaged in

12  repeated and ongoing violations of the anti-kickback laws relating to the care of

13  patients who purchased referrals from the Marketing Defendants, as described above.

14  These violations include, but are not limited to, the following:

15        a.     The Hospital Defendants

16       &bull;     violated the AKS by paying kickbacks to TRIGGIANI and SGG for

17  patient referrals.

18       &bull;     violated the AKS by soliciting or receiving kickbacks from PROCARE

19  for the transport of patients.

20       &bull;     violated the Stark law, as of August 1, 2009, by engaging in a prohibited

21  financial relationship with GOLCHINI, who was sole owner of SGG, in the form of a

22  sham contract which was a pretext for providing remuneration for patient referrals.

23        b.     The Marketing Defendants

24       &bull;     violated the AKS by soliciting or receiving the kickback payments from

25  LAMMC for the referral of patients.

26       &bull;     violated the AKS by paying kickbacks to PROCARE for the transport of

27  patients.

28

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

- violated the AKS by paying kickbacks to outside facilities, including SNFs and B&Cs for access to patients to be sent to LAMMC for Health Care Services.

- (as to SGG and GOLCHINI) violated the Stark law as of August 1, 2009, by engaging in a prohibited financial relationship with LAMMC in the form of a sham contract which was a pretext for providing remuneration to GOLCHINI as sole shareholder of SGG for patient referrals.

c.    PROCARE

- violated the AKS by kickbacks payments to LAMMC for the transport of patients.

- violated the AKS by soliciting or receiving kickback payments from the Marketing Defendants for the transport of patients.

d.    The Doctor Defendants

- violated the AKS by caring for and treating patients they knew were the result of kickback payments to refer patients to LAMMC, and thereafter billing government health care programs for their care.

328.   No safe harbors authorized by the AKS or Stark are applicable to the conduct described herein which would make these pay-for- patient arrangements lawful.

329.   By presenting the referenced claims seeking payment from Medicare and Medi-Cal, the Provider Defendants violated the FCA.  Each of the other Defendants facilitated and caused each of the Provider Defendants' submission of these false claims.

The Exclusion Laws

330.   TRIGGIANI was excluded from Medicare and Medi-Cal, effective June 19, 2008.  For all claims after June 19, 2008, the Provider Defendants are liable under the FCA because they knowingly and repeatedly submitted false or fraudulent claims in violation of the exclusion laws that are prohibited by 42 U.S.C. §§ 1320, *et*

AMENDED COMPLAINT          119          CASE NO:  CV-12-00960 RSWL (SHX)

seq. Further, because each of the other Defendants facilitated such claims for each of the Provider Defendants, as described above, each of them caused the submission of false claims and is also liable under the FCA.

Lack of Medical Necessity

331. No payment may be made for any expenses incurred for items or services that are not reasonable and necessary for the diagnosis or treatment of illness or injury. 42 USC § 1395Y(a)(1)(A)

332. The Provider Defendants repeatedly and knowingly submitted claims for care and services that were not reasonable or medically necessary. These claims included, but are not limited to, the care and services of patients described above.

333. The Doctor Defendants repeatedly and falsely attested to the reasonableness and medical necessity for inpatient services at LAMMC, their own professional services, and transportation services, as described above. The Doctor Defendants, therefore, submitted, or caused to be submitted, false or fraudulent claims to Government Payors for care of patients that was, in fact, not reasonable and/or medically necessary. Each of the other Defendants also facilitated and caused the submission of these false claims.

334. For all these claims, therefore, the Provider Defendants are liable under the FCA. Further, because each of the other Defendants facilitated such claims for each of the Provider Defendants, as described above, each of them caused the submission of false claims and is also liable under the FCA.

335. As a direct and proximate result of the Provider Defendants' presentation of false or fraudulent claims for payment, the United States has suffered actual monetary damages and is entitled to recover actual and treble damages plus a civil monetary penalty for each false or fraudulent claim paid from all of the Defendants.

/ / /

/ / /

/ / /

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

## COUNT II

### False or Fraudulent Records and Statements

### Material to False or Fraudulent Claims

### In Violation of the False Claims Act – 31 U.S.C. § 3729(a)(1)(B)

### (Against All Defendants)

336.   Relator realleges and incorporates by reference the allegations made in Paragraphs 1 through 321 of this Complaint.

337.   Relator, on behalf of the United States, is asserting pre and post FERA FCA claims against the Provider Defendants for violations of the FCA during the applicable time periods before and after the FERA amendments. Thus, the pre-amendment and amended versions of the FCA are relevant and applicable to this claim for relief.

338.   Any person who knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim is liable for violation of the False Claims Act. 31 U.S.C. § 3729(a)(2) (as amended, 31 U.S.C. § 3729(a)(1)(B).

339.   The Defendants knowingly made, used, caused to be made, or caused to be used, false or fraudulent records and statements material to false or fraudulent claims for care and services, including drugs, diagnostic tests and general acute and inpatient psychiatric hospital care and medically unnecessary ambulance transportation services.

340.   The false or fraudulent records and statements include, but are not limited to:

- False certifications in Provider Agreements, *supra* ¶ 44-49;
- False certifications in Hospital Disclosure Reports/Yearly Cost Reports, *supra* ¶ 60-67;

/ / /

/ / /

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

AMENDED COMPLAINT          121          CASE NO:  CV-12-00960 RSWL (SHX)

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

- False certifications in each claim form submitted for payment certifying that the services being billed complied with the anti-kickback laws, the exclusion laws and were medically necessary, *supra* ¶ 56-57; 70;

- False medical records, including but not limited to false 5150 hold forms, voluntary admission forms; doctor orders directing unnecessary medical treatments, *supra* ¶ 162-281;

- LAMMC/SGG/TRIGGIANI Sham contracts, *supra* ¶ 205-206.

341. As described above, the false or fraudulent records and statements were not the result of the Defendants' mere disregard of government regulations or an improper internal policy. *See e.g.* ¶¶ 192-194; 220(b); 224; 227(b) and 235. Rather, these false or fraudulent records and statements were material to the government's payment of funds under Medicare and Medi-Cal.

342. Compliance with the anti-kickback laws is a condition of payment by the Medicare and Medi-Cal programs. 42 CFR § 413.24.

343. Compliance with the exclusion laws is a condition of payment by the Medicare and Medi-Cal programs. 42 CFR § 424.516(a)(3).

344. Compliance with the requirement that all care be reasonable and medically necessary is a condition of payment by the Medicare and Medi-Cal programs, particularly for inpatient psychiatric services. 42 USC § 1395f(a)(2)(A); 42 CFR § 424.14 *See also* ¶ 56-57 and 70, above. Notwithstanding the reasonable and medically necessary requirement, the Doctor Defendants certified the reasonableness and medical necessity for the care of patients when no treatment could reasonably be expected to improve the condition for which such treatment is or was purportedly necessary, including patients described above.

345. As a direct and proximate result of the Defendants knowingly making, using, causing to be made, or causing to be used, false or fraudulent records and statements material to false or fraudulent claims, the United States has suffered actual monetary damages and is entitled to recover actual and treble damages plus a

1  civil monetary penalty for each false or fraudulent claim paid from all of the

2  Defendants.

### COUNT III

### Conspiracy in Violation of the False Claims Act - 31 U.S.C. § 3729(a)(1)(C)

### (As to All Defendants)

6      346.   Relator realleges and incorporates by reference the allegations made in

7  Paragraphs 1 through 321 of this Complaint.

8      347.   The FCA subjects to civil liability any person who <u>conspires</u> to

9  defraud the government by presenting a false or fraudulent claim for payment or

10  getting a false or fraudulent claim paid.  *See* 31 U.S.C. § 3729(a)(3) (pre-FERA)

11  and 31 U.S.C. § 3729(a)(1)(C) (post-FERA).

12      348.   The Provider Defendants each had a duty to comply with federal and

13  state statutes and regulations in connection with the presentation of claims for

14  payment to the government, and otherwise not to present, or cause to be presented,

15  claims for payment that are violative of the AKS, Stark, the Exclusion Laws or their

16  Medicare and Medi-Cal Provider Agreements.

17      349.   As shown above, Defendants have conspired to defraud the government

18  by presenting multiple false or fraudulent claims for payment, or getting multiple

19  false or fraudulent claims paid.

20      350.   The referral relationships between the Hospital Defendant and the

21  Marketing Defendants and the Marketing Defendants and the outside facilities had

22  the effect of defrauding the government by presenting false or fraudulent claims for

23  payment, or getting false or fraudulent claims paid.  Each of the Defendants played

24  a role, as described above, in defrauding the government.

25      351.   The foregoing conspiracy directly and proximately caused the

26  government to pay claims submitted by the Provider Defendants that it otherwise

27  would not have paid, had it known of Defendants' conspiracy, including their

28  kickback arrangements, the ongoing involvement of an excluded provider, and other

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

AMENDED COMPLAINT        123        CASE NO:  CV-12-00960 RSWL (SHX)

1    violations of state and federal law. This conspiracy caused the Government Payors

2    to suffer damages in amounts to be proven at trial.

3                                **COUNT IV**

4                    **Retention of Overpayments in**

5    **Violation of the False Claims Act – 31 U.S.C. § 3729(a)(1)(g)**

6                          **(As to All Defendants)**

7        352.   Relator realleges and incorporates by reference the allegations made in

8    Paragraphs 1 through 321 of this Complaint.

9        353.   As described above, the Provider Defendants, submitted false claims

10   which the government paid.

11       354.   An overpayment is a payment by a federal entity to a provider or supplier

12   in excess of what was due and payable.  An overpayment may include payment for

13   non-covered items or services including services that are not reasonable and

14   necessary in accordance with the Medicare rules.  An overpayment may be received

15   through an innocent billing error or through a mistake of the contractor. 42 USC §

16   1320a-7k(d)(1) warns that "returning the overpayment … is an obligation (as defined

17   in 3729(b)(3) of title 31 for purposes of section 3729 of such title."

18       355.   As of May 24, 2010, the effective day of the legislation that established

19   subsection 7k(d)(1), each day that the Provider Defendants retain an overpayment,

20   they are violating the FCA.  Moreover, because the other Defendants facilitated and

21   caused the retention of these overpayments, and conspired to keep them, each of

22   them is similarly liable.

23       356.   As a direct and proximate result of the Provider Defendants' retention of

24   overpayments, the United States has suffered actual monetary damages and is

25   entitled to recover from all of the Defendants actual and treble damages plus a civil

26   monetary penalty for each retained overpayment as a false or fraudulent claim paid.

27   / / /

28   / / /

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

AMENDED COMPLAINT          124          CASE NO:  CV-12-00960 RSWL (SHX)

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

## COUNT V

### Retaliation In Violation of the FCA – 31 U.S.C. § 3730(h)

#### (Against Los Angeles Doctors Hospital Corporation,

#### its parent PHC, and affiliates)

357. Relator realleges and incorporates by reference the allegations made in Paragraphs 1 through 321 of this Complaint.

358. Relator was discriminated against, harassed by and marginalized in her employment at LAMMC, by the officers, agents and employees of the Hospital Defendant because of lawful acts taken by Relator in furtherance of an action and/or possible action under the False Claims Act and/or investigation of False Claims Act violations that could serve as a basis of an action under the False Claims Act or the California False Claims Act.

359. The actions of the Defendants set forth above violated 31 U.S.C. § 3730(h) and damaged Relator.

360. As alleged above, each of Defendants' officers, agents and employees harassed Relator in violation of 31 U.S.C. § 3730(h) and/or assisted and/or conspired with the other Defendants to harass Relator in violation of 31 U.S.C. § 3730(h) making each subject to liability.

361. Relator is, therefore, entitled to the relief provided by 31 U.S.C. § 3730(h), including damages in an amount to be determined at trial.

## COUNT VI

### Presentation of False or Fraudulent Claims In

### Violation of CFCA - Cal Gov't Code § 12651(a)(1)

#### (Against All Defendants)

362. Relator realleges and incorporates by reference the allegations made in Paragraphs 1 through 321 of this Complaint.

363. This is a claim for treble damages and penalties under the California False Claims Act (CFCA), Cal. Gov't Code §§12650, *et seq.*

364.   The Provider Defendants knowingly submitted false or fraudulent claims to Medi-Cal.  Further, each of the other Defendants facilitated such claims for each of the Provider Defendants, as described above.  The Provider Defendants, along with the other Defendants, therefore, knowingly submitted or caused the submission of the above-referenced and other false or fraudulent claims in violation of Cal. Gov't Code § 12651(a)(1).

365.   The Provider Defendants in concert with the other Defendants, who facilitated such claims for each of the Provider Defendants, submitted false or fraudulent claims to the government for payment when they repeatedly submitted claims for services which were procured in violation of the anti-kickback laws, the exclusion laws, the False Claims Act, the California False Claims Act and controlling federal and state health care provider regulations.  As alleged above and incorporate herein, at all times relevant to this complaint, Defendants violated:

a.     the anti-kickback laws;

b.     the exclusion laws; and

c.     the regulations governing the provision of government health care programs.

The Anti-Kickback Laws

366.   At all times relevant to this complaint, each of the Defendants engaged in repeated and ongoing violations of the federal and state anti-kickback laws relating to the care of patients who were purchased referrals from the Marketing Defendants, as described above.  These violations include, but are not limited to, the following:

a.     The Hospital Defendants

•      Violated federal and state anti-kickback laws by paying kickbacks to TRIGGIANI and SGG for patient referrals.

•      violated federal and state anti-kickback laws by soliciting or receiving kickbacks from PROCARE for the transport of patients.

/ / /

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

1   • violated federal and state anti-kickback laws, as of August 1, 2009, by

2   engaging in a prohibited financial relationship with GOLCHINI, who was sole owner

3   of SGG, in the form of a sham contract which was a pretext for providing

4   remuneration for patient referrals.

5   b.   The Marketing Defendants

6   • violated federal and state anti-kickback laws by soliciting or receiving the

7   kickback payments from LAMMC for the referral of patients.

8   • violated federal and state anti-kickback laws by paying kickbacks to

9   PROCARE for the transport of patients.

10   • violated federal and state anti-kickback laws by paying kickbacks to

11   outside facilities, including SNFs and B&Cs for access to patients to be sent to

12   LAMMC for Health Care Services.

13   • (as to SGG and GOLCHINI) violated federal and state anti-kickback

14   laws as of August 1, 2009, by engaging in a prohibited financial relationship with

15   LAMMC in the form of a sham contract which was a pretext for providing

16   remuneration to GOLCHINI as sole shareholder of SGG for patient referrals.

17   c.   PROCARE

18   • violated federal and state anti-kickback laws by paying kickbacks to

19   LAMMC for the transport of patients.

20   • violated federal and state anti-kickback laws by soliciting or receiving

21   kickback payments from the Marketing Defendants for the transport of patients.

22   d.   The Doctor Defendants

23   • violated federal and state anti-kickback laws by caring for and treating

24   patients they knew were the result of kickback payments to refer patients to

25   LAMMC, and thereafter billing government health care programs for their care.

26   367.   No safe harbors authorized by the federal anti-kickback laws are

27   applicable to the conduct described herein which would make these pay-for- patient

28   arrangements lawful.

AMENDED COMPLAINT        127        CASE NO:  CV-12-00960 RSWL (SHX)

1    368.  By presenting the referenced claims seeking payment from Medi-Cal, the

2    Provider Defendants violated the CFCA.  Each of the other Defendants facilitated

3    and caused each of the Provider Defendants' submission of these false claims.

4    <u>The Exclusion Laws</u>

5    369.  TRIGGIANI was excluded from Medi-Cal, effective June 19, 2008.  For

6    all claims after June 19, 2008, therefore, the Provider Defendants are liable under the

7    CFCA because they knowingly and repeatedly submitted false or fraudulent claims in

8    violation of the exclusion laws that are prohibited by Cal. Gov't Code § 12651(a)(1).

9    Further, because each of the other Defendants facilitated such claims for each of the

10   Provider Defendants, as described above, each of them caused the submission of false

11   claims and is also liable under the CFCA.

12   <u>Lack of Medical Necessity</u>

13   370.  No payment may be made for any expenses incurred for items or services

14   that are not reasonable and necessary for the diagnosis or treatment of illness or

15   injury.

16   371.  The Provider Defendants repeatedly and knowingly submitted claims for

17   care and services that were not reasonable or medically necessary. These claims

18   included, but are not limited to, care and services of patients described above.

19   372.  The Doctor Defendants repeatedly and falsely attested to the

20   reasonableness and medical necessity for inpatient services at LAMMC, their own

21   professional services, and transportation services, as described above.  The Doctor

22   Defendants, therefore, submitted, or caused to be submitted, false or fraudulent

23   claims to Government Payors for care of patients that was, in fact, not reasonable

24   and/or medically necessary.  Each of the other Defendants also facilitated and caused

25   the submission of these false claims.

26   373.  For all these claims, therefore, the Provider Defendants are liable under

27   the CFCA.  Further, because each of the other Defendants facilitated such claims for

28   / / /

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

AMENDED COMPLAINT          128          CASE NO:  CV-12-00960 RSWL (SHX)

1  each of the Provider Defendants, as described above, each of them caused the

2  submission of false claims and is also liable under the CFCA.

3      374.  As a direct and proximate result of the Provider Defendants' presentation

4  of false or fraudulent claims for payment, the State of California has suffered actual

5  monetary damages and is entitled to recover actual and treble damages plus a civil

6  monetary penalty for each false or fraudulent claim paid from all of the Defendants.

7                                **COUNT VII**

8          **False or Fraudulent Records and Statements Material to**

9                    **A False or Fraudulent Claim**

10          **In Violation of California's False Claims Act**

11                    **Cal Gov't Code § 12651(a)(2)**

12                      **(Against All Defendants)**

13     375.  Relator realleges and incorporates by reference the allegations made in

14  Paragraphs 1 through 321 of this Complaint.

15     376.  Any person who knowingly makes, uses, or causes to be made or used a

16  false record or statement material to a false or fraudulent claim violates the CFCA.

17  Cal Gov't Code § 12651(a)(2).

18     377.  The Defendants knowingly made, used, caused to be made, or caused to

19  be used, false or fraudulent records and statements material to false or fraudulent

20  claims for care and services, including drugs, diagnostic tests and general acute and

21  inpatient psychiatric hospital care and medically unnecessary ambulance

22  transportation services.

23     378.  The material false or fraudulent records and statements include, but are

24  not limited to:

25     •    False certifications in Provider Agreements, *supra* ¶ 44-49;

26     •    False certifications in Hospital Disclosure Reports/Yearly Cost Reports,

27  *supra* ¶ 60-67;

28  / / /

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

AMENDED COMPLAINT        129        CASE NO:  CV-12-00960 RSWL (SHX)

- False certifications in each claim form submitted for payment certifying that the services being billed were medically necessary, *supra* ¶ 56-57 and 70;

- False Medical Records, including but not limited to false 5150 hold forms, voluntary admission forms; doctor orders directing unnecessary medical treatments, including drugs, tests and general acute and inpatient psychiatric hospital admissions and medically unnecessary ambulance transportation services, *supra* ¶ 162-281;

- LAMMC/SGG/TRIGGIANI Sham contracts, *supra* ¶ 205-206.

379. As described above, the false or fraudulent records and statements were not the result of the Defendants' mere disregard of government regulations or an improper internal policy. *See e.g.* ¶¶ 192-194; 220(b); 224; 227(b) and 235. Rather, these false or fraudulent records and statements were material to the government's payment of funds under Medi-Cal.

380. Compliance with the anti-kickback laws is a condition of payment by the Medi-Cal programs.

381. Compliance with the exclusion laws is a condition of payment by the Medi-Cal program.

382. Compliance with the requirement that all care be reasonable and medically necessary is a condition of payment by the Medi-Cal program, particularly for inpatient psychiatric services. Notwithstanding the reasonable and medically necessary requirement, the Doctor Defendants certified the reasonableness and medical necessity for the care of patients when no treatment could reasonably be expected to improve the condition for which such treatment is or was purportedly necessary, including patients described above.

383. As a direct and proximate result of the Defendants knowingly making, using, causing to be made, or causing to be used, false or fraudulent records and statements to get false or fraudulent claims paid or approved, the State of California has suffered actual monetary damages and is entitled to recover actual and treble

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

1  damages plus a civil monetary penalty for each false or fraudulent claim paid from

2  all of the Defendants.

### COUNT VIII

#### Conspiracy to Commit Violations of California's False Claims Act

#### Cal Gov't Code § 12651(a)(3)

#### (Against All Defendants)

7  384.  Relator realleges and incorporates by reference the allegations made in

8  Paragraphs 1 through 321 of this Complaint.

9  385.  The CFCA subjects to civil liability any person who <u>conspires</u> to

10  commit a violation of the CFCA.  Cal. Gov't Code § 12651(a)(3).

11  386.  The Provider Defendants each had a duty to comply with federal and

12  state statutes and regulations in connection with the presentation of claims for

13  payment to Government Payors, and otherwise to not present or cause to be presented

14  claims for payment that are violative of the federal and state anti-kickback laws, the

15  exclusion laws or their Medi-Cal Provider Agreements.

16  387.  As shown above, Defendants have conspired to commit violations of the

17  CFCA.

18  388.  The referral relationships between the Hospital Defendant and the

19  Marketing Defendants and the Marketing Defendants and the outside facilities had

20  the effect of defrauding the federal and state governments.  Each of the Defendants

21  played a role, as described above, in defrauding the federal and state government.

22  389.  The foregoing conspiracy directly and proximately caused the State of

23  California to pay claims submitted by the Provider Defendants that it otherwise

24  would not have paid, had it known of Defendants' kickback arrangements, including

25  the ongoing involvement of an excluded provider. These conspiracies caused the

26  State of California to suffer damages in amounts to be proven at trial.

27  / / /

28  / / /

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

AMENDED COMPLAINT          131          CASE NO:  CV-12-00960 RSWL (SHX)

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

## COUNT IX

### Retaliation in Violation of California's FCA - Cal Gov't Code § 12653(b)

### (Against Los Angeles Doctors Hospital Corporation,

### its parent PHC, and affiliates)

390. Relator realleges and incorporates by reference the allegations made in Paragraphs 1 through 321 of this Complaint.

391. The California False Claims Act, Cal. Gov't Code § 12653, provides, in part:

a) No employer shall make, adopt, or enforce any rule, regulation, or policy preventing an employee from disclosing information to a government or law enforcement agency or from acting in furtherance of a false claims action, including investigating, initiating, testifying, or assisting in an action filed or to be filed under Section 12652.

b) No employer shall discharge, demote, suspend, threaten, harass, deny promotion to, or in any other manner discriminate against, an employee in the terms and conditions of employment because of lawful acts done by the employee on behalf of the employee or others in disclosing information to a government or law enforcement agency or in furthering a false claims action, including investigation for, initiation of, testimony for, or assistance in, an action filed or to be filed under Section 12652.

c) An employer who violates subdivision (b) shall be liable for all relief necessary to make the employee whole, including reinstatement with the same seniority status that the employee would have had but for the discrimination, two times the amount of back pay, interest on the back pay, compensation for any special damage sustained as a result of the discrimination, and, where appropriate, punitive damages. In addition, the defendant shall be required to pay litigation costs and reasonable attorneys' fees.

/ / /

AMENDED COMPLAINT 132 CASE NO: CV-12-00960 RSWL (SHX)

392. Relator's actions in informing LAMMC, PHC and federal, state and local authorities of Defendants' repeated violations of law, including the improper use of psychiatric holds, constitute protected activities in furtherance of efforts to stop violations of the California False Claims Act.

393. Defendants retaliated against Relator as a direct result of her protected activities. The retaliation included, but was not limited to, harassment, discrimination, unfair treatment, and termination.

394. Defendants' fraudulent acts as described herein constitute violations of the California False Claims Act, Cal. Gov't Code § 12653. Relator's efforts to disclose and correct defendants' violations of the California False Claims Act, as described herein, were made in furtherance of protected activities under Cal. Gov't Code § 12653.

395. Defendants, and/or their representatives had actual or constructive knowledge that Plaintiff was engaging in such protected activities when she took steps to report Defendants' violations of law, including the improper use of psychiatric holds.

396. Relator is, therefore, entitled to the relief provided by Cal. Gov't Code § 12653 including two times the amount of back pay, interest on the back pay, compensation for any special damage sustained as a result of the discrimination, and punitive damages in an amount to be determined at trial along with litigation costs and reasonable attorneys' fees.

## COUNT X

### Retaliation in Violation of California's Health & Safety Code § 1278.5

### (Against Los Angeles Doctors Hospital Corporation,

### its parent PHC, and affiliates)

397. Relator realleges and incorporates by reference the allegations made in Paragraphs 1 through 321 of this Complaint and additionally alleges as follows:

398. California Health and Safety Code § 1278.5(b) provides, in part, that:

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

1        (1)    No health facility shall discriminate or retaliate, in any manner,

2  against any . . . employee . . . because that person has done either of the following:

3        (A)    Presented a grievance, complaint, or report to the facility,

4  to an entity or agency responsible for accrediting or evaluating the facility, or the

5  medical staff of the facility, or to any other governmental entity.

6        (B)    Has initiated, participated, or cooperated in an investigation

7  or administrative proceeding related to, the quality of care, services, or conditions at

8  the facility that is carried out by an entity or agency responsible for accrediting or

9  evaluating the facility or its medical staff, or governmental entity.

10       (2)    No entity that owns or operates a health facility, or which owns or

11  operates any other health facility, shall discriminate or retaliate against any person

12  because that person has taken any actions pursuant to this subdivision.

13     399.   Relator's actions in informing LAMMC, PHC and federal, state and

14  local authorities of Defendants' repeated violations of law, including the improper

15  use of psychiatric holds, constitute protected activities under Cal. Health & Saf.

16  Code § 1278.5.

17     400.   Defendants retaliated against Relator as a direct result of her protected

18  activities.  The retaliation included, but was not limited to, harassment,

19  discriminatory and unfair treatment while she was employed, and ultimately

20  termination.

21     401.   Defendants' fraudulent acts as described herein constitute violations of

22  Health and Safety Code § 1278.5.  Relator's efforts to disclose and rectify

23  Defendants' violations of the California Health and Safety Code, as described herein,

24  were made in furtherance of protected activities under Health and Safety Code

25  § 1278.5.

26     402.   Defendants and their representatives had actual or constructive

27  knowledge that Relator was engaged in such protected activities when she reported

28  Defendants' violations of law, including the improper use of psychiatric holds.

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

403. Relator is, therefore, entitled to the relief provided by Health and Safety Code § 1278.5 including damages and punitive damages in an amount to be determined at trial along with litigation costs and reasonable attorneys' fees.

## COUNT XI

### Constructive Discharge in Violation of Public Policy

### Cal. Labor Code § 1102.5

**(Against Los Angeles Doctors Hospital Corporation,**

**its parent PHC, and affiliates)**

404. Relator hereby incorporates by reference Paragraphs 1 through 321 of this Complaint as if fully set forth herein and additionally alleges as follows:

405. It is, and at all times relevant to this action it has been, the law and fundamental public policy of the state of California that an employer may not retaliate against an employee for refusing to participate in an activity that she reasonably believes would result in a violation of a state statute. This public policy is embodied in statutes including, but not limited to, California Labor Code § 1102.5.

406. Defendants harassed, and discriminated against Relator, ultimately terminating her employment, in retaliation for refusing to participate in activities that she reasonably believes were in violation of state statutes, including the California False Claims Act, the California Anti-Kickback Law, the LPS law and laws governing provision of health care. Accordingly, Relator was unlawfully terminated in violation of the fundamental public policies of the State of California.

407. As a direct, foreseeable and proximate result of Defendants' unlawful actions, Relator has suffered and continues to suffer substantial losses in earnings and other employment benefits and has incurred other economic losses in an amount to be proven at trial.

408. As a direct, foreseeable, and proximate result of Defendants' unlawful actions, Relator has suffered emotional distress, humiliation, shame, and

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

AMENDED COMPLAINT     135     CASE NO: CV-12-00960 RSWL (SHX)

1  embarrassment, all to the Relator's damage in an amount to be proven at the time of

2  trial.

3      409.   Defendants committed the acts herein despicably, maliciously,

4  fraudulently, and oppressively, with the wrongful intention of injuring Relator, from

5  an improper and evil motive amounting to malice, and in conscious disregard of the

6  rights and safety of Relator.

7      410.   Relator is, therefore, entitled to the relief provided by Labor Code §

8  1102.5 including damages and punitive damages in an amount to be determined at

9  trial along with litigation costs and reasonable attorneys' fees.

**RELIEF REQUESTED**

11     WHEREFORE, Relator requests that judgment be entered against Defendants,

12  ordering that:

13     1.   As to Counts I through IV, the violations of the Federal False Claims

14  Act, that Defendants:

15          a.   cease and desist from violating the False Claims Act, 31 U.S.C.

16  § 3729 *et. seq.;*

17          b.   pay an amount equal to three times the amount of damages the

18  United States has sustained because of Defendants' actions, plus a civil penalty

19  against Defendants of not less than $5,500 and not more than $11,000 for each

20  violation of 31 U.S.C. § 3729;

21          c.   Relator be awarded the maximum amount allowed pursuant to

22  31 U.S.C. § 3730(d);

23          d.   Relator be awarded all costs of this action, including attorneys'

24  fees, expenses, and costs pursuant to 31 U.S.C. §§3730(d);

25     2.   As to Count V, Retaliation in violation of the FCA, that Relator be

26  awarded all the relief to which she is entitled pursuant to 31 U.S.C. § 3730(h),

27  including personal injury damages for emotional and mental distress, all amounts

28  / / /

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861

1  due her under the law for back pay, interest on her back pay, attorneys' fees and
2  litigation costs, and such other relief as the Court deems appropriate.

3       3.     As to Count VI through VIII, the violations of the California False
4  Claims Act, that Defendants:

5           a.     cease and desist from violating the California False Claims Act,
6  Cal. Gov't Code § 12650 *et. seq.*;

7           b.     pay an amount equal to three times the amount of damages the
8  State of California has sustained because of Defendants' actions, plus a civil penalty
9  against Defendants of not less than $5,500 and not more than $11,000 for each
10  violation of Cal. Gov't Code § 12651(a).

11           c.     Relator be awarded the maximum amount allowed pursuant to
12  Cal. Gov't Code § 12652(g);

13           d.     Relator be awarded all costs of this action, including attorneys'
14  fees, expenses, and costs pursuant to Cal. Gov't Code § 12652(g)(8).

15       4.     As to Counts IX, X and XI, Retaliation and Termination in violation of
16  state law, that Relator be awarded all the relief to which she is entitled pursuant to
17  Cal. Gov't Code § 12653(b), Cal. Health & Safety Code § 1278.5 and Cal. Labor
18  Code § 1102.5, including personal injury damages for emotional and mental distress,
19  all back pay, interest on her back pay, attorneys' fees and litigation costs, punitive
20  damages and such other relief as the Court deems appropriate.

21       5.     Relator, on behalf of the United States, the State of California and
22  herself, also requests that Plaintiffs be granted all such other relief as the Court
23  deems just and proper.

24  / / /
25  / / /
26  / / /
27  / / /
28  / / /

AMENDED COMPLAINT     137     CASE NO: CV-12-00960 RSWL (SHX)

## DEMAND FOR JURY

Pursuant to Fed. R. Civ. P. 38, the Relator hereby demands a trial by jury.

Dated:  August 19, 2013            **KELLER GROVER LLP**

By: _____
       JEFFREY F. KELLER
       KATHLEEN R. SCANLAN

Attorneys for Relator
*JULIE A. MACIAS*

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax. 415.543.7861