**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. JULIE A. MACIAS )<br>)<br>Plaintiff, )<br>)<br>)<br>v. )<br>)<br>)<br>PACIFIC HEALTH CORPORATION, )<br>et al. )<br>)<br>)<br>Defendants. ) | CV-12-00960 RSWL-JC<br><br>**ORDER re Relator's Motion for Default Judgment Against Defendants Pacific Health Corporation and Los Angeles Doctors Hospital Corporation**<br>[508] |

Currently before the Court is Relator Julie A. Macias' ("Relator") Motion for Default Judgment against Defendants Pacific Health Corporation and Los Angeles Doctors Hospital Corporation [508].  Having reviewed all papers submitted pertaining to this Motion, the Court **NOW FINDS AND RULES AS FOLLOWS**: the Court **GRANTS** Relator's Motion for Default Judgment.

///

///

///

1

## I. BACKGROUND

**A.  Factual Background**

This case arises out of a *qui tam* action brought by Relator Julie A. Macias ("Relator") on behalf of herself in the name of the United States of America ("the Government") and the State of California for violations of the False Claims Act ("FCA"), 31 U.S.C. § 3729, and California False Claims Act ("CFCA"), Cal. Gov't Code § 12651.  Amended Compl. ("AC") ¶ 1, ECF No. 31.[1]

Defendant Pacific Health Corporation ("PHC") owns and operates numerous hospitals in Los Angeles and Orange Counties.  Id. ¶ 9.  Defendant Los Angeles Doctors Hospital Corporation ("Doctors Hospital") is a subsidiary of PHC and owned and operated Los Angeles Metropolitan Medical Center ("LAMMC").[2]  Id. ¶ 10.  At all times relevant to this case, PHC controlled LAMMC, and Relator seeks default judgment assigning joint and several liability to Defendants PHC and Doctors Hospital (collectively, "Corporate Defendants" or "LAMMC").  Relator was a registered nurse on the

---

[1] The AC also alleges claims against the following Defendants: SGG, Inc. ("SGG"); Procare Mobile Response LLC ("Procare"); Karen Triggiani ("Triggiani"); Robert Barrett ("Barrett"); Keivan Golchini, M.D. ("Golchini"); Farhad Khossoussi, M.D. ("Khossoussi"); Alan Markie, M.D. ("Markie"); and Litos O. Mallare, M.D. ("Mallare").  All of these Defendants have been dismissed from this Action.  See ECF Nos. 335, 340, 448, 467, 476, 478, 491.

[2] PHC announced that it was closing LAMMC in April of 2013. AC ¶ 36.

Psychiatric Evaluation Team ("PET") at LAMMC. AC ¶ 6.
From April 2003 to July 2012, Relator was employed as a
member of LAMMC's PET to conduct psychiatric
evaluations for involuntary commitments pursuant to
California Welfare and Institutions Code Section 5150
("5150 holds"). Id. ¶ 162.

Defendant SGG, Inc. ("SGG") was a California
corporation with its principal place of business in San
Marino, California. Id. ¶ 12. SGG was primarily
engaged in the health services industry, including
hospital marketing. Id. Defendant Karen Triggiani
("Triggiani") is an individual who founded SGG in 1997
and was its sole shareholder from March 20, 1998 until
August 15, 2007. Id. Triggiani was excluded from
Medicare on June 19, 2008 after being convicted of
conspiracy to commit Medicare fraud. Id. ¶ 217.
Defendant Robert Barrett ("Barrett") is Triggiani's
husband, who was the sole shareholder of SGG from
December 27, 2007 to August 1, 2009. Id. Defendant
Dr. Keivan Golchini ("Golchini") is a doctor
specializing in internal medicine, who was the sole
shareholder of SGG from August 1, 2009 through December
26, 2012 when SGG was dissolved. Id. ¶¶ 12, 16.
Defendant Dr. Farhad Khossoussi ("Khossoussi") is a
practicing psychiatrist who was granted privileges to
practice in the psychiatry department at LAMMC. Decl.
of Farhad Khossoussi, M.D. in Supp. of Mot. for Summ.

J. ("Khossoussi Decl.") ¶¶ 2-3, ECF No. 353.

Relator alleges that LAMMC engaged in a scheme to improperly refer, transport, and commit patients, often unwillingly, to LAMMC's locked psychiatric units to fraudulently bill Medicare and Medi-Cal. Id. ¶¶ 24, 159-275. Triggiani allegedly provided case management and discharge planning services to LAMMC patients while she was excluded from Medicare in violation of excluded provider regulations. Id. ¶¶ 217-219, 221-264. Pursuant to an allegedly sham contract with LAMMC, SGG (and in particular Triggiani) would recruit patients from outside facilities and refer them to LAMMC in exchange for kickback payments. Id. ¶¶ 24, 204-211. Relator alleges that Dr. Khossoussi admitted and treated these patients knowing the referrals were in exchange for kickbacks. Id. ¶ 327. Dr. Khossoussi, according to Relator, then billed to government healthcare programs the services he provided to these patients. Id. Relator further alleges that Dr. Khossoussi continued to use SGG's and Triggiani's services even after Triggiani was convicted of conspiracy to commit Medicare fraud and excluded from Medicare. Id. ¶¶ 24, 212-264. Relator alleges that Defendants also attempted to conceal Triggiani's continued involvement. Id.

Physicians, hospitals, and ambulance companies who meet the requirements for participation in Medicare may

receive compensation for health care services furnished
to patients eligible for benefits. Id. ¶ 43.
Compliance with the federal Anti-Kickback Statute
("AKS") and excluded provider regulations are
preconditions to receiving Medicare and Medi-Cal
payments. Id. ¶¶ 44-47. LAMMC was required to certify
its compliance with these requirements in annual cost
reports. Id. ¶¶ 45-46, 60, 64-65, 67, 80, 97, 117,
132-35. As a result, Relator alleges that LAMMC's
ongoing scheme rendered it ineligible for Medicare and
Medi-Cal reimbursement. Id. ¶¶ 324-30, 339-45, 347-51,
364-69, 376-83, 385-89.

**B. Procedural Background**

　　Relator filed the original Complaint [1] in this
Action on February 3, 2012. The United States declined
to intervene on May 22, 2013. See U.S.'s Notice of
Election to Decline Intervention, ECF No. 19. On
August 20, 2013, Relator filed an Amended Complaint
[31] in this Action. The State of California declined
to intervene on February 11, 2014. See Cal.'s Notice
of Election to Decline Intervention, ECF No. 36. As a
result, the Court ordered that the seal be lifted and
that the Complaint and Amended Complaint be served on
Corporate Defendants. See Order re Unsealing of
Compl., ECF No. 37.

　　Relator served the Summons and AC on Corporate
Defendants on April 2, 2014 [39, 44-45]. On April 12,

2014, Corporate Defendants moved to dismiss the AC on the grounds that "public disclosure" barred Relator's claims [58].  On May 30, 2014, the Court denied Corporate Defendants' Motion to Dismiss [100].  On January 26, 2016, counsel for Corporate Defendants brought a Motion to Withdraw as Counsel pursuant to Corporate Defendants' request because they did not have sufficient funds to pay counsel and requested they cease defending them.  Mot. to Withdraw 4:9-16, ECF No. 180.  On March 21, 2016, the Court granted Corporate Defendants' Motion to Withdraw as Counsel.  ECF No. 187.  The Court ordered Corporate Defendants to secure new counsel within thirty days of the Order.  Order 6:9-17.  On April 26, 2016, the Court ordered Corporate Defendants to show cause why they failed to comply with the Court's March 21, 2016 Order.  Order to Show Cause 2:17-21; ECF No. 198.  The Court advised Corporate Defendants that if they failed to do so, the Court may impose sanctions and strike their Answer, placing them in default.  Id. at 2:21-24.  Corporate Defendants failed to comply with the Court's April 26, 2016 Order, and their Answer was stricken on May 9, 2016 and the Clerk of Court entered default against Corporate Defendants.  ECF Nos. 214, 215.

On July 18, 2016, Relator filed a Motion for Partial Default Judgment against Corporate Defendants as to her fifth, ninth, tenth, and eleventh claims—all

related to retaliation [246].[3]  The Court granted
Relator's Motion on October 11, 2016 [262].  The Court
deferred entry of judgment on Relator's retaliation
claim until the case was resolved in its entirety.
Once the remaining Defendants were dismissed following
settlement, Relator filed the Instant Motion for
Default Judgment against Corporate Defendants on March
29, 2019 [508] as to the remaining claims for
violations of the FCA and CFCA.

## II. DISCUSSION

**A.  Legal Standard**

Federal Rule of Civil Procedure ("Rule") 55(b)
authorizes a district court to grant default judgment.
Pursuant to Local Rule 55-1, the party moving for
default judgment must submit a declaration
establishing: (1) when and against which party default
was entered; (2) on which pleading default was entered;
(3) whether the defaulting party is a minor,
incompetent person, or active service member; and
(4) proper service.  Upon default, all factual
allegations in the complaint, except those relating to

---

[3] The fifth claim against Corporate Defendants is a
violation of the False Claims Act pursuant to 31 U.S.C. §
3730(h).  AC ¶ 357.  The ninth claim against Corporate Defendants
is a violation of California's False Claims Act pursuant to
California Government Code § 12653(b).  Id. ¶ 390.  The tenth
claim against Corporate Defendants is a violation of California's
Health and Safety Code pursuant to § 1278.5.  Id. ¶ 397.  The
eleventh claim against Corporate Defendants is a violation of
California Labor Code § 1102.5 and constructive discharge in
violation of public policy.  Id. ¶ 405.

damages, are assumed to be true.  TeleVideo Sys., Inc.
v. Heidenthal, 826 F.2d 915, 917-18 (9th Cir. 1987)
(quoting Geddes v. United Fin. Grp., 559 F.2d 557, 560
(9th Cir. 1977)).

In exercising its discretion to grant default
judgment, the court must consider the following factors
(the "Eitel factors"): (1) possibility of prejudice to
the plaintiff, (2) merits of the substantive claim,
(3) sufficiency of the complaint, (4) sum of money at
stake, (5) possibility of disputes regarding material
facts, (6) whether excusable neglect caused the
default, and (7) the strong policy favoring decisions
on the merits.  NewGen, LLC v. Safe Cig, LLC, 840 F.3d
606, 616 (9th Cir. 2016) (quoting Eitel v. McCool, 782
F.2d 1470, 1471-72 (9th Cir. 1986)).  Additionally, if
the defaulting party failed to plead or otherwise
defend, the court must determine that it has subject
matter and personal jurisdiction.  In re Tuli, 172 F.3d
707, 712 (9th Cir. 1999).  When default judgment is
granted, the relief awarded "must not differ in kind
from, or exceed in amount, what is demanded in the
pleadings."  Fed. R. Civ. P. 54(c).

**B.  Discussion**

1.  <u>Jurisdiction and Service of Process</u>

In considering whether to enter default judgment,
the Court must first determine whether it has
jurisdiction over the subject matter and the parties to
the case.  In re Tuli, 172 F.3d at 712.

The Court has subject matter jurisdiction over the matter as Relator's claims allege violations of the FCA arising under 31 U.S.C. § 3730.  <u>See</u> AC.  The Court further has supplemental jurisdiction over Relator's CFCA claim.  28 U.S.C. § 1367.

The Court also has personal jurisdiction over Corporate Defendants.  If a defendant's contacts with the forum state are "substantial" or "continuous and systematic," general jurisdiction may be exercised over that defendant for any cause of action.  <u>Schwarzenegger v. Fred Martin Motor Co.</u>, 374 F.3d 797, 801-02 (9th Cir. 2004).  PHC is a Georgia corporation with its principal place of business in Tustin, California.  AC ¶9.  PHC owned and operated numerous hospitals in Los Angeles and Orange County.  <u>Id.</u>  Doctors Hospital is a California corporation with its principal place of business in Los Angeles, California.  <u>Id.</u> ¶ 10.  Thus, the Court has general jurisdiction because Corporate Defendants' contacts with California were "substantial" in that both of their principal places of business were in California.

Finally, Relator has proffered the requisite Proof of Service showing that Corporate Defendants were properly served with the Summons and Amended Complaint on April 2, 2014.  Unless federal law provides otherwise, service on a corporation within the United States is proper in any manner following state law in the state where the district court is located or where

service is made.  Fed. R. Civ. P. 4(e)(1), 4(h)(1)(A).
Here, Relator served both Corporate Defendants by mail,
in compliance with Cal. Code Civ. Proc. § 415.30.  <u>See</u>
ECF Nos. 39, 44.

    2.  <u>Procedural Requirements</u>

    Relator has satisfied the procedural requirements
for default judgment pursuant to Rule 55 and Local Rule
55-1.  Under Rule 55(a), the Clerk of Court properly
entered default against Defendants.  ECF No. 215.
Relator properly moved pursuant to Rule 55(b) for entry
of default judgment.  ECF No. 508.

    Local Rule 55-1 requires that Relator provide the
following in an application for default judgment: (1)
when and against what party the default was entered;
(2) the identification of the pleading to which default
was entered; (3) whether the defaulting party is an
infant or incompetent person; (4) that the
Servicemembers Civil Relief Act does not apply; and (5)
that notice has been served on the defaulting party.
Relator has satisfied these requirements.  The Clerk of
Court entered default on May 9, 2016.  Declaration of
Eric A. Grover ("Grover Decl.") ¶ 3, ECF No. 508-2.
Neither of the Defendants are infants, incompetent
persons, or exempted under the Servicemembers Civil
Relief Act.  <u>Id.</u> ¶¶ 4-6.

    Relator attempted to serve the present Motion on
Corporate Defendants by hand delivered courier service
on March 29, 2019, at the following addresses provided

by Corporate Defendants' former counsel, Nelson
Hardiman: Pacific Health Corporation 3699 Wilshire
Blvd., Suite 540 Los Angeles, CA 90010; and Los Angeles
Doctors Hospital Corporation 3699 Wilshire Blvd., Suite
540 Los Angeles, CA. Declaration of Eric A. Grover re
Service ("Grover Service Decl.") ¶ 2, ECF No. 514. The
California Secretary of State website shows both the
above referenced addresses as the last known addresses
of Corporate Defendants. Id. ¶¶ 3-4. However, Relator
was unable to serve Corporate Defendants, and her
process server confirmed that they are no longer
located at the above addresses. Id. ¶ 6. Relator's
counsel has been unable to find another address for
Corporate Defendants, as they are not presently
represented by counsel, have not reappeared in the
case, and have not provided any way to be contacted.
Id. ¶ 8. However, default judgment should not be
precluded on this basis alone as Corporate Defendants
were successfully served with the Amended Complaint
[39, 44, 45] about five years ago, but have failed to
appear in the action since their counsel withdrew and
default was entered in 2016.

A party in default is not entitled to notice under
Fed. R. Civ. P. 55 unless it has appeared, formally or
informally, and demonstrated a clear intent to defend
the suit. Fed. R. Civ. P. 55(b)(2) ("If the party
against whom a default judgment is sought has appeared
personally or by a representative, that party or its

representative must be served with written notice of the application at least 7 days before the hearing."); In re Roxford Foods, Inc., 12 F.3d 875, 879 (9th Cir. 1993) ("While it is true that the failure to provide 55(b)(2) notice, if the notice is required, is a serious procedural irregularity that usually justifies setting aside a default judgment or reversing for the failure to do so, notice is only required where the party has made an appearance.") (quotations and citations omitted). Corporate Defendants have not obtained new counsel in the last three years, despite the fact that they cannot appear *pro se*. See Rowland v. California Men's Colony, Unit II Men's Advisory Council, 506 U.S. 194, 202 (1993). Thus, the Court finds that Corporate Defendants have not demonstrated a clear intent to defend this suit, but rather the opposite—that they have no intent to defend and they have not since their counsel withdrew in 2016. See Brock v. Unique Racquetball & Health Clubs, Inc., 786 F.2d 61 (2d Cir. 1986) (entering default despite prior appearance up until trial because a "judge, responsible for the orderly and expeditious conduct of litigation, must have broad latitude to impose the sanction of default for non-attendance occurring after a trial has begun").

///

///

///

### 3. Eitel Factors

#### i. *Factor 1: Prejudice to Plaintiff*

A court must first consider whether a plaintiff will suffer prejudice if default judgment is not entered.  See Eitel, 782 F.2d at 1471 (citation omitted).  Here, while Relator has recovered on her retaliation claims,[4] and has come to settlement agreements with the individual defendants, without default judgment, Relator and the Government will likely have no recourse for recovery on the claims for violations of the FCA and CFCA as against Corporate Defendants.  See Landstar Ranger, Inc. v. Parth Enters., 725 F. Supp. 2d 916, 920 (C.D. Cal. 2010); PepsiCo, Inc. v. Cal. Sec. Cans, 238 F. Supp. 2d 1172, 1177 (C.D. Cal. 2002).  Thus, this factor favors default judgment.

#### ii. *Factors 2 & 3: Sufficiency of the Complaint and Merits of the Claim*

The second and third Eitel factors call for analysis of the causes of action.  See Eitel, 782 F.2d at 1471 (citation omitted).  To warrant default judgment, the allegations in the Amended Complaint must be sufficient to state a claim upon which Relator can

---

[4] On October 7, 2016, the Court granted Relator's Motion for Partial Default Judgment against Corporate Defendants as to Relator's fifth, ninth, tenth, and eleventh claims for retaliation.  ECF No. 262.  The Court deferred entry of judgment until the case is resolved in its entirety as to all claims and parties.

recover. <u>Danning v. Lavine</u>, 572 F.2d 1386, 1388 (9th Cir. 1978). As discussed above, when a court reviews a motion for default judgment, it must accept the well-pleaded allegations of the complaint relating to liability as true. <u>TeleVideo</u>, 826 F.2d at 917-18. At issue here are Relator's claims for violation of the FCA and CFCA.[5]

Pursuant to the FCA, any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" from the United States Government is liable for civil penalties. 31 U.S.C. § 3729(a)(1)(A). To sufficiently plead a claim under the FCA, a plaintiff must establish the following: (1) a false statement or fraudulent course of conduct; (2) made with scienter; (3) that was material, causing; (4) the government to pay out money or forfeit moneys due. <u>United States v. Baran</u>, No. CV 14-02639 RGK (AJWx), 2015 U.S. Dist. LEXIS 125190, at *10 (C.D. Cal. Aug. 28, 2015) (citing <u>United States v. Univ. of Phoenix</u>, 461 F.3d 1166, 1174 (9th Cir. 2006)).

---

[5] The elements of the CFCA and FCA claims are materially identical, and as such, the state claim is not substantively addressed in this Order. <u>See</u> 31 U.S.C. § 3729(1)(A)-(C); Cal. Gov't Code § 12651(a)(1)-(3). <u>See</u> <u>also</u> <u>United States v. Somnia, Inc.</u>, 339 F. Supp. 3d 947, 953 (E.D. Cal. 2018) (analyzing CFCA claim in tandem with an FCA claim); <u>United States v. Safran Grp.</u>, No. 15-cv-00746-LHK, 2017 WL 235197, at *4 (N.D. Cal. Jan. 19, 2017) (citing <u>Fassberg Const. Co. v. Hous. Auth. of City of L.A.</u>, 60 Cal. Rptr. 3d 375 (2007) (as modified)) ("Where, as here, the statutory provisions of the federal FCA and California FCA are the same, courts apply the same analysis to federal and California FCA claims.").

1.  *False Statement or Fraudulent Course*
    *of Conduct*

The first element can be satisfied by pleading a theory of express or implied false certification.  <u>Id.</u> (citing <u>Ebeid ex rel. U.S. v. Lungwitz</u>, 616 F.3d 993, 995 (9th Cir. 2010)).  Express certification occurs when "the entity seeking payment certifies compliance with a law, rule or regulation as part of the process through which the claim for payment is submitted." <u>Ebeid</u>, 616 F.3d at 998.  Implied certification occurs when an "entity has previously undertaken to expressly comply with a law, rule, or regulation, and that obligation is implicated by submitting a claim for payment even though a certification of compliance is not required in the process of submitting the claim." <u>Id.</u>

First, Relator alleges that Corporate Defendants violated the federal Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b), because from at least 2004 to 2011, LAMMC paid SGG and Triggiani kickbacks for patient referrals.  AC ¶¶ 30-35, 195-211, 215-16, 221-58, 326-27.  The AKS prohibits any person from offering any kind of remuneration to induce the purchase, order, or recommendation "of any item or service for which payment may be made in whole or in part under a Federal health care program."  42 U.S.C. § 1320a-7b(b).  While the AKS itself does not establish a civil cause of action, a violation of the AKS constitutes a "false or

fraudulent claim for purposes of the FCA." Id. §
1320a-7b(g). See also United States v. Celgene Corp.,
226 F. Supp. 3d 1032, 1053 (C.D. Cal. 2016). A payment
violates the AKS "if even one purpose of remuneration
was to obtain referrals or induce referrals of Medicare
patients." United States v. Ctr. for Diagnostic
Imaging, Inc., 787 F. Supp. 2d 1213, 1217-18 (W.D. Wash
2011) (citing United States v. Kats, 871 F.2d 105, 108
(9th Cir. 1989)).

The Court finds that Relator sufficiently alleges a
violation of the AKS, and thus a false or fraudulent
claim for purpose of the FCA. The following summarizes
Relator's allegations which describe in detail the
Corporate Defendants' kickback scheme: (1) SGG entered
into a "Consultant Service Agreement" with LAMMC ("SGG
Contract"), whereby LAMMC paid SGG $40,000 per month
for "consulting" and "marketing" services, id. ¶¶ 204-
06; (2) the SGG Contract is a sham contract designed to
conceal illegal kickback payments for patient
referrals, id. ¶¶ 207-11; (3) LAMMC was aware that
Triggiani and SGG recruited patients from outside
facilities in exchange for kickbacks before entering
into the SGG Contract, id. ¶ 208; (4) as part of the
SGG Contract, Triggiani worked with outside facilities
to obtain patients for LAMMC's locked psychiatric
units, referred to as "Karen facilities," and Triggiani
referred such patients to be admitted to LAMMC's
psychiatric units, id. ¶¶ 223-62, 180(e), 191(a), 195-

99, 211, 215-16, 223, 226-27, 235, 241-46, 249-58; and (5) LAMMC tracked these referrals and often wrote Triggiani's name, "SGG", or a circled "T" on patient records to indicate the ones Triggiani referred.  Id. ¶¶ 195-203, 215, 223-62; Ex. 21 at 151-57; Ex. 22 at 77:4-19; Ex. 19.

Second, Relator alleges that Corporate Defendants submitted false claims in violation of excluded provider regulations.  AC ¶ 330.  In order to receive Medicare and Medi-Cal payments, a provider is required to certify, among other things, that it is not "employing or contracting with individuals or entities that [were] . . . [e]xcluded from participation in any Federal health care programs . . . .".  42 C.F.R. § 424.516(a)(3).  Relator alleges that LAMMC had an "affirmative duty to check the program exclusion status of individuals and entities prior to entering into employment or contractual relationships," however Triggiani was excluded from Medicare and Medi-Cal on June 19, 2008.  Id. ¶¶ 133, 212, 217; see also Ex. 38, Triggiani Plea Agreement, ECF No. 508-9.  Further, as an "excluded provider," Triggiani also was not authorized to provide case management or discharge planning services to program beneficiaries, and LAMMC was prohibited from seeking reimbursement for those services.  Ex. 27, U.S. Department of Health & Human Services "Special Advisory Bulletin on the Effect of Exclusion from participation in Federal Health Care

Programs," 7, ECF No. 508-7; 42 C.F.R. § 482.43.
Relator alleges that nonetheless, Triggianni continued
to provide these services to LAMMC patients and that
LAMMC continued to submit claims for those services,
through at least 2010.  AC ¶¶ 226, 228, 230, 233-35,
241-50, 252, 254-58.  As alleged, the Court finds that
LAMMC's continued employment of Triggianni, an excluded
provider, is sufficient to constitute a false
certification for the purpose of the FCA.

Finally, Relator alleges that Corporate Defendants,
through LAMMC, submitted false certifications of
compliance in its costs reports.  In order for
providers of Medicare services to receive
reimbursement, providers are required to submit a cost
report at the end of the period.  42 C.F.R. § 413.20.
Medicare and Medi-Cal use these reports to make
adjustments to interim reimbursements and set
prospective payment rates going forward, such as
LAMMC's Disproportional Share Hospital ("DSH") rates.
Relator contends that as a DSH hospital, LAMMC received
an increase in its prospective payment rates based on
the number of low-income program beneficiaries it
served, and by including costs for illegally referred
patients and prohibited services, LAAMC increased its
DSH and prospective payment rates.  Mot. at 18 n.77;
Ex. 83, Expert Report of Michael F. Arrigo ("Arrigo
Report") 16-17, ECF No. 508-9.  In submitting its cost
reports, LAMMC was required to certify its compliance

with the AKS and its eligibility to be a Medicare provider and receive payments. AC ¶ 97; see Ex. 47 at 1 (electronically filed cost report with certification section confirming LAMMC is "familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations"). Relator alleges that LAMMC's AKS and excluded provider violations rendered its certifications of "compliance with such laws and regulations" materially false. Further, Relator alleges that the cost reports include costs relating to patients referred by Triggiani and Triggiani's prohibited services. As such, taking Relator's allegations as true, the Court finds that LAMMC's submission of these cost reports also constitute a false claim under the FCA and CFCA. United States v. Bourseau, 531 F.3d 1159, 1164-65 (9th Cir. 2008) ("Courts have interpreted the FCA to cover . . . Medicare cost reports containing nonallowed or inflated costs.").

In sum, Relator points to several instances of false certification, and the Court finds that they establish that Corporate Defendants made false or fraudulent statements. Accordingly, Relator sufficiently pleads the first element.

///

///

## 2. *Scienter*

Relator must also establish that the false or fraudulent statements were made with scienter. Scienter is satisfied under the FCA if a defendant "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b). No proof of a specific intent to defraud is required. Id.

Here, Relator alleges not only that Corporate Defendants, through LAMMC, knowingly violated the AKS by paying SGG and Triggiani for patient referrals, but also that LAMMC actively tried to conceal Triggiani's involvement. AC ¶¶ 201-02, 204-25, 229-31, 233-58. For example, LAMMC instructed staff to use a circled "T" to identify patients Triggiani referred or used other names besides hers, while keeping her phone number on the intake forms. Id. ¶224; see Ex. 22, Deposition of Betty Gray ("Gray Dep.") 77:1-19, ECF No. 508-7 (stating that every time Intake received a call from one of Triggiani's patients "they couldn't write her name as the referral" and wrote "T" instead); Ex. 52, Deposition of Julie Macias ("Macias Dep.") 553:15-555:19, ECF No. 508-9 (testifying that she was told not to put Triggiani's name down); Ex. 53 at 2 (instructing Intake staff: "Do not write . . . SGG as the referral source"); Ex. 54 (Intake Department list with circled

"T" to indicate "Karen facilities"). Relator further argues that Corporate Defendants knowingly violated the excluded provider regulations by using Triggiani, an excluded provider, for prohibited services, as previously discussed. Relator alleges that LAMMC was aware of Triggiani's exclusion and had an affirmative duty to check her exclusion before contracting with her and SGG. AG ¶ 133. Relator supports this contention by providing a letter from LAMMC's CEO at the time, John Fenton ("Fenton"), to Triggiani's husband, Barrett, on August 5, 2009, asking that SGG stop "all consulting services on behalf of the Hospital" due to Triggiani's exclusion. See Ex. 57, ECF No. 508-9. Finally, Relator alleges that Corporate Defendants knowingly submitted claims to Medicare and Medi-Cal for Triggiani's referrals and prohibited services. AC ¶¶ 203, 223, 229-34, 240-44, 247-58. Thus, the Court finds that Relator's allegations, taken as true, and supporting evidence sufficiently establish scienter.

### 3. *Materiality*

The third element requires that "false statement or course of conduct must be material to the government's decision to pay out moneys to the claimant." Ebeid, 616 F.3d at 997. The FCA defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). The AKS expressly states that a violation constitutes a "false or

fraudulent claim for purposes of the FCA." 42 U.S.C. §
1320a-7b(g). Several courts have found that compliance
with the AKS is material for the purpose of the FCA.
See United States ex. rel. Wood v. Allergan, Inc., 246
F. Supp. 3d 772, 817-18 (S.D.N.Y. 2017) (reversed on
other grounds) (finding compliance with the AKS a
"'material' condition of payment"); United States ex
rel. Lutz. v. Berkeley Heartlab, Inc., No. 9:14-230-
RMG, 2017 WL 6015574, at *1-2 (D.S.C. Dec. 4, 2017)
(same). Moreover, every healthcare provider must
certify it "abides by the medicare laws, regulations,
and program instructions . . . [and] understand[s] that
a payment of a claim by medicare is conditioned upon
the claim and the underlying complying with such laws
. . . including . . . the Federal anti-kickback Statute
. . . .". AC ¶ 45; see 42 CFR § 424.516. Accordingly,
the Court finds that compliance with the AKS is
material to the Government providing Medicare payments
and that, as a result, Relator has sufficiently
established materiality.

4. *Government Harm*

The last element requires that the Government
actually paid out moneys or forfeited moneys due.
United States v. Phoenix, 461 F.3d at 1173. Relator
alleges that through the use of the unlawful kickbacks
and through Triggiani as an excluded manager, Corporate
Defendants obtained reimbursements from Medicare and
Medi-Cal. AC ¶ 160. The AC details patients admitted

under the psych hold scheme, through Triggiani and SGG's referrals, and identifies each patient as a Medicare or Medi-Cal beneficiary whose cost of care was billed to the government health care programs. Id. ¶¶ 195, 203, 223, 229-34, 240-45, 247-64. Relator alleges that the Corporate Defendants billed for Adult Psychiatric Acute Inpatient Care as follows: (1) for the fiscal year ending August 2012, LAMMC billed Medi-Cal and Medicare, respectively, $21,933,450 and $33,331,569; (2) for the fiscal year ending August 2011, $19,470,578 and $30,643,058, respectively; (3) for the fiscal year ending August 2010, $16,029,669 and $27,766,200, respectively; for the fiscal year ending August 2009, $13,391,317 and $29,242,457, respectively; (4) for the fiscal year ending 2008, $21,837,491 and $35,243,416, respectively; (5) for the fiscal year ending 2007, $24,621,161 and $18,316,338, respectively; and (6) for the fiscal year ending August 2006, $19,935,345 and $22,155,549, respectively. AC ¶¶ 314-21.

Based on the foregoing, the Court finds that Relator sufficiently alleges the fourth element of the FCA, and as such, adequately alleges a violation of the FCA and CFCA. Accordingly, the second and third Eitel factors weigh in favor of granting default judgment.

///
///
///

###### iii.   *Factor 4: Money at Stake*

The fourth <u>Eitel</u> factor addresses the sum of money at stake in the action.  <u>Eitel</u>, 782 F.2d at 1471 (citation omitted).  This requires that the Court assess whether the recovery sought is proportional to the harm caused by a defendant's conduct.  <u>See</u> <u>Walters v. Statewide Concrete Barrier, Inc.</u>, No. C 04-2559 JSW, 2006 WL 2527776, at *4 (N.D. Cal. Aug. 30, 2006) ("If the sum of money at issue is reasonably proportionate to the harm caused by the defendant's actions, then default judgment is warranted.").  Here, Relator seeks $111,315,425 in Medicare damages and $75,960,032 in Medi-Cal damages, trebled to $333,946,275 and $227,880,096 respectively.  31 U.S.C. § 3729; Cal. Gov't. Code § 12651.  Default judgment is disfavored when a large amount of money is involved or the requested amount is unreasonable in light of the loss caused by the defendant's actions.  <u>Vogel</u>, 992 F. Supp. 2d at 1012.  However, the Court has significant discretion to determine the amount of damages to be awarded.  <u>See</u> <u>Rolex Watch, U.S.A., Inc. v. Michel Co.</u>, 179 F.3d 704, 712 (9th Cir. 1999); <u>Moroccanoil, Inc. v. Allstate Beauty Prod., Inc.</u>, 847 F. Supp. 2d 1197, 1202 (C.D. Cal. 2012).  Because the Court has discretion in awarding any damages, the Court can ensure that any award will correspond to "the seriousness of the defendant's conduct."  <u>PepsiCo</u>, 238 F. Supp. 2d at 1176.

Although Plaintiff has requested a large sum of money, this factor does not necessarily weigh against granting default judgment. As discussed in further detail below as to the requested relief, Relator has submitted sufficient supporting documentation and evidence for the requested damages. Thus, this factor is neutral.

### iv. *Factor 5: Dispute of Material Fact*

The fifth _Eitel_ factor is the likelihood of a dispute as to material facts. _Eitel_, 782 F.2d at 1471-72 (citation omitted). The claims against all other Defendants have been resolved. Corporate Defendants' previous appearance in this Action suggests there was a dispute, however their failure to obtain new counsel and reappear favors granting default judgment. _LegalZoom.com v. Macey Bankruptcy Law, P.C._, No. 2:13-cv-8620-ODW(MRWx), 2014 WL 961832, at *4 (C.D. Cal. Mar. 12, 2014) (finding failure to obtain new counsel "swings the pendulum back toward entry of default judgment"). Because Relator's factual allegations are presumed true in this context, Relator has supported her claims with ample evidence, and Corporate Defendants have failed to defend themselves, no factual dispute exists that would preclude the entry of default judgment. _See Vogel_, 992 F. Supp. 2d at 1013. Thus, this factor weighs in favor of default judgment.

///

### v. *Factor 6: Excusable Neglect*

Next, courts consider whether the default was due to some excusable neglect. <u>Eitel</u>, 782 F.2d at 1472 (citation omitted). Relator properly served Corporate Defendants with the AC, and Corporate Defendants previously appeared in this Action. After their motion to dismiss was denied nearly five years ago, Corporate Defendants ceased operations and have not reappeared in this Action despite the Court's orders that Corporate Defendants obtain and notify the Court of new counsel. ECF Nos. 187, 198. Corporations cannot appear *pro se*. <u>See</u> <u>Rowland v. California Men's Colony, Unit II Men's Advisory Council</u>, 506 U.S. 194, 202 (1993). Corporate Defendants' Answer to Plaintiff's AC was stricken, thus placing Defendants in default. ECF Nos. 214-15. Because Corporate Defendants had actual knowledge of this lawsuit by previously appearing, but refused to reappear despite ample opportunity to do so, the Court finds that default "did not result from excusable neglect, but rather from willful disobedience." <u>Philip Morris U.S.A. Inc. v. Castworld Prods.</u>, 219 F.R.D. 494, 501 (C.D. Cal. 2003). Accordingly, this factor weighs in favor of granting default judgment.

### vi. *Factor 7: Public Policy*

The seventh <u>Eitel</u> factor considers the strong policy favoring rulings on the merits. <u>Eitel</u>, 782 F.2d at 1472 (citation omitted). Notwithstanding such policy, default judgment is appropriate "[w]here the

26

[d]efendant's failure to appear makes decision on the merits impossible." *Warner Bros. Home Entm't, Inc. v. Slaughter*, CV 13-0892-DOC (RNBx), 2013 U.S. Dist LEXIS 156597, at *9 (C.D. Cal. Oct. 30, 2013) (citing *Craigslist, Inc. v. Naturemarket, Inc.*, 694 F. Supp. 2d 1039, 1061 (N.D. Cal. 2010)). As a result—and because most other *Eitel* factors favor default judgment here—the Court **GRANTS** Relator's Motion for Default Judgment.

    4. <u>Relief</u>

    Since allegations as to the amount of damages within a well-pleaded complaint are not taken as true upon entry of default, a plaintiff is required to provide proof of all damages sought in the complaint. <u>PepsiCo</u>, 238 F. Supp. 2d at 1175. Federal Rule of Civil Procedure 54(c) provides that "a default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings." Here, Relator seeks the following (1) an award of treble damages sustained by the United States and State of California pursuant to 31 U.S.C. § 3729(a)(1); (2) post-judgment interest; and (3) an award to Relator of the *qui tam* plaintiff's share of proceeds pursuant to 31 U.S.C. § 3730(d). AC at 136-37.

        i.  *Treble Damages*

    The FCA and CFCA both provide nearly identical provisions allowing for treble damages. 31 U.S.C. § 3729(a)(1); Cal. Gov't Code § 12651(a). Any individual

who violates the FCA is liable to the United States Government for a civil penalty of not less than $5,500 and not more than $11,000, plus three times the amount of damages which the Government sustains because of that person's actions.  31 U.S.C. § 3729(a); 28 C.F.R. § 85.3(a)(9).  "Ordinarily the measure of the government's damages [under the FCA] would be the amount that it paid out by reason of the false statements over and above what it would have paid if the claims had been truthful." <u>United States v. Mackby</u>, 339 F.3d 1013, 1018 (9th Cir. 2003) (quoting <u>United States v. Woodbury</u>, 359 F.2d 370, 379 (9th Cir. 1966)).  The government has a strong interest in preventing fraud because of the harm that false claims cause both in the form of monetary damages and harm to the integrity of the government.  <u>See</u> <u>id.</u> at 1018-19.

Relator argues that LAMMC's false certifications of compliance rendered its cost reports false in their entirety, as they were conditioned on LAMMC's submission of truthful cost reports to Medicare and Medi-Cal and included interim claims for services in violation of the AKS and excluded provider regulations. Grover Decl. ¶ 11.  Relator seeks total reimbursements from Medicare and Medi-Cal to LAMMC for adult acute psychiatric services from 2007-2010 in the amounts: $111,315,425 for Medicare and $75,860,032 for Medi-Cal, trebled under the FCA and CFCA to $333,946,275 and $227,880,096 respectively.  Mot. at 29:1-7.  Because

the applicable statute of limitations for FCA and CFCA claims is six years after the date the violation is committed, LAMMC only seeks damages for false claims submitted from August 20, 2007, to 2010.  Mot. at 27 n.131; 31 U.S.C. § 3731(b); Cal. Gov't Code § 12654(a). To support her contention, Relator provides LAMMC's Hospital Disclosure Reports for each fiscal year period.  Id., Exs. 1-4, ECF No. 508-3.  The total is broken down as follows:

| Year | Medicare Revenue Psychiatric Acute - Adult | Medi-Cal Revenue Psychiatric Acute – Adult | Citation |
|------|------|------|------|
| 2007 | $18,612,004 | $24,623,858 | Ex. 1 at 35-36. |
| 2008 | $35,562,764 | $21,847,860 | Ex. 2 at 35-36. |
| 2009 | $29,372,807 | $13,391,317 | Ex. 3 at 35-36. |
| 2010 | $27,767,850 | $16,096,997 | Ex. 4 at 35-36. |
| Total | $111,315,425 | $75,960,032 | |
| **Trebled Damages** | **$333,946,275** | **$227,880,096** | |

Grover Decl. ¶ 11.[6]

---

[6] Relator provides further examples of false interim claims, although Relator argues there is no way to identify every single false interim claim as "only [LAMMC] w[as] in the position to observe and record that information."  Mot. at 28 n.139.  For this reason, Relator declined to include these in her request for damages demonstrating a conservative estimation of damages.  For example, Relator provides SGG Case Management/Discharge Planning reports for January to August of 2009, which identify LAMMC patients by medical record number for which Triggiani performed case management and discharge planning services.  See Exs. 28-35. While Triggiani provided these services until at least 2010, Relator was only able to obtain reports covering this eight-month

Based on Relator's allegations, her Motion for Default Judgment, supporting evidence, and the strong interest in preventing fraud, the Court **GRANTS** damages in the amount of $111,315,425 in Medicare damages for Relator's FCA claims and $75,960,032 in Medi-Cal damages for her CFCA claims, trebled to $333,946,274 and $227,880,096, respectively.

ii. *Post-Judgment Interest*

Relator requests post-judgment interest on the default judgment from the date of judgment until the judgment is satisfied. Under 28 U.S.C. § 1961, post-judgment interest "shall be allowed on any money judgment in a civil case recovered in a district court . . . .". Section 1961 further provides that "[s]uch interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment." 28 U.S.C. § 1961. The Ninth Circuit has held that the award of post-judgment interest is mandatory. Barnard v. Theobald, 721 F.3d 1069, 1078 (9th Cir. 2013). Thus, the Court **GRANTS** post-judgment interest, calculated in the manner set forth in 28

---

span because Defendants failed to produce the remaining reports. Grover Decl. ¶ 9. Based off of these numbers, Relator's expert, Mr. Arrigo, was able to identify reimbursements of $3,816,362 for Medicare and $380,867 for Medi-Cal associated with these services. Ex. 83 at 53-55.

U.S.C. § 1961(a).

### iii. *Relator's Share*

Pursuant to the FCA, where the government does not intervene in a *qui tam* action, as in here, the relator "shall receive an amount which the court decides is reasonable for collecting the civil penalty and damages . . . not less than 25 percent and not more than 30 percent of the proceeds of the action or settlement and shall be paid out of such proceeds." 31 U.S.C. § 3730(d)(2).

The district court plays an important role in determining the amount that a *qui tam* plaintiff will receive within the range of 25-30% allowed. United States ex rel. Killingsworth v. Northrop Corp., 25 F.3d 715, 723 (9th Cir. 1994). Certain factors inform the court's determination of what constitutes a reasonable share, including the degree of the relator's involvement in the case. See United States ex rel. Pratt v. Alliant Techsystems, 50 F. Supp. 2d 942, 948 (C.D. Cal. 1999) (finding relator's active involvement and assistance justified an award of 28 of FCA proceeds). Other district courts have also focused on certain factors when determining a reasonable amount to award a relator. United States ex rel. Pedicone v. Mazak Corp., 807 F. Supp. 1350, 1353 (S.D. Ohio 1992) *overruled on other grounds by* United States ex rel. Smith v. Lampers, 69 F. App'x 719 (6th Cir. 2003) (finding significant the relator's personal and

professional expense to himself and awarding 30%).

Here, Relator has been actively involved in this case for ten years, as she began reporting to the Government and cooperating with an ongoing FBI investigation for nearly three years before filing her complaint in 2012.  Declaration of Julie Macias ("Macias Decl.") ¶ 5-35, ECF No. 73-4.  Moreover, Relator provided numerous interviews, documents, and upon being asked to wear a wire, recordings evidencing the fraud.  Id. ¶ 6-13, 15-24, 26-32, 34-35.  Finally, Relator experienced retaliation and emotional distress as a result of her efforts in pursuing these claims, even after the Government declined to intervene. Macias Decl. ¶¶ 7-10, 18-27, ECF No. 248-2.

The Court finds that based on her involvement and exposure, Relator is entitled to a share of the proceeds.  However, Relator requests 29% of Medicare damages and 40% of Medi-Cal damages.  Relator argues that these are the same percentages she received in settlements with the other defendants, and that neither the United States nor the State of California objected to these percentages.  Grover Decl. ¶ 10.  However, Relator cites no authority supporting her argument to receive more than the statutorily allowed percentage. The Court thus exercises its discretion to award Relator 25% of the total proceeds from both the Medicare and the Medi-Cal reimbursements.  Accordingly, the Court **GRANTS** an award to Relator of 25% of the

damages and civil penalties awarded to the Government and the State of California.

### III. CONCLUSION

Based on the foregoing, the Court **GRANTS** Relator's Motion for Default Judgment against Defendants Pacific Health Corporation and Los Angeles Doctors Hospital.

**IT IS SO ORDERED.**

DATED: June 5, 2019

/s/ RONALD S.W. LEW

_____

**HONORABLE RONALD S.W. LEW**
Senior U.S. District Judge